FILED

2012 NOV 20   PM 4: 24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  O'HAGAN SPENCER LLP
2  Julian G. Senior (SBN 219098)
     E-mail: jsenior@ohaganspencer.com
3  David C. Shay (SBN 241702)
     E-mail: dshay@ohaganspencer.com
4  1600 Rosecrans Ave.
5  Bldg. 7 -- Ste. 320
6  Manhattan Beach, CA 90266
   Tel. No.: 310.727.3330
7  Fax No.: 310.727.3331

8  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
9  Clem C. Trischler (Pro Hac Vice to be sought)
     E-mail: CCT@pietragallo.com
10 Emily J. Hicks
11   E-mail: EJH@pietragallo.com
12 One Oxford Centre
   The Thirty-Eighth Floor
13 Pittsburgh, PA  15219
14 Phone No.: (412) 263-2000
   Fax No.: (412) 263-2001
15
16 Attorneys for Defendant
   MYLAN, INC. and MYLAN PHARMACEUTICALS, INC.
17

18                UNITED STATES DISTRICT COURT

19                CENTRAL DISTRICT OF CALIFORNIA

20 DEUNA BROWN, a single individual;        )   CASE No.: CV12  9977
   JEAN COOPER, a single individual;        )
21 STEPHANIE COPLEN, a single               )
   individual; NORMA CRAPP, a single        )   [Los Angeles County Superior Court
22 individual; ANNIE CRAWFORD, a            )   Case No.:  TC027014]
23 single individual; ERELINE               )
   CRAWFORD-TURNER, a single                )   NOTICE OF REMOVAL BY
24 individual; MONICA CROFTON, a            )   DEFENDANTS MYLAN INC. AND
25 single individual; GERRY CROW, a         )   MYLAN PHARMACEUTICALS
   single individual; WILLIAM CRUSE, a      )   INC.,UNDER 28 U.S.C. §§ 1331,
26 single individual; CYNTHIA               )   1332, 1367, 1441, 1446, AND 1453
27 CUELLAR, a single individual;            )   [Filed Concurrently with
   JERRY CUNNINGHAM, a single               )   Declaration of Emily J. Hicks in
28 individual; ELGIN DABBS, a single        )   Support of Mylan Defendants'
                                            )   Notice of Removal]

                                      1

individual; JUDITH DANIELS, a single individual; VERTA DANZY, a single individual; MYRTLE DARLING, a single individual; JOHNNY DAUGHERTY, a single individual; CYNTHIA DAVIS, a single individual; EVELYN DAVIS, a single individual; GWENDOLYN DAVIS, a single individual; KWAME DAVIS, a single individual; LINDA DAVIS, a single individual; ROSENELL DAVIS, a single individual; KATHY DAY, a single individual; RICHARD DAYNE, a single individual; JEFFREY DEAMER, a single individual; RICHARD DEGEARE, a single individual; BENITA DENSON, a single individual; BARBARA DICE, a single individual; MARILYN DICKSON, a single individual; DAVID DOTY, a single individual; DONALD DRUM, a single individual; NANCY DRUMMOND, a single individual; ELMO DUNCAN, a single individual; SHIRLEY DUNLAP, a single individual; HARRY DUNMIRE, a single individual; VERNA DUPLECHAIN, a single individual; DAVID EASLEY, a single individual; SHARRON EATON, a single individual; CLARENCE EBERSOLE, a single individual; KAREN EDWARDS, a single individual; DELPHINE ELLIS, a single individual; ERVIN ELLISON, a single individual; ANTHONY ESPOSITO, a single individual; JOHNSON EVANS, a single individual; JAY FAIGEN, a single individual; GEORGE FARES, a single individual; LORRAINE FARRELL, a single individual; NORMA FIELDS, a

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Action Filed: November 13, 2012**
**Removal Date: November 20, 2012**

2
NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

single individual; AGNES FILO, a single individual; and, MATTHEW FOSTER, a single individual,

Plaintiffs,

vs.

MCKESSON CORPORATION; ELI LILLY AND COMPANY; AAIPHARMA, INC; AAIPHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN PHARMACEUTICALS INC; XANODYNE PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC; GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS HOLDINGS; INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN INC.; MALLINCKRODT INC.; WATSON PHARMACEUTICALS, INC.;

3

1 | and DOES 1 through 50, inclusive,  )
2 | Defendants.  )

3    Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. ("Removing

4 Defendants") hereby remove to this Court the state court action described below.

5 Removal is warranted under 28 U.S.C. §§ 1441(b), 1446, and 1453 because this is a

6 civil action over which this Court has original jurisdiction under 28 U.S.C. §§ 1331,

7 1332, and 1367.  In support of removal, Removing Defendants state as follows:

8 ## BACKGROUND

9    1.    On or about November 13, 2012, Plaintiffs commenced this action by

10 filing a complaint in the Superior Court of Los Angeles County, in the State of

11 California, bearing case number TC027014.  Plaintiffs are 50 individuals who allege

12 cardiovascular injuries as a result of ingestion of prescription pain medications

13 containing the active ingredient propoxyphene.  (*See* Ex. A, Compl. ¶ 1.)  Plaintiffs

14 improperly fail to allege where any of them reside (except to state that Plaintiff

15 Deuna Brown is a resident of this State (*id.* ¶ 14)), which form of propoxyphene they

16 took, which Defendant manufactured it, or what cardiovascular injury they allegedly

17 experienced.

18    2.    Plaintiffs assert claims against numerous entities they allege are or were

19 involved in the manufacture of brand name and generic prescription pain medications

20 containing propoxyphene (*id.* ¶¶ 25-89) and also against one purported distributor of

21 prescription medications, McKesson Corporation ("McKesson").   (*Id.* ¶¶ 18-24.)

22 Plaintiffs seek to recover compensatory and punitive damages against all Defendants

23 under numerous legal theories, including that the entities allegedly involved in the

24 manufacture of generic prescription medications containing propoxyphene (the

25 "Generic Defendants") have improperly breached their duty to use the same FDA-

26 approved labeling as the brand companies.  (*See id.* ¶¶ 5-7.)

27    3.    The instant action is one of more than twenty multi-plaintiff lawsuits

28 alleging injuries from ingestion of propoxyphene-containing pain products filed from

4

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1   approximately November 9, 2012 to November 16, 2012, in numerous California
2   counties.  These lawsuits join the seven similar lawsuits filed in Los Angeles and San
3   Francisco Counties in late 2011 and early 2012.

4       4.      On October 23, 2012, attorneys from Khorammi, LLP (Oakland CA),
5   Davis & Crump PC (Gulfport MS), The Sill Law Group PLLC (Edmond OK) and
6   Pearson Randall & Schumacher, PA (Minneapolis, MN)  ("Coordination Counsel")
7   filed a petition with the California Judicial Counsel to establish a coordinated
8   proceeding before a single trial judge for California state-court products liability
9   actions alleging personal injuries due to prescription pain medications containing
10  propoxyphene.  (*See* Ex. B, Pet. for Coord.)  In support of the Petition, Coordination
11  Counsel claims that "[o]ne judge hearing all of the actions for all purposes in a
12  selected site or sites will promote the ends of justice."  (Ex. C, Mem. in Support of
13  Pet. for Coord. at 8.)

14      5.      The Petition for Coordination specifically identifies the seven "original"
15  actions described in paragraph 3 above, which embrace the claims of more than 100
16  individual Plaintiffs, and specifically states that Coordination Counsel intends to
17  include in the coordination additional, then-unfiled claims.  (*Id.*)  Significantly,
18  subsequent to the filing of the Petition for Coordination, Elise Sanguinetti, whose
19  firm Khorarmi LLP serves as Coordination Counsel and who submitted a declaration
20  in support of the Petition for Coordination, has moved to stay the seven original
21  actions pending a ruling on coordination, stating that "[c]oordination of all the
22  California Propoxyphene cases makes sense." (See Ex. D, Mem. in Supp. of Mot. to
23  Stay at 4, Freitas v. McKesson Corp., No. CGC 11-515537 (Cal. Super. Ct. S.F.
24  County Nov. 9, 2012),.)  Thus, the Petition now embraces the claims of more than
25  500 individual Plaintiffs.

26      6.      As set forth more fully below, this case is properly removed to this
27  Court pursuant to 28 U.S.C. § 1441 because there is federal jurisdiction on three
28  independent grounds – (a) as a mass action, pursuant to 28 U.S.C. § 1332(d)(11); (b)

under federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367; and (c) as an action between citizens of different states in which the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332(a) – and Removing Defendants have satisfied the procedural requirements for removal set forth in 28 U.S.C. §§ 1446 and 1453.

<u>**THIS CASE IS REMOVABLE AS A MASS ACTION**</u>

7.      This case is removable pursuant to the mass action provisions of the diversity jurisdiction statute.  28 U.S.C. § 1332(d)(11).  An action is removable as a mass action where it meets the following requirements:

a.      It involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, *see id.* § 1332(d)(11)(B)(i);

b.      The aggregate amount in controversy exceeds $5,000,000 and the claims of the individual plaintiffs each exceed the amount of $75,000, *see id.* §§ 1332(a), (d)(2), (d)(11)(B)(i); and

c.      Any plaintiff is a citizen of a State different from any defendant, *see id.* § 1332(d)(2)(A).

8.      As set forth below, this action and the other propoxyphene actions embraced by the Petition for Coordination satisfy all the jurisdictional requirements for a mass action.  In addition, Removing Defendants have satisfied all procedural requirements for removal of a mass action pursuant to 28 U.S.C. §§ 1446 and 1453.  Accordingly, mass action removal is proper.

**A.      The Petition for Coordination Proposes Joint Trial of the Claims of 100 or More Persons**

9.      This action is removable as a mass action because the Petition for Coordination proposes to try this case jointly with numerous other propoxyphene actions embracing the claims of more than 500 individuals.  (*See* Pet. for Coord. at 3-7.)  As the Seventh Circuit recently held in *In re Abbott Laboratories, Inc.*, No. 12-

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

8020, 2012 WL 4875584 (7th Cir. Oct. 16, 2012) (to be published in F.3d), a petition for state-court coordination of individual actions may render those actions a "mass action" for purposes of removal where, as here, the coordination petition proposes joint trial of the individual actions. *See id.* at *1. And while a mass action does not result where individual actions are joined "upon motion of a defendant," 28 U.S.C. § 1332(d)(11)(B)(ii)(II); *see also Tanoh v. Dow Chemical Co.*, 561 F.3d 945, 953 (9th Cir. 2009); *Anderson v. Bayer Corp.*, 610 F.3d 390, 393 (7th Cir. 2010), there is no such barrier where, also as here, the proposal for joint trial originates with the plaintiffs. *See Abbott*, 2012 WL 4875584, at *3.

10.    Here, the proposal for joint trial in the Petition for Coordination is even clearer than it was in *Abbott*. In that case, the Seventh Circuit held that a petition for coordination need not specifically request joint trial because "a proposal for a joint trial can be implicit." *Id.* at *3; *see also Bullard v. Burlington N. Santa Fe Ry. Co.*, 535 F.3d 759, 762 (7th Cir. 2008); *Koral v. Boeing Co.*, 628 F.3d 945, 947 (7th Cir. 2011). The Seventh Circuit found that the plaintiffs' coordination petition implicitly requested a joint trial where it sought coordination "'through trial'" and "'not solely for pretrial proceedings'" and asserted that coordination "through trial 'would also facilitate the efficient disposition of a number of universal and fundamental substantive questions applicable to all or most Plaintiffs' cases *without the risk of inconsistent adjudication* in those issues between various courts.'" *Abbott*, 2012 WL 4875584, at *3 (citation omitted).

11.    Here, the Petition for Coordination presents all of the factors (and more) that the Seventh Circuit held constituted a request for a joint trial in *Abbott*. Initially, like the *Abbott* plaintiffs' request for coordination "through trial," the Petition here proposes "*[o]ne judge* hearing *all of the actions* for *all purposes* in a selected site or sites" in order to "promote the ends of justice." (Mem. in Supp. of Pet. for Coordination at 8 (emphasis added).) Coordination for "all purposes" naturally embraces coordination for trial.

12.     Moreover, like the *Abbott* plaintiffs' assertions concerning the "*risk of inconsistent adjudication*," the Petition for Coordination here emphasizes that "[f]ailure to coordinate these actions will result in the disadvantages of duplicate and inconsistent rulings, orders, or judgments" as to "issues pertaining to liability, allocation of fault and contribution, as well as the same wrongful conduct of defendants." (Mem. in Supp. of Pet. for Coordination at 10; *see also id.* at 6, 8; Ex. E, Sanguinetti Decl. in Supp. of Coordination ¶ 11 ("Without coordination, two or more separate courts will decide essentially the same issues and may render different rulings on liability and other issues.").)   In the same vein, the Petition for Coordination here argues that there are "common issues" among each of the constituent actions, including *whether the plaintiffs are entitled to compensatory and punitive damages*.  (*See* Sanguinetti Decl. in Supp. of Coordination ¶ 7.)   The Petition's proposal to resolve the determinations of liability, allocation of fault, and award of compensatory and punitive damages as "common issues" necessarily requires a joint trial.[1]

13.     Indeed, the Seventh Circuit cited similar remarks by plaintiffs concerning the risk of inconsistent adjudication of purported common issues when it observed that "it is difficult to see how a trial court could consolidate the cases as requested by plaintiffs and not hold a joint trial or an exemplar trial with the legal issues applied to the remaining cases.  In either situation, plaintiffs' claims would be tried jointly."   *Abbott*, 2012 WL 4875584, at *3; *see also* 28 U.S.C. § 1332(d)(11)(B)(i) (providing that the mass action standard is satisfied where joint trial is proposed "on the ground that the plaintiffs' claims involve common questions of law or fact").   Thus, even a joint trial as to certain issues, which the Petition for Coordination repeatedly suggests in its discussion of avoiding inconsistent rulings as to "common issues," is sufficient to establish mass action jurisdiction pursuant to 28

---

[1] Removing Defendants do not concede that Plaintiffs are entitled to a joint trial, but merely note that the Petition for Coordination proposes one, thereby entitling Defendants to remove the cases pursuant to the mass action provisions of 28 U.S.C. § 1332.

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1   U.S.C. § 1332(d)(11).

2       14.   In addition, the Petition for Coordination envisions that a joint trial

3   would put pressure on Defendants to settle all California propoxyphene cases.

4   Coordination Counsel's declaration in support of the Petition states that one of the

5   primary motivating factors for settling cases is "the avoidance of the risk of an

6   adverse judgment at trial."  (Sanguinetti Decl. in Supp. of Coordination ¶ 12.)

7   Coordination Counsel argues that coordination is mandated here because if the cases

8   are not coordinated, "[s]ettlement of one of these cases may not end the litigation in

9   the other . . . cases."  (*Id.*)  Implicit in this call for settlement is a proposal for joint

10  trial:  in order for the threat of adverse judgment at trial to compel settlement or end

11  litigation in the other cases, there must be either a joint trial of all cases, or a

12  judgment at an exemplar trial that is binding on the other cases.  Thus, "[i]n either

13  situation" there is a proposal for joint trial and the first mass action requirement is

14  satisfied.  *Abbott*, 2012 WL 4875584, at *3.

15      15.   Finally, as in *Abbott*, Plaintiffs have done nothing to suggest that they

16  propose   coordination   "solely   for   pretrial   proceedings."     28   U.S.C.   §

17  1332(d)(11)(B)(ii)(IV); *see also Abbott*, 2012 WL 4875584, at *3.  To the contrary,

18  for all the reasons set forth above, the Petition for Coordination necessarily

19  constitutes a proposal for coordination for trial.

20      16.   Accordingly, the Petition for Coordination proposes joint trial of the

21  monetary claims of more than 100 individuals, and the first requirement of mass

22  action removal is satisfied.

23      **B.    The Amount in Controversy Is Satisfied**

24      17.   Both the individual $75,000 and aggregate $5,000,000 amount in

25  controversy requirements for mass action removal are readily satisfied.  *See* 28

26  U.S.C. §§ 1332(a), (d)(2), (d)(11)(B)(i).  Indeed, the Petition for Coordination itself

27  admits that there are "multi-millions of dollars at stake" in these cases (Pet. for

28  Coord. at 10), and Coordination Counsel has publicly stated that the propoxyphene

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  litigation "has the potential to be in the billions of dollars for recoveries around the

2  country."[2]

3      18.   First, it is apparent from the face of the Complaint, and the serious

4  nature of the "severe cardiovascular injuries" alleged by each Plaintiff (*see* Compl. ¶

5  90), that the amount in controversy exceeds $75,000 for each Plaintiff, just as it is for

6  the claims in the other actions embraced by the Petition.  Where, as here, Plaintiffs

7  allege serious bodily injuries, courts have readily found that the amount-in-

8  controversy requirement is satisfied.  *See In re Rezulin Prods. Liab. Litig.*, 133 F.

9  Supp. 2d 272, 296 (S.D.N.Y. 2001).  In addition, compensatory and punitive damages

10  in excess of the jurisdictional amount of $75,000 have been awarded in products

11  liability cases in California.  *See, e.g.*, *Stewart v. Union Carbide Corp.*, 190 Cal. App.

12  4th 23, 38, 117 Cal. Rptr. 3d 791, 804 (2010); *Karlsson v. Ford Motor Co.*, 140 Cal.

13  App. 4th 1202, 1223-24, 45 Cal. Rptr. 3d 265, 282-83 (2006); *Jones v. John Crane,*

14  *Inc.*, 132 Cal. App. 4th 990, 1012, 35 Cal. Rptr. 3d 144, 161 (2005).  Other federal

15  courts have thus concluded that the amount in controversy exceeded $75,000 in

16  similar pharmaceutical cases.  *See, e.g.*, *Smith v. Wyeth, Inc.*, 488 F. Supp. 2d 625,

17  630-31 (W.D. Ky. 2007) (denying motion to remand); *accord Copley v. Wyeth, Inc.*,

18  No. 09-722, 2009 WL 1089663, at *3 (E.D. Pa. Apr. 22, 2009).  In addition, because

19  Plaintiffs' demands for punitive damages are also includable in the amount in

20  controversy, *see Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th Cir.

21  2007), it is evident, from the face of the Complaint, that the amount of recovery

22  sought by each Plaintiff exceeds $75,000.[3]

23

24      [2] Olivia Whitaker, *Oklahoma Attorney Predicts Billions of Dollars in Darvocet Lawsuit Recoveries* (Feb. 9, 2011), *available at* http://www.articlesbase.com/mental-health-

25  articles/oklahoma-attorney-predicts-billions-of-dollars-in-darvocet-lawsuit-recoveries-4199525.html.

26      [3] Removing Defendants note that they are not required to concede that Plaintiffs are, in fact,

27  entitled to recover more than $75,000.  *See Kelderman v. Remington Arms Co.*, 734 F. Supp. 1527, 1528 (S.D. Iowa 1990) (rejecting a plaintiff's attempt to "place [a] defendant in the awkward

28  position of embracing a concession on the important issue of damages," to establish jurisdiction, noting that a "defendant need not go that far").  Indeed, Removing Defendants specifically deny that Plaintiffs are entitled to recover any damages.

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

19.     Second, because each individual Plaintiff's claim exceeds $75,000, the aggregate amount in controversy for putative coordinated litigation, which embraces the claims of more than 500 individuals, necessarily exceeds $5,000,000, since $75,000 multiplied by 500 is $37,500,000.

20.     Accordingly, the amount-in-controversy requirement is satisfied.

**C.     The Diversity Requirement Is Satisfied**

21.     The diversity requirements for mass action removal have been satisfied. *See* 28 U.S.C. § 1332(d)(2)(A).  While diversity removal normally requires complete diversity between plaintiffs and defendants, for removal of a mass action, only "minimal diversity" is required – i.e., that at least one plaintiff be diverse from one defendant.  *See id.*  This requirement is readily satisfied here:  Plaintiff Deuna Brown, a citizen of California (Compl. ¶ 14), is diverse from Lilly, a citizen of Indiana.  (*Id.* ¶ 25.)

22.     Accordingly, all the jurisdictional requirements of mass action removal are satisfied.

**THIS CASE IS REMOVABLE UNDER FEDERAL QUESTION AND SUPPLEMENTAL JURISDICTION**

23.     This action is removable under the CAFA "mass action" provisions alone.  However, as a separate and independent basis for removal, this action is also properly removable under 28 U.S.C. §§ 1331 and 1367.  Plaintiffs' claims against Generic Defendants are removable because they necessarily raise a substantial and disputed question of federal law.  In addition, all remaining claims are removable subject to the Court's supplemental jurisdiction.

**A.     Plaintiffs' Claims Against Generic Defendants Are Removable Because They Necessarily Raise Substantial Issues of Federal Law**

24.     Plaintiffs' claims against Generic Defendants are removable because they necessarily raise a substantial and disputed question of federal law.  The Supreme Court has held that state-law claims are removable under federal question jurisdiction pursuant to 28 U.S.C. § 1331 where they "necessarily raise a stated

11

1    federal issue, actually disputed and substantial, which a federal forum may entertain

2    without disturbing any congressionally approved balance of federal and state judicial

3    responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S.

4    308, 314 (2005).

5      25.   Federal jurisdiction exists where a state law claim necessarily involves

6    the construction or application of federal law. *See, e.g.*, *D'Alessio v. New York Stock*

7    *Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir. 2001) ("[A] case is deemed 'to arise under'

8    federal law 'where the vindication of a right under state law necessarily turn[s] on

9    some construction of federal law.'") (alteration in original) (quoting *Franchise Tax*

10    *Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983)).

11      26.   In addition, this Court has original and removal jurisdiction of civil

12    actions, such as this one, that arise "under the Constitution, laws, or treaties of the

13    United States." 28 U.S.C. § 1331, 1441(a).   Among the civil actions that "arise

14    under" federal law are "state-law claims that implicate significant federal issues."

15    *Grable*, 545 U.S. at 312.   Such claims capture the "commonsense notion that a

16    federal court ought to be able to hear claims recognized under state law that

17    nonetheless turn on substantial questions of federal law, and thus justify resort to the

18    experience, solicitude, and hope of uniformity that a federal forum offers on federal

19    issues." *Id.*

20      27.   Thus, federal question jurisdiction also exists where, as here, a "state

21    law claim necessarily raise[s] a stated federal issue, actually disputed and substantial,

22    which a federal forum may entertain without disturbing any congressionally approved

23    balance of federal and state judicial responsibilities." *Id.* at 314.

24      28.   The claims asserted in Plaintiffs' Complaint meet both of these

25    standards for federal question jurisdiction. As the Eastern District of New York has

26    recently held, claims against generic defendants are removable under *Grable* where,

27    like Plaintiffs' claims here, they allege that the generic defendants are liable in

28    failure-to-warn due to breach of their federal duty to use the same FDA-approved

1 labeling as the brand defendants. *Bowdrie v. Sun Pharm. Indus. Ltd.*, No. 12-CV-853
2 (WFK) (MDG), 2012 WL 5465994 (E.D.N.Y. Nov. 9, 2012).

3    29. As recognized by the Supreme Court in *PLIVA, Inc. v. Mensing*, 131 S.
4 Ct. 2567 (2011), generic defendants are prohibited by federal law from independently
5 changing the labeling for their products, but are instead required by federal law to use
6 labeling identical to the FDA-approved labeling used by the brand defendant. *See id.*
7 at 2578. The plaintiffs in *Bowdrie* alleged that the generic defendants were liable on
8 state-law failure-to-warn claims because they breached their duty to employ the same
9 labeling as the brand defendants. 2012 WL 5465994, at *1.

10    30. The *Bowdrie* court held that the plaintiffs' state-law claims that generic
11 defendants "failed to meet their ongoing duty of sameness by failing to . . . update
12 their FDA-approved labeling to mirror updated [brand drug] labeling . . . . necessarily
13 raise[d] a federal question." 2012 WL 5465994, at *3 ("A question of federal law is
14 a necessary element of Plaintiffs' state law causes of action."). The court further held
15 that this federal question was substantial because it:

16
17      goes far beyond simply incorporating a federal standard into a
     state law cause of action. To the extent they invoke the "federal
18      duty of sameness," Plaintiffs' causes of action implicate the
     labeling requirements for generic drug manufacturers nationwide.
19      The federal question present in this case involves a responsibility
     that is in the first instance, and primarily, federal: regulation of
20      the manufacture, marketing, and distribution of drugs.

21 *Id.* at *4. Thus, the court held, the Plaintiffs' claims were removable under federal
22 question jurisdiction under the rule of *Grable*. *Id.* at *3.

23    31. The same reasoning applies to this action, where, just like in *Bowdrie*,
24 Plaintiffs claim that Generic Defendants are liable in failure-to-warn due to their
25 alleged failure to update their labeling to conform to the brand. (*See* Compl. ¶¶ 6-7.)

26    32. It is irrelevant that Plaintiffs may not have intended to plead a state law
27 cause of action that raises a substantial and disputed issue of federal law to establish a
28 basis for jurisdiction arising from a federal question. In *Grable*, the Supreme Court

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

held that federal question jurisdiction exists when a state law cause of action raises a substantial federal question that is in dispute. *Grable*, 545 U.S. at 316-20. Plaintiffs may not avoid this result through artful pleading. *See Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998) (holding that "[i]f a court concludes that plaintiff has 'artfully pleaded' claims" by omitting to plead federal questions, "it may uphold removal even though no federal question appears on the face of the plaintiff's complaint").

33.    Accordingly, Plaintiffs' failure-to-update claims against Generic Defendants are properly removable under federal question jurisdiction pursuant to the rule of *Grable* because they necessarily (indeed, affirmatively) raise a substantial, disputed issue of federal law.

### B.    Supplemental Jurisdiction Extends to All Other Claims

34.    This Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). As set forth above, Plaintiffs' claims against Generic Defendants are within the Court's original jurisdiction pursuant to 28 U.S.C. § 1331. On an individual, per-Plaintiff basis, all other claims in this action arise out of the same case or controversy in that they seek relief in connection with personal injuries allegedly due to the ingestion of a propoxyphene-containing pain medication.

35.    Accordingly, there is supplemental jurisdiction over all other claims in this action.

### THIS CASE IS REMOVABLE UNDER DIVERSITY JURISDICTION

36.    This Court has subject-matter jurisdiction over this action under the CAFA "mass action" provisions alone. However, as a separate and independent basis for subject-matter jurisdiction, this case is removable pursuant to 28 U.S.C. §§ 1332 and 1441 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different States. Initially, the amount-in-controversy requirement is satisfied for the

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

reasons set forth in the mass action section above.  Further, although Plaintiffs have improperly failed to allege the citizenship of any Plaintiff other than Deuna Brown, Removing Defendants state, upon information and belief and subject to appropriate additional information to be obtained, that complete diversity exists in this case pursuant to the theories of fraudulent joinder and fraudulent misjoinder.  Removing Defendants have asserted diversity jurisdiction at this time in order to avoid waiver of this basis for removal in connection with their removal of this action under the CAFA mass action provisions set forth above.

### A. No Manufacturing Defendant Is a California Citizen

37. The Defendants allegedly involved in the manufacture, marketing, and/or sale of prescription pain medications containing propoxyphene are citizens of Alabama, Delaware, Indiana, Ireland, Kentucky, Maryland, Massachusetts, Missouri, Nevada, North Carolina, Pennsylvania, and West Virginia, and are thus completely diverse from Plaintiffs.

a. Removing Defendants are informed and believe that Defendant Eli Lilly and Company is incorporated under the laws of Indiana and has its principal place of business in Indiana, and is therefore a citizen of Indiana for purposes of diversity.

b. Removing Defendants are informed and believe that Defendant aaiPharma Inc. is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and is therefore a citizen of Delaware and North Carolina for purposes of diversity.

c. Removing Defendants are informed and believe that Defendant AAIPharma LLC is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and is therefore a citizen of Delaware and North Carolina for purposes of diversity.

d. Removing Defendants are informed and believe that Defendant AAI Development Services Inc. is incorporated under the laws of Delaware and has

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  its principal place of business in North Carolina, and is therefore a citizen of
2  Delaware and North Carolina for purposes of diversity.

3        e.     Removing Defendants are informed and believe that Defendant
4  NeoSan Pharmaceuticals Inc. is incorporated under the laws of Delaware and has its
5  principal place of business in North Carolina, and is therefore a citizen of Delaware
6  and North Carolina for purposes of diversity.

7        f.     Removing Defendants are informed and believe that Defendant
8  Xanodyne Pharmaceuticals, Inc. is incorporated under the laws of Delaware and has
9  its principal place of business in Kentucky, and is therefore a citizen of Delaware and
10  Kentucky for purposes of diversity.

11        g.     Removing Defendants are informed and believe that Defendant
12  Qualitest Pharmaceuticals, Inc. is incorporated under the laws of Alabama and has its
13  principal place of business in Alabama, and is therefore a citizen of Alabama for
14  purposes of diversity.

15        h.     Removing Defendants are informed and believe that Defendant
16  Vintage Pharmaceuticals, Inc. is incorporated under the laws of Alabama and has its
17  principal place of business in Alabama, and is therefore a citizen of Alabama for
18  purposes of diversity.

19        i.     Removing Defendants are informed and believe that Defendant
20  Propst Distribution, Inc. is incorporated under the laws of Alabama and has its
21  principal place of business in Alabama, and is therefore a citizen of Alabama for
22  purposes of diversity.

23        j.     Removing Defendants are informed and believe that Defendant
24  Brenn Distribution, Inc. is incorporated under the laws of Alabama and has its
25  principal place of business in Alabama, and is therefore a citizen of Alabama for
26  purposes of diversity.

27        k.     Removing Defendants are informed and believe that Defendant
28  Brenn Manufacturing Inc. is incorporated under the laws of Alabama and has its

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  principal place of business in Alabama, and is therefore a citizen of Alabama for
2  purposes of diversity.

3         l.     Removing Defendants are informed and believe that Defendant
4  Cornerstone Biopharma, Inc. is incorporated under the laws of Nevada and has its
5  principal place of business in North Carolina, and is therefore a citizen of Nevada and
6  North Carolina for purposes of diversity.

7         m.    Removing Defendants are informed and believe that Defendant
8  Cornerstone Biopharma Holdings, Inc. is incorporated under the laws of Delaware
9  and has its principal place of business in North Carolina, and is therefore a citizen of
10 Delaware and North Carolina for purposes of diversity.

11        n.     Removing Defendants are informed and believe that Defendant
12 Teva Biopharmaceuticals, Inc. is incorporated under the laws of Delaware and has its
13 principal place of business in Maryland, and is therefore a citizen of Delaware and
14 Maryland for purposes of diversity.

15        o.     Removing Defendants are informed and believe that Defendant
16 Teva Pharmaceuticals USA, Inc. is incorporated under the laws of Delaware and has
17 its principal place of business in Pennsylvania, and is therefore a citizen of Delaware
18 and Pennsylvania for purposes of diversity.

19        p.     Defendant Mylan Pharmaceuticals Inc. is incorporated under the
20 laws of West Virginia and has its principal place of business in West Virginia, and is
21 therefore a citizen of West Virginia for purposes of diversity.

22        q.     Defendant Mylan, Inc. is incorporated under the laws of
23 Pennsylvania and has its principal place of business in Pennsylvania, and is therefore
24 a citizen of Pennsylvania for purposes of diversity.

25        r.     Removing Defendants are informed and believe that Defendant
26 Covidien plc is incorporated under the laws of Ireland and is therefore a citizen of
27 Ireland for purposes of diversity.

28        s.     Removing Defendants are informed and believe that Defendant

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1    Covidien Inc. is incorporated under the laws of Delaware and has its principal place
2    of business in Massachusetts, and is therefore a citizen of Delaware and
3    Massachusetts for purposes of diversity.

4       t.  Removing Defendants are informed and believe that Defendant
5    Mallinckrodt Inc. is incorporated under the laws of Delaware and has its principal
6    place of business in Missouri, and is therefore a citizen of Delaware and Missouri for
7    purposes of diversity.

8       u.  Removing Defendants are informed and believe that Defendant
9    Watson Pharmaceuticals, Inc. is incorporated under the laws of Nevada and has its
10   principal place of business in New Jersey, and is therefore a citizen of Nevada and
11   New Jersey for purposes of diversity.

12      v.  Removing Defendants are informed and believe that Defendant
13   Endo Pharmaceuticals Holdings Inc. is incorporated under the laws of Delaware and
14   has its principal place of business in Pennsylvania and is therefore a citizen of
15   Delaware and Pennsylvania for purposes of diversity.

16      w.  Removing Defendants are informed and believe that Defendant
17   Endo Pharmaceuticals Inc. is incorporated under the laws of Delaware and has its
18   principal place of business in Pennsylvania and is therefore a citizen of Delaware and
19   Pennsylvania for purposes of diversity.

20      x.  Removing Defendants are informed and believe that Defendant
21   Generics International (US Parent), Inc. is incorporated under the laws of Delaware
22   and has its principal place of business in Alabama, and is therefore a citizen of
23   Delaware and Alabama for purposes of diversity.

24      y.  Removing Defendants are informed and believe that Defendant
25   Generics International (US), Inc. is incorporated under the laws of Delaware and has
26   its principal place of business in Alabama, and is therefore a citizen of Delaware and
27   Alabama for purposes of diversity.

28      z.  Removing Defendants are informed and believe that Defendant

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  Vintage Pharmaceuticals, LLC is a limited liability company and therefore has the
2  citizenship of its members for purposes of diversity. Defendant Generics
3  International (US), Inc. is the sole member of Vintage Pharmaceuticals, LLC, and
4  therefore, for diversity purposes, Vintage Pharmaceuticals, LLC is deemed a citizen
5  of Delaware and Alabama.

6           aa.    Removing Defendants are informed and believe that Defendant
7  Generics Bidco I, LLC is a limited liability company and therefore has the citizenship
8  of its members for purposes of diversity. Generics International (US), Inc. is the sole
9  member of Generics Bidco I, LLC, and therefore, for diversity purposes, Generics
10 Bidco I, LLC is deemed a citizen of Delaware and Alabama.

11          bb.    Removing Defendants are informed and believe that Defendant
12 Generics Bidco II, LLC is a limited liability company and therefore has the
13 citizenship of its members for purposes of diversity. Generics International (US),
14 Inc. is the sole member of Generics Bidco II, LLC, and therefore, for diversity
15 purposes, Generics Bidco II, LLC is deemed a citizen of Delaware and Alabama.

16     **B.    McKesson Is Fraudulently Joined**

17      38.    Only McKesson, an alleged "Distributor Defendant" in this action, is
18 purportedly a citizen of California, because McKesson is allegedly incorporated
19 under the laws of Delaware and has its principal place of business in California. (*See*
20 Compl. ¶ 18.) As set forth below, McKesson has been fraudulently joined to this
21 action, and thus its citizenship should be disregarded for purposes of diversity.

22      39.    Under the fraudulent-joinder doctrine, a court should disregard the
23 citizenship of a defendant where, as here, there is "no possibility that the plaintiff will
24 be able to establish a cause of action in state court against the alleged sham
25 defendant." *Taylor v. Jeppesen DataPlan, Inc.*, No. C 10-1920 SBA, 2010 U.S. Dist.
26 LEXIS 106160, at *5 (N.D. Cal. Sept. 27, 2010) (internal quotation marks and
27 citation omitted). Non-diverse defendants are fraudulently joined – and their
28 presence in the lawsuit is thus ignored for purposes of determining the propriety of

removal – where no viable cause of action has been stated against them.  *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001); *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d 1089, 1100 (C.D. Cal. 2002); *United Computer Sys., Inc. v. AT & T Corp.*, 298 F.3d 756, 761 (9th Cir. 2002); *see also Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 393 (5th Cir. 2000) (pursuant to the fraudulent-joinder doctrine, a court should disregard the citizenship of an in-state defendant where, as here, "there is no reasonable basis for predicting that plaintiffs might establish liability . . . against the in-state defendants"); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (affirming district court's finding of fraudulent joinder and recognizing that a "reasonable" basis to predict that a plaintiff could prevail on his or her claims against the in-state defendants requires more than a "theoretical" basis).  That is the case here, for there is no possibility "'that the plaintiff[s] will be able to establish [their] cause[s] of action in state court against'" McKesson.  *Taylor*, 2010 U.S. Dist. LEXIS 106160, at *5 (citation omitted).

40.    All of Plaintiffs' claims against McKesson – both those that challenge the labeling for propoxyphene and those that challenge its design – fail as a matter of law.  In *Mensing*, the Supreme Court held that state-law claims challenging the labeling of a generic prescription medication are preempted, because federal law requires generic defendants to use the same labeling as the branded manufacturer and prohibits those generic defendants from independently changing the FDA-approved labeling.   131 S. Ct. at 2578.[4]  As explained by the court in *In re Fosamax (Alendronate Sodium) Products Liability Litigation (No. II),* MDL No. 2243 (JAP-

---

[4] The Ninth Circuit has recognized that a dispositive affirmative defense – here, federal preemption – may serve as the basis for a showing of fraudulent joinder.  *See Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313 (9th Cir. 1998).  That showing is not barred by the common defense rule, which applies "only when the common defense asserted would be equally dispositive as to *all* of the defendants."  *McDonal v. Abbott Labs.*, 408 F.3d 177, 184 (5th Cir. 2005).  Here, *Mensing* preemption is not dispositive as to all Defendants and it may apply in different ways with respect to Generic Defendants and distributors such as McKesson based on the federal law and regulations applicable to each.

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  LHG), 2012 WL 181411 (D.N.J. Jan. 17, 2012), the Supreme Court's holding in

2  *Mensing* also preempts all failure-to-warn claims against distributors of prescription

3  medications like McKesson, because such distributors are also not authorized to

4  change product labeling under federal law. *Id.* at *3; *accord Stevens v. Cmty. Health*

5  *Care, Inc.*, 29 Mass. L. Rptr. 153 (Mass. Super. Ct. Essex County 2011).

6      41.    Likewise, Plaintiffs' claims against McKesson challenging the product's

7  design are barred because a distributor of prescription medications, like a generic

8  defendant, is no more free to change the design and composition of the FDA-

9  approved products it sells than it is to change the labeling, as numerous courts have

10 recognized. *See In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, MDL

11 No. 2226, 2012 WL 718618, at *3 (E.D. Ky. Mar. 5, 2012) (dismissing as preempted

12 all claims "based on the allegedly defective design of the drug, which the Generic

13 Defendants, bound by their 'ongoing federal duty of sameness,' were powerless to

14 change" (citation omitted)); *accord, e.g.*, *In re Pamidronate Prods. Liab. Litig.*, 842

15 F. Supp. 2d 479, 484 (E.D.N.Y. 2012); *Fosamax*, 2012 WL 181411, at *6; *Stevens v.*

16 *Pliva, Inc.*, No. 6:10-0886, 2011 WL 6224569, at *2 (W.D. La. Nov. 15, 2011).

17 Thus, because both of Plaintiffs' claims against McKesson fail as a matter of law,

18 McKesson is fraudulently joined and its purported California citizenship does not

19 preclude removal.

20      42.    In addition, Plaintiffs' design defect claims against McKesson fail as a

21 matter of California law because California has long held that strict liability design

22 defect claims are improper with respect to prescription medications. *See Brown v.*

23 *Superior Court*, 44 Cal. 3d 1049 (1988). In *Brown*, the California Supreme Court

24 adopted the rule of the Restatement (Second) of Torts § 402A comment k with

25 respect to *all* prescription medications, holding that liability for such medications was

26 to be determined "under general principles of negligence, and for failure to warn of

27 known or reasonably knowable side effects," *id.* at 1069 n.12, and thereby "granting

28 immunity from strict liability to all such drugs." *Id.* at 1069 n.11; *see also*

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1   Restatement (Second) of Torts § 402A cmt. k (stating that "[t]he seller of such

2   products [here, prescription medications] . . . is not to be held to strict liability for

3   unfortunate consequences attending their use" provided "they are properly prepared

4   and marketed, and proper warning is given"); *Skinner v. Warner-Lambert Co.*, No.

5   CV 03-1643-R(RZX), 2003 WL 25598915, at *1 (C.D. Cal. Apr. 28, 2003)

6   ("Pursuant to comment k . . . and California law following comment k, a distributor

7   of a prescription drug is not subject to strict liability."). Accordingly, based on the

8   conclusive holding of the California Supreme Court in *Brown*, Plaintiffs' strict

9   liability design defect claims against McKesson fail as a matter of law.

10      43.    But even further, and apart from the legal viability of Plaintiffs' claims

11  against McKesson, the fraudulent joinder of McKesson is obvious based on the

12  insufficiency of Plaintiffs' pleadings. *See, e.g.*, *Brown v. Allstate Ins.*, 17 F. Supp. 2d

13  1134, 1137 (S.D. Cal. 1998) (finding in-state defendants fraudulently joined where

14  "no material allegations against [the in-state defendants] are made"); *Lyons v. Am.*

15  *Tobacco Co.*, No. Civ. A. 96-0881-BH-S, 1997 WL 809677, at *5 (S.D. Ala. Sept.

16  30, 1997) (holding that there is "no better admission of fraudulent joinder of [the

17  resident defendants]" than the failure of the plaintiff "to set forth any specific factual

18  allegations" against them). In order to state a proper claim for relief, Plaintiffs must

19  allege "enough facts to state a claim to relief that is plausible on its face" and allow

20  the court to draw the reasonable inference that the defendant is liable for the

21  misconduct alleged. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

22  Legal conclusions and threadbare recitals of elements, supported by mere conclusion,

23  simply do not suffice. *Ashcroft v. Iqbal*, 536 U.S. 662, 678 (2009). This Court is

24  "'not bound to accept as true a legal conclusion couched as a factual allegation.'"

25  *Twombly*, 550 U.S. at 555 (citation omitted). Rather, Rule 8 "'contemplate[s] the

26  statement of circumstances, occurrences, and events in support of the claim

27  presented.'" *Id.* at 556 (citation omitted). Thus, pleadings – such as Plaintiffs'

28  Complaint here – which fail to set forth factual allegations to support asserted legal

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  conclusions should be dismissed for failure to state a claim. *Twombly*, 550 U.S. at

2  555; *see also Iqbal*, 536 U.S. 662, 678-79 ("Rule 8 . . . does not unlock the doors of

3  discovery for a plaintiff armed with nothing more than conclusions.").

4      44.  Here, Plaintiffs offer only conclusory allegations that McKesson

5  distributed the pain medications containing propoxyphene that they allegedly

6  ingested.  These assertions are based solely on Plaintiffs' vague factual allegations,

7  "[u]pon information and belief and subject to discovery of information within the

8  exclusive control of defendants," that McKesson "maintains comprehensive

9  distribution agreements with major retail pharmacies including CVS, Wal-Mart, and

10  Rite Aid."  (Compl. ¶ 20.)  Yet Plaintiffs *never allege* that they obtained their

11  prescriptions from any of these pharmacies.  Moreover, as Plaintiffs admit,

12  McKesson is only "one of" the national distributors of prescription medications (*id.* ¶

13  22), and it is not even the exclusive distributor of prescription medications for the

14  pharmacies identified by Plaintiffs.  For example, press releases reveal that in 2009,

15  both McKesson *and its competitor Cardinal Health* renewed national pharmaceutical

16  distribution agreements with CVS.[5]  In light of the presence of other distributors, who

17  are not joined as defendants, Plaintiffs have failed to allege facts giving rise to a

18  plausible claim of causation with respect to McKesson, thus leading to the "suspicion

19  that McKesson could have been added to defeat diversity removal."  *Camara v.*

20  *Bayer Corp.*, No. C 09-06084 WHA, 2010 WL 902780, at *3 (N.D. Cal. Mar. 9,

21  2010) (staying case pending transfer to MDL and declining to decide motion to

22  _____

23  [5] *Compare Cardinal Health Renews Distribution Agreement with CVS Caremark*, Cardinal

24  Health (July 6, 2009), http://cardinalhealth.mediaroom.com/index.php?s=43&item=277 ("Cardinal Health today announced it has renewed its distribution agreement with CVS Caremark to supply pharmaceuticals to its national network of retail pharmacies through mid-2013."), *with McKesson*

25  *Renews Pharmaceutical Distribution Agreement with CVS Caremark*, McKesson (July 6, 2009), http://www.mckesson.com/en_us/McKesson.com/About%2BUs/Newsroom/Press%2BReleases%2

26  BArchives/2009/McKesson%2BRenews%2BPharmaceutical%2BDistribution%2BAgreement%2B with%2BCVS%2BCaremark.html ("McKesson Corporation . . . today announced that it has

27  renewed its current distribution agreement to supply CVS Caremark with branded and generic drugs.").

28

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1 remand because plaintiff's complaint failed "to clearly explain the role of McKesson

2 in the injury of these specific plaintiffs"). *Id.* Plaintiffs' allegations against

3 McKesson simply do not meet the *Iqbal/Twombly* pleading standard.

4     45.    For all these reasons, McKesson is fraudulently joined, and its

5 citizenship must be disregarded for jurisdictional purposes.

6     **C.    Plaintiffs Are Fraudulently Misjoined**

7     46.    Removing Defendants state that, upon information and belief, Plaintiffs

8 are citizens of states other than Alabama, Delaware, Indiana, Kentucky, Maryland,

9 Massachusetts, Missouri, Nevada, North Carolina, Pennsylvania, and West Virginia,

10 and the properly joined parties are therefore completely diverse.  Nevertheless, to the

11 extent certain Plaintiffs are citizens of the same state as any defendant other than

12 McKesson, removal is not barred due to lack of complete diversity because Plaintiffs

13 have fraudulently misjoined the distinct personal injury claims of 50 Plaintiffs for the

14 purpose of frustrating diversity.  Removing Defendants state that but for Plaintiffs'

15 fraudulent misjoinder of their varying claims, the vast majority of Plaintiffs would be

16 diverse from Defendants and their claims satisfy the requirements for diversity

17 jurisdiction.  Accordingly, the Court should sever Plaintiffs' claims by Plaintiff

18 family and should find that it has diversity jurisdiction over all Plaintiff families as to

19 whom complete diversity would be satisfied upon severance.

20     47.    The fraudulent misjoinder doctrine is intended to ensure that a

21 defendant's statutory right to remove cannot be subverted by procedural

22 gamesmanship, such as the type engaged in by Plaintiffs here.  *See Tapscott v. MS*

23 *Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996) (fraudulent-misjoinder

24 doctrine applies where plaintiffs' claims are "egregious[ly]" misjoined to defeat

25 federal jurisdiction and "have no real connection" to one another), *abrogated on*

26 *other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000); *see*

27 *also In re Benjamin Moore & Co.*, 318 F.3d 626, 630-31 (5th Cir. 2002) (noting "the

28 force of the *Tapscott* principle that fraudulent misjoinder of plaintiffs is no more

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

permissible than fraudulent misjoinder of defendants to circumvent diversity jurisdiction"); *Greene v. Wyeth*, 344 F. Supp. 2d 674, 684-85 (D. Nev. 2004) ("[T]his Court agrees with the Fifth and Eleventh Circuits that the [fraudulent misjoinder] rule is a logical extension of the established precedent that a plaintiff may not fraudulently join a defendant in order to defeat diversity jurisdiction in federal court") (footnotes omitted). Numerous courts from around the country have affirmed the validity of the fraudulent misjoinder doctrine as a basis for removal.[6]

48. Under the fraudulent misjoinder doctrine, federal diversity jurisdiction exists "where diversity is destroyed only through misjoinder of parties." *Asher v. 3M*, No. 04-CV-522-KKC, 2005 U.S. Dist. LEXIS 42266, at *37 (E.D. Ky. June 30, 2005). "Misjoinder of parties occurs when a party fails to satisfy the conditions for permissive joinder under Rule 20(a)." *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 144 (S.D.N.Y. 2001). Accordingly, fraudulent misjoinder applies where, as in this case, Plaintiffs have improperly joined different claims that did not arise "out of the same transaction, occurrence, or series of transactions or occurrences" and give rise to common questions of law or fact. *See* Fed. R. Civ. P. 20(a); Cal. Code Civ. Proc. § 378; *see also Adams v. I-Flow Corp.*, CV09-09550 R SSX, 2010 WL 1339948, at *8 (C.D. Cal. Mar. 30, 2010) ("The California rule on joinder of parties plaintiff is practically identical to [the federal rule]."). Where fraudulent misjoinder applies, a court must sever the improperly joined claims into separate and distinct

---

[6] *See, e.g.*, *Augustine v. Emp'rs. Mut. Cas. Co.*, No. 2:08-cv-1102, 2010 U.S. Dist. LEXIS 126431, at *49 (E.D. La. Nov. 30, 2010); *WIAV Networks, LLC v. 3COM Corp.*, No. C 10-03448 WHA, 2010 U.S. Dist. LEXIS 110957, at *19-20 (N.D. Cal. Oct. 1, 2010); *Bishop v. Sturdivant*, No. 4:10CV49TSL-JCS, 2010 U.S. Dist. LEXIS 79992, at *8 (S.D. Miss. Aug. 6, 2010); *Hughes v. Sears, Roebuck & Co.*, No. 2:09–CV–93, 2009 WL 2877424, at *5-6 (N.D. W. Va. Sept. 3, 2009); *Willingham v. State Farm Ins. Co.*, No. 2:09-CV-59-SA-SAA, 2009 U.S. Dist. LEXIS 76639, at *11 (N.D. Miss. Aug. 27, 2009); *Sutton v. Davol, Inc.*, 251 F.R.D. 500, 505 (E.D. Cal. 2008); *Milliet v. Liberty Mut. Ins. Co.*, No. 07-7443 SECTION "N" (4), 2008 U.S. Dist. LEXIS 2344, at *7-8 (E.D. La. Jan. 11, 2008); *Jones v. State Farm Fire & Cas. Co.*, No. 06-7994 SECTION: "K"(2), 2007 U.S. Dist. LEXIS 102293, at *4 (E.D. La. Feb. 28, 2007); *Grennell v. W. S. Life Ins. Co.*, 298 F. Supp. 2d 390, 396 (S.D. W. Va. 2004); *Reed v. Am. Med. Sec. Grp., Inc.*, 324 F. Supp. 2d 798, 803-05 (S.D. Miss. 2004); *Burns v. W. S. Life Ins. Co.*, 298 F. Supp. 2d 401, 403 (S.D. W. Va. 2004); *Madison Materials Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-CV-14 WS, 2004 U.S. Dist. LEXIS 31111, at *13 (S.D. Miss. Sept. 14, 2004); *Smith v. Nationwide Mut. Ins. Co.*, 286 F. Supp. 2d 777, 781 (S.D. Miss. 2003).

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  cases.

2      49.    Here, the claims of these 50 different Plaintiffs have been fraudulently

3  misjoined because they do not arise out of the same transaction, occurrence, or series

4  of transactions or occurrences.

5      50.    Among other differences with respect to the 50 Plaintiffs in this action,

6  each Plaintiff (or Plaintiff family) necessarily has a distinct medical history, including

7  a treatment regimen, prior history of injury, genetic risk factors, and prescriptions of

8  propoxyphene by different healthcare providers.  Plaintiffs purchased propoxyphene

9  pain products from different pharmacies, for different purposes, and after different

10  conversations with their individual healthcare providers.  They likely would have

11  used propoxyphene pain products at different doses, for different durations, for

12  different conditions, and during different years.  Plaintiffs' extremely broad

13  allegations of "cardiovascular injuries" can encompass a wide variety of conditions,

14  each of which is affected in different ways by a multitude of different causal factors.

15      51.    Finally, to the extent additional information shows that Plaintiffs reside

16  and were allegedly incurred injuries in different states, the law of each Plaintiff's

17  home state is likely to govern his or her claims.  *See Boaz v. Boyle & Co.*, 40 Cal.

18  App. 4th 700, 713 (1995) ("[T]he lack of a significant California connection [the

19  circumstances giving rise to plaintiffs' claims] provide[s] strong reasons to believe

20  that a California court would look to the substantive law of [plaintiffs' home state].").

21  As such, Plaintiffs' claims would implicate the laws of their different home states,

22  and each of these states has unique and conflicting laws regarding products liability

23  claims.

24      52.    Numerous courts have found fraudulent misjoinder under the precise

25  circumstances presented here.   Those courts have recognized that claims by

26  pharmaceutical product-liability plaintiffs – like those in this case – are highly

27  individualized and cannot be joined to defeat jurisdiction, even where the plaintiffs

28  allegedly used the same product.  *See, e.g.*, *In re Fosamax*, 2012 WL 1118780, at *4

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1  (finding fraudulent misjoinder where plaintiffs "allege such unspecific injuries as to
2  make it impossible to determine how the Plaintiffs share any connection" and "given
3  the complicated causation questions that pervade drug product liability claims,
4  Plaintiffs' claims will require divergent questions of law and fact"); *Weaver v. Am.*
5  *Home Prods. Corp.* (*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*
6  *Prods. Liab. Litig.*), 294 F. Supp. 2d 667, 679 (E.D. Pa. 2003) (finding that plaintiffs
7  were fraudulently misjoined because "the claims of the pharmaceutical plaintiffs who
8  had drugs prescribed by different doctors for different time periods do not arise out of
9  the same 'transaction, occurrence, or series of transactions or occurrences'") (quoting
10 Fed. R. Civ. P. 20(a)); *In re Baycol Prods. Litig.*, No. 03-2931, 2003 WL 22341303,
11 at *3 (D. Minn. 2003) (holding that a plaintiff in a pharmaceutical product-liability
12 action had "been fraudulently [mis]joined with the other plaintiffs, warranting
13 severance and remand" of that plaintiff's claims and denying plaintiffs' motion to
14 remand); *In re Rezulin*, 168 F. Supp. 2d at 146 (prescription drug plaintiffs' claims
15 were fraudulently misjoined where they did not "allege that they received Rezulin
16 from the same source or that they were exposed to Rezulin for similar periods of
17 time" and where they alleged "different injuries"); *Chaney v. Gate Pharms.* (In re
18 Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.), No.
19 Civ.A. 98-20478, 1999 WL 554584, at *3 (E.D. Pa. July 16, 1999) (pleading went
20 "well beyond mere misjoinder" where plaintiffs "attempt[ed] to join persons from
21 seven different states into one civil action who have absolutely no connection to each
22 other except that they each ingested fenfluramine, Redux (dexfenfluramine),
23 phentermine or some combination of those drugs").

24      53.    Numerous federal courts have also granted motions to sever in similar
25 cases.  *See, e.g., Boschert v. Pfizer, Inc.*, No. 4:08-CV-1714, 2009 U.S. Dist. LEXIS
26 41261, at *7-8 (E.D. Mo. May 14, 2009) (granting motion to sever claims of four
27 plaintiffs allegedly injured as a result of using smoking-cessation medication
28 Chantix, holding that, "the mere fact [that] four plaintiffs took Chantix at some point

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

in time and suffered some sort of mental or behavioral side-effect is not enough of a logical or factual connection to satisfy the same transaction or occurrence requirement."); *Cumba v. Merck & Co.*, No. 08-CV-2328, 2009 U.S. Dist. LEXIS 41132, at *4-5 (D.N.J. May 12, 2009) (granting motion to sever claims of 49 plaintiffs who allegedly "took the drug Vytorin and . . . [allegedly] sustained broadly similar injuries as a result thereof" because their claims were based on disparate facts); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2007 U.S. Dist. LEXIS 17603, at *115-22 (M.D. Fla. Mar. 7, 2007) (severing claims of multiple plaintiffs alleging injury from use of Seroquel and ordering each to file an individual complaint and pay the court's full filing fee).

54.    As in the above-cited cases, Plaintiffs' claims here do not arise out of the same transaction, occurrence, or series of transactions; nor do they give rise to common questions of law or fact.  Thus, the claims of each Plaintiff family should be severed into separate actions and the Court should determine that it has diversity jurisdiction over the remaining Plaintiff families as to whom complete diversity exists.

55.    Moreover, subject to obtaining additional information regarding the basic details of Plaintiffs' claims, Removing Defendants reserve their right to assert the fraudulent joinder of any Defendant as to any individual Plaintiff (and spouse if applicable) who does not allege ingestion of a product manufactured by that Defendant, such that complete diversity would exist as to that Plaintiff upon the severance requested above.

## **ALL REMOVAL PROCEDURES ARE SATISFIED**

56.    Because this case is removable as a mass action together with the other actions embraced by the Petition for Coordination, all of those cases are being removed upon substantially the same grounds.

57.    Removing Defendants have not yet been served in this action. Accordingly, this removal is timely, since Removing Defendants were not required to

1   remove until 30 days from service of the Complaint.  *See* 28 U.S.C. § 1446(b)(1).

2       58.    All defendants properly joined and served consent to the removal of this

3   action, since Removing Defendants are informed that only McKesson has been

4   served in this action and that McKesson consents to its removal.  *See id.* §

5   1446(b)(2)(A).  In addition, Removing Defendants state that, with respect to their

6   mass action removal, the consent of other Defendants to remove is not required.  *See*

7   *id.* § 1453(b).

8       59.    Removing Defendants state that no Defendant properly joined and

9   served is a resident of this State, because McKesson, the only alleged citizen of

10  California, is fraudulently joined for the reasons set forth above.  *See id.* §

11  1441(b)(2).  Moreover, with respect to mass action jurisdiction, removal is not barred

12  by the California citizenship of any Defendant.  *See id.* § 1453(b).

13      60.    A copy of Plaintiffs' Complaint is attached as Exhibit A.  *See id.* §

14  1446(d).

15      61.    Written notice of this removal is being provided to all adverse parties

16  and is being filed with the clerk of the California Superior Court.  *See id.*

17      62.    Removing Defendants hereby reserve their right to amend this notice of

18  removal.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

1    WHEREFORE, Removing Defendants respectfully remove this action from

2 the Superior Court of the County of Los Angeles, in the State of California, bearing

3 Number TC027014, to this Court.

4

5 DATED:  November 20, 2012                    O'HAGAN SPENCER, LLP

6

7                                             By: */s/ Julian G. Senior*
                                                 Julian G. Senior
8                                                David C. Shay

9                                                And

10

11                                              PIETRAGALLO GORDON ALFANO
                                                BOSICK & RASPANTI, LLP
12                                              Clem C. Trischler (PA ID 52957)
                                                *Pro Hac Vice to be sought*
13                                              Emily J. Hicks (SBN 232155)
                                                One Oxford Centre, 38th Floor
14                                              Pittsburgh, PA 15219
                                                Phone No.: (412) 263-2000
15                                              Fax No.: 412 263-4247
16
                                                Attorneys for Defendants
17                                              MYLAN INC. and
                                                MYLAN PHARMACEUTICALS INC.
18

19

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL BY DEFENDANTS MYLAN INC. AND MYLAN
PHARMACEUTICALS INC.,UNDER 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446, AND 1453

# EXHIBIT A

**DEFENDANT'S EXHIBIT**

_A_

1  J. PAUL SIZEMORE (CA Bar No. 254981)
   THE SIZEMORE LAW FIRM
2  2101 Rosecrans Avenue, Suite 3290
   El Segundo, CA  90245
3  Tel:  (310) 322-8800
   Fax:  (310) 322-8811
4  Email address:  paul@sizemorelawfirm.com

5
   MATTHEW J. SILL (OK Bar No. 21547)
6  _(Pro hac vice application pending)_
   SILL LAW GROUP PLLC
7  14005 N. Eastern Avenue
   Edmond, OK 73103
8  Tel: (405) 509-6300
   Fax: (405) 509-6268
9  Email address:  matt@sill-law.com

10
11  Attorneys for Plaintiffs

12

13         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

14      IN AND FOR THE COUNTY OF LOS ANGELES – SOUTH CENTRAL DISTRICT

15  DEUNA BROWN, a single individual;
    JEAN COOPER,  a single individual;          )   CASE NO.:
16  STEPHANIE COPLEN, a single individual;       )
    NORMA CRAPP, a single individual;            )   **COMPLAINT FOR DAMAGES**
17  ANNIE CRAWFORD, a single individual;         )   **DEMAND FOR JURY TRIAL**
18  ERELINE CRAWFORD-TURNER, a single            )
    individual;                                  )   **Causes of Action:**
19  MONICA CROFTON, a single individual;         )   **(As to All Defendants)**
    GERRY CROW, a single individual;             )   **1.  Strict Products Liability – Design**
20  WILLIAM CRUSE, a single individual;          )   **Defect**
21  CYNTHIA CUELLAR, a single individual;        )   **2.  Strict Products Liability – Failure to**
    JERRY CUNNINGHAM, a single individual;       )   **Warn**
22  ELGIN DABBS, a single individual;            )   **3.  Strict Liability in Tort**
    JUDITH DANIELS, a single individual;         )   **4.  Negligent Design**
23  VERTA DANZY, a single individual;            )   **5.  Negligence**
24  MYRTLE DARLING, a single individual;         )   **6.  Negligent Failure to Warn**
    JOHNNY DAUGHERTY, a single individual;       )   **7.  Fraudulent Non-Disclosure**
25  CYNTHIA DAVIS, a single individual;          )   **8.  Negligent Misrepresentation**
    EVELYN DAVIS, a single individual;           )   **9.  Fraudulent Misrepresentation and**
26  GWENDOLYN DAVIS, a single individual;        )   **Concealment**
    KWAME DAVIS, a single individual;            )   **10.  Negligence Per Se**
27  LINDA DAVIS, a single individual;            )   **11.  Breach of Express Warranty**
    ROSENELL DAVIS, a single individual;         )   **12.  Breach of Implied Warranty**
28  KATHY DAY, a single individual;              )   **13.  Deceit by Concealment – Violation**

- 1 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

| | |
|---|---|
| 1 | RICHARD DAYNE, a single individual; | ) of California Civil Code §§ 1709, 1710 |
| | JEFFREY DEAMER, a single individual; | ) **14. Violation of Business and** |
| 2 | RICHARD DEGEARE, a single individual; | ) **Professions Code § 17200** |
| | BENITA DENSON, a single individual; | ) **15. Violation of Business and** |
| 3 | BARBARA DICE, a single individual; | ) **Professions Code § 17500** |
| | MARILYN DICKSON, a single individual; | ) **16. Violation of Civil Code § 1750, et** |

1  RICHARD DAYNE, a single individual;            )  of California Civil Code  §§ 1709, 1710
   JEFFREY DEAMER, a single individual;           )  **14.  Violation of Business and**
2  RICHARD DEGEARE, a single individual;          )  **Professions Code  § 17200**
   BENITA DENSON, a single individual;            )  **15.  Violation of Business and**
3  BARBARA DICE, a single individual;             )  **Professions Code  § 17500**
   MARILYN DICKSON, a single individual;          )  **16.  Violation of Civil Code § 1750, et**
4  DAVID DOTY, a single individual;               )  **seq.**
   DONALD DRUM, a single individual;              )  **(As to Innovator and Brand**
5  NANCY DRUMMOND, a single individual;           )  **Defendants)**
6  ELMO DUNCAN, a single individual;              )  **17.  Negligence**
   SHIRLEY DUNLAP, a single individual;           )  **18.  Fraudulent Non-Disclosure**
7  HARRY DUNMIRE, a single individual;            )  **19.  Negligent Misrepresentation**
   VERNA DUPLECHAIN, a single individual;         )  **20.  Fraudulent Misrepresentation and**
8  DAVID EASLEY, a single individual;             )  **Concealment**
   SHARRON EATON, a single individual;            )
9  CLARENCE EBERSOLE, a single individual;        )
10 KAREN EDWARDS, a single individual;            )
   DELPHINE ELLIS, a single individual;           )
11 ERVIN ELLISON, a single individual;            )
   ANTHONY ESPOSITO, a single individual;         )
12 JOHNSON EVANS, a single individual;            )
13 JAY FAIGEN, a single individual;               )
   GEORGE FARES, a single individual;             )
14 LORRAINE FARRELL, a single individual;         )
   NORMA FIELDS, a single individual;             )
15 AGNES FILO, a single individual; and,          )
16 MATTHEW FOSTER, a single individual;           )
                                                  )
17                     Plaintiffs,                )
                                                  )
18                                                )
   vs.                                            )
19                                                )
   MCKESSON CORPORATION; ELI LILLY AND            )
20 COMPANY;  AAIPHARMA, INC; AAIPHARMA            )
   LLC; AAI DEVELOPMENT SERVICES, INC.;           )
21 NEOSAN PHARMACEUTICALS INC;                    )
22 XANODYNE PHARMACEUTICALS, INC.;                )
   QUALITEST PHARMACEUTICALS, INC.;               )
23 VINTAGE PHARMACEUTICALS, INC.;                 )
   PROPST DISTRIBUTION, INC.; BRENN               )
24 DISTRIBUTION, INC.; BRENN                      )
25 MANUFACTURING, INC.; VINTAGE                   )
   PHARMACEUTICALS, LLC;                          )
26 GENERICS INTERNATIONAL (US), INC.;             )
   GENERICS BIDCO I, LLC; GENERICS BIDCO          )
27 II, LLC; GENERICS INTERNATIONAL (US            )
   PARENT), INC.; ENDO PHARMACEUTICALS,           )
28 INC.; ENDO PHARMACEUTICALS HOLDINGS            )

- 2 -

INC.; CORNERSTONE BIOPHARMA, INC.;          )
CORNERSTONE BIOPHARMA HOLDINGS,             )
INC.; TEVA BIOPHARMACEUTICALS, INC.;        )
TEVA PHARMACEUTICALS USA, INC.;             )
MYLAN PHARMACEUTICALS, INC.; MYLAN,         )
INC.; COVIDIEN PLC; COVIDIEN INC.;          )
MALLINCKRODT INC.; WATSON                    )
PHARMACEUTICALS, INC.;                       )
and DOES 1 through 50, inclusive,           )
                                            )
                Defendants.                 )

## INTRODUCTION

1.    This lawsuit concerns personal injury related to Plaintiffs' ingestion of prescription medication containing the active ingredient propoxyphene for treatment of mild to moderate pain, marketed and sold as generic and/or brand-name drugs under various names. All such medications that contain propoxyphene, in their various generic and brand-name forms, are referred to in this Complaint as "Propoxyphene Products".

2.    Plaintiffs allege that Defendants MCKESSON CORPORATION; ELI LILLY AND COMPANY; AAIPHARMA, INC; AAIPHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN PHARMACEUTICALS INC.; XANODYNE PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC; GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS HOLDINGS INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN INC.; MALLINCKRODT INC.; WATSON PHARMACEUTICALS, INC.; and DOES 1 through 50, inclusive, inclusive knowingly or negligently manufactured, marketed, distributed, and sold defectively designed Propoxyphene Products without adequate warnings.

- 3 -

3.    In July, 2009, the FDA ordered Defendant Xanodyne Pharmaceuticals, Inc., (hereinafter "Xanodyne") to make changes to the labels of its Propoxyphene Products. These changes included: (a) an addition to the Clinical Pharmacology section of the label discussing the cardiac effects of propoxyphene; (b) a revised boxed warning concerning the risks of both intentional and accidental overdose; (c) the reiteration of this warning regarding the risk of overdose in the Warnings section of the label; and (d) the addition of bolded warnings in the Dosage and Administration section of the label warning against exceeding the maximum daily dose.

4.    Without further discovery, it is unclear to Plaintiffs whether Xanodyne implemented these required actions during the time that Propoxyphene Products remained on the market.

5.    By ordering the RLD holder to make these changes to its label, the FDA empowered Generic Manufacturer Defendants to make the same changes to their own product labels through the "Changes Being Effected" (CBE) process that does not require prior FDA approval. 21 C.F.R. §314.70(c). This is true whether or not Xanodyne ever implemented the labeling change.

6.    The Generic Defendants could have made these labeling changes without running afoul of the requirement of "sameness" because federal law expressly permits generic labeling to differ from RLD labeling where the labeling revision is "made to comply with current FDA labeling guidelines or other guidance." 21 C.F.R. §314.94(a)(8)(iv).

7.    While Plaintiffs cannot know for certain without further discovery, it appears that certain Generic Defendants never implemented these FDA-approved labeling changes between the time that the FDA ordered the changes in July 2009 and the time that they withdrew Propoxyphene Products from the market. Many of the Plaintiffs used and were injured by Propoxyphene Products during this period and allege that their physicians would not have prescribed Propoxyphene Products to them if they had been informed of these new warnings.

8.    On information and belief, Defendant McKesson distributed Propoxyphene Products with outdated and inaccurate labeling after July 2009, specifically, (a) an addition to the Clinical Pharmacology section of the label discussing the cardiac effects of propoxyphene; (b) a revised boxed warning concerning the risks of both intentional and accidental overdose; (c) the reiteration of this warning regarding the risk of overdose in the Warnings section of the label; and (d) the addition

- 4 -

of bolded warnings in the Dosage and Administration section of the label warning against exceeding the maximum daily dose.

9.      On information and belief, Defendant McKesson, which distributes more Propoxyphene Products throughout the United States than any other entity, is directly responsible for distributing the Propoxyphene Products with outdated and inaccurate labeling ingested by multiple Plaintiffs in this action.

10.      Defendants knew or should have known that Propoxyphene Products were ineffective, or at best, marginally effective, and that any benefits of propoxyphene were outweighed by its risks, including serious risks of adverse cardiovascular events that could result in death, as well as other injuries.

11.      The serious health risks associated with Propoxyphene Products and the many safer alternatives that were available led the British government to declare in a 2005 recall that it could not identify *any* group of patients for whom the benefits of propoxyphene outweighed its risks.

12.      In turn, in November 2010, the limited utility and significant risks associated with Propoxyphene Products led the United States Food and Drug Administration ("FDA") to take action to get all such products withdrawn from the market, and to get physicians to stop prescribing Propoxyphene Products, but the FDA's actions came too late to prevent Plaintiffs' injuries.

13.      All Defendants involved in the manufacture, marketing, distribution and sale of those defectively designed drugs must be held liable for those injuries.

## PARTIES AND JURISDICTION

14.      Plaintiffs allege an amount in controversy above of the minimal jurisdictional limits of this Court. A substantial part of the events giving rise to this claim occurred within the County of Los Angeles, State of California. For example, Plaintiff Deuna Brown, a citizen and resident of Los Angeles County, was prescribed Darvocet and suffered injuries as a result, within Los Angeles County.

15.      The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Plaintiffs despite Plaintiffs' reasonable attempts to identify Defendant DOES 1 through 50, who therefore sue said Defendants by such

- 5 -

1 fictitious names. Plaintiffs believe and allege that each of the Defendants designated herein by

2 fictitious names is in some manner legally responsible for the events and happenings herein referred

3 to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

4       16.     At all times herein alleged, unless specified otherwise, "Defendants" include all herein

5 named Defendants as well as Defendants DOES 1 through 50, inclusive.

6       17.     DOES 1 through 50, and each of them, acted independently of, or jointly with, other

7 Defendants, and are in some manner legally responsible for the events and happenings herein referred

8 to, and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

9                              **DISTRIBUTOR DEFENDANTS**

10      18.     Defendant MCKESSON CORPORATION (hereinafter, "McKesson"), at all times

11 alleged herein, is and was a corporation organized and existing under the laws of the State of

12 Delaware, with its principal place of business in the city of San Francisco, County of San Francisco,

13 California, duly authorized to transact business in the State of California. At all times alleged herein,

14 McKesson is and was engaged in the business of marketing, distributing, promoting, advertising and

15 selling Propoxyphene Products nationwide and specifically within the State of California, including

16 Los Angeles County, where Plaintiffs resided and/or ingested Propoxyphene Products.

17      19.     On information and belief, McKesson has been integrally involved in marketing,

18 promoting, distributing, advertising, and merchandising propoxyphene products, including

19 propoxyphene with inaccurate and outdated labeling, nationally, and specifically in the State of

20 California.

21      20.     Upon information and belief and subject to discovery of information within the

22 exclusive control of Defendants, McKesson distributed the Propoxyphene Products ingested by

23 multiple Plaintiffs alleged herein to have ingested Propoxyphene Products. McKesson, maintains

24 comprehensive distribution agreements with major retail pharmacies including, but not limited to,

25 CVS, Wal-Mart, and Rite Aid.

26      21.     The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman

27 Amendments"), which amended the federal Food, Drug, and Cosmetic Act, does not address

28 distributor liability.

- 6 -

22.     McKesson is not only one of the major national distributors of prescription drugs, it is also involved in several levels of marketing, advertising, and promoting products for its drug manufacturing clients.

23.     On its website, McKesson announces that it delivers to pharmaceutical drug companies, "an unmatched combination of communication, promotion, distribution, and packaging options, plus targeted analytics of exclusive data.  McKesson Manufacturing Marketing enables brands to set strategies that prioritize opportunities, optimize resources, and maximize profitability." McKesson further advertises in its National Consumer Outreach Campaigns, to:

> [o]ffer bother pharmacists and manufacturers a high-profile public platform to increase awareness about a variety of health concerns, from general wellness to guidance on complying with specific therapies.  McKesson works with manufacturers to tailor campaigns to their specific goals, and enhances the partnership between manufacturers and pharmacists to enhance the success of national consumer outreach campaigns.

Moreover, according to its website, McKesson builds "patient awareness through retail merchandising, promotions, and advertising," it increases "patient acquisition by fostering new trial usage," an enhances "pharmacists' brand awareness through multiple communication platforms, online ordering, and in-store promotions."  McKesson advertises to pharmaceutical manufacturers, including those manufacturing propoxyphene, promising not only to deliver drugs, but once there,

> [y]ou need help promoting your products, getting them on the right shelves, reducing out-of-stocks, and increasing your sales.  Working with McKesson, we empower you to reach regional and independent pharmacies nationwide.  And by supporting you with merchandising, front-end promotions, and other strategic programs, we help you grow your profits.

24.     At all times alleged herein, McKesson includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their offices, directors, employees, agents, representatives and any and all other persons acting on their behalf.

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**INNOVATOR AND BRAND DEFENDANTS**

25.    Defendant Eli Lilly and Company ("Eli Lilly") was at all relevant times a corporation organized under the laws of Indiana, with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana 46285.

26.    Defendant, aaiPharma, Inc., ("aaiPharma") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 2320 Scientific Park Drive, Wilmington, North Carolina 28405.

27.    Defendant aaiPharma LLC ("aaiPharma LLC") was at all relevant times a limited liability company organized under the laws of Delaware, with its principal place of business located at 2320 Scientific Park Drive, Wilmington, North Carolina 28405.

28.    Defendant AAI Development Services, Inc. ("AAI DS") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 2320 Scientific Park Drive, Wilmington, North Carolina 28405.  AAI DS was at all relevant times a division of aaiPharma.

29.    Defendant NeoSan Pharmaceuticals Inc. ("NeoSan") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 2320 Scientific Park Drive, Wilmington, North Carolina 28405.  NeoSan was at all relevant times a commercialization business unit of aaiPharma.

30.    Defendant's aaiPharma, aaiPharma LLC, AAI DS, and NeoSan shall be referred to herein individually by name or jointly as the "aaiPharma Entities."

31.    Defendant Xanodyne Pharmaceuticals, Inc. ("Xanodyne") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at One Riverfront Place, Newport, Kentucky 41071.

32.    For reference sake only, Defendant Eli Lilly, the Defendant aaiPharma Entities, and Defendant Xanodyne shall be referred to herein individually by name or jointly as the "Innovator and Brand Defendants," as these Defendants have, at various times as more fully set forth below, held the approved New Drug Application ("NDA") for Darvocet and Darvon, brand-name prescription

1    medications containing propoxyphene as their sole or primary active ingredient for treatment of mild

2    to moderate pain.

3        33.    Upon information and belief, other entities besides Defendant Eli Lilly, the Defendant

4    aaiPharma Entities and Defendant Xanodyne, including but not limited to one or more other named

5    Defendants or other entities not yet named, were involved in the testing, manufacture, marketing,

6    sales and/or distribution of brand-name Propoxyphene Products, and to the extent such an entity has

7    done so, then such entity is also a "Innovator and Brand Defendant," although Plaintiffs are still in

8    the process of investigating the extent of such relationships.

9        34.    Defendant Eli Lilly first introduced propoxyphene to the United States market in 1957,

10   and held the approved NDAs for Darvocet (propoxyphene) and Darvon (propoxyphene plus

11   acetaminophen) until 2002.   Defendant Eli Lilly is credited as Innovator of both Darvon and

12   Darvocet.

13       35.    In 2002, Defendant Eli Lilly sold its approved NDAs for Darvocet and Darvon to the

14   Defendant aaiPharma Entities, subject to numerous restrictions, as set forth below.   Pursuant to this

15   agreement, Eli Lilly retained an ongoing role and interest in the manufacture and marketing of

16   Darvocet and Darvon, and on information and belief, Eli Lilly also continued to manufacture generic

17   propoxyphene products for certain generic drug companies.

18       36.    In 2007, the Defendant aaiPharma Entities, as part of their bankruptcy reorganization,

19   sold their approved NDAs for Darvocet and Darvon to Defendant Xanodyne.

20       37.    The Innovator and Brand Defendants were in the business of and did (either directly or

21   indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

22   develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

23   and introduce into interstate commerce throughout the United States, including in California and Los

24   Angeles County, Darvon and Darvocet for use as prescription pain management medications for mild

25   to moderate pain.

26       38.    Upon information and belief, the Innovator and Brand Defendants entered into

27   contractual relationships related to the development, design, research, testing, licensing,

28   manufacturing, labeling, advertising, promotion, marketing, sale, distribution and/or introduction of

- 9 -

Darvon and Darvocet into interstate commerce throughout the United States, including within California and Los Angeles County.

## GENERIC QUALITEST DEFENDANTS

39.     Defendant Qualitest Pharmaceuticals, Inc. ("Qualitest") was at all relevant times a corporation organized under the laws of Alabama, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811.

40.     On or about November 7, 2007, Defendant Qualitest changed its name to Propst Distribution, Inc. ("Propst"), but continued doing business under the name Qualitest Pharmaceuticals, Inc.

41.     Defendant Vintage Pharmaceuticals, Inc. ("Vintage") was at all relevant times a corporation organized under the laws of Alabama, with its principal place of business located at 140 Vintage Drive, Huntsville Alabama 35811.

42.     On or about November 5, 2007, Defendant Vintage changed its name to Propst Distribution, Inc. ("Propst").

43.     Defendant Propst was at all relevant times a corporation organized under the laws of Alabama, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811, and its reporting address located at 401 Meridian Street N, Huntsville, Alabama 35801.

44.     On or about June 23, 2011, Defendant Qualitest and Defendant Propst changed their legal names to Brenn Distribution, Inc. ("Brenn Distribution") and Defendant Vintage changed its name to Brenn Manufacturing, Inc., but all continued doing business under the name Qualitest Pharmaceuticals, Inc.

45.     Defendant Brenn Distribution was at all relevant times a corporation organized under the laws of Alabama, with its principle place of business located at 301 Meridian Street, Huntsville, Alabama 35801.

46.     Defendant, Brenn Manufacturing was at all relevant times a corporation organized under the laws of Alabama, with its principle place of business located at 301 Meridian Street, Huntsville, Alabama  35801.

- 10 -

47.     Defendant Vintage Pharmaceuticals, LLC ("Vintage LLC") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811, and may have also done business under the name Qualitest Pharmaceuticals.

48.     Defendant Generics International (US), Inc. ("Generics US") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811.

49.     Defendant Generics Bidco I, LLC ("Generics Bidco I") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811.

50.     Defendant Generics Bidco II, LLC ("Generics Bidco II") was at all relevant times a corporation organized under the laws of Delaware, which may have had its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811.

51.     Defendant Generics International (US Parent), Inc. ("Generics US Parent") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama 35811.

52.     Defendant Endo Pharmaceuticals, Inc. ("Endo") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317.

53.     Defendant Endo Pharmaceuticals Holdings Inc. ("Endo Holdings") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317.

54.     Defendant, Cornerstone BioPharma, Inc. ("Cornerstone BioPharma"), was at all relevant times a corporation organized under the laws of the State of Nevada, with its principal place of business located at 1255 Crescent Green Drive, Suite 250, Cary, NC 27511.

55.     Defendant, Cornerstone BioPharma Holdings, Inc., ("Cornerstone Holdings"), was at all relevant times a corporation organized under the laws of the State of Delaware, with its principal place of business located at 1255 Crescent Green Drive, Suite 250, Cary, NC 27511.

- 11 -

56.   Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn Manufacturing, Defendant Vintage LLC, Defendant Generics US, Defendant Generics Bidco I, Defendant Generics Bidco II, Defendant Generics US Parent, Defendant Endo, Defendant Endo Holdings, Defendant Cornerstone BioPharma and Defendant, Cornerstone Holdings shall be referred to herein individually by name or jointly as the "Generic Qualitest Defendants."

57.   At all relevant times, Defendant Generics US Parent owned Defendant Generics Bidco I, Defendant Generics Bidco II and Defendant Generics US.

58.   Until on or about December 1, 2010, Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn Manufacturing and/or Defendant Vintage LLC were owned by Defendant Generics US, Defendant Generics Bidco I, Defendant Generics Bidco II and/or Defendant Generics US Parent.

59.   On or about December 1, 2010, Defendant Endo Holdings acquired Defendant Generics US, Defendant Generics Bidco I, Defendant Generics Bidco II and Defendant Generics US Parent, and presumably indirectly acquired through one or all of them Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn Manufacturing and/or Defendant Vintage LLC.

60.   The businesses of Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn Manufacturing, and/or Defendant Vintage LLC may have been combined thereafter into a single business unit with Defendant Endo.

61.   Additionally, Cornerstone BioPharma entered into a certain Asset Purchase Agreement and/or Manufacturing Agreement, as amended, with one or more of the other Qualitest Defendants, including but not necessarily limited to Defendant, Vintage, LLC on or about July 20, 2004 for the sale, manufacture, marketing, supply, distribution and/or testing of Propoxyphene Products including but not necessarily limited to Propoxyphene Napsylate/APAP 100 in 325mg and 500 mg forms.

/ / /

/ / /

- 12 -

62.    Upon information and belief Defendant Cornerstone Holdings is a parent, subsidiary, affiliate, or other related company through merger or otherwise with Defendant Cornerstone BioPharma.

63.    The extent to which Defendant Endo and/or Defendant Endo Holdings may have assumed responsibility for the acts, omissions or liability of other Generic Qualitest Defendants, contractually or otherwise, is unknown at this time, and Plaintiffs requires discovery as to this issue.

64.    It is believed that at all relevant times, Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn and/or Defendant Vintage LLC were the holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

65.    It is possible, however, that the ANDA for these generic drugs may have been owned by another of the Generic Qualitest Defendants, or one or more of their subsidiaries, parents or related entities, but Plaintiffs have been unable to determine this, despite diligent and reasonable investigations.

66.    Despite diligent and reasonable investigations, Plaintiff has been unable to determine the exact relationship between and among the Generic Qualitest Defendants, but believe that each has been in the business of, and been involved with, either directly or indirectly (through each other or other subsidiaries, related entities, third parties, predecessors or successors in interest), developing, designing, researching, testing, licensing, manufacturing, labeling, advertising, promoting, marketing, selling, distributing and introducing into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications.

67.    Upon information and belief, the Generic Qualitest Defendants manufactured the majority of the Propoxyphene Products sold at national retailers, including CVS and Wal-Mart, as distributed by McKesson Defendants.

/ / /

/ / /

/ / /

- 13 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## GENERIC TEVA DEFENDANTS

68.     Defendant TEVA Biopharmaceuticals, Inc. ("TEVA Biopharmaceuticals") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 9410 Key West Avenue, Rockville, Maryland 20850-3345.

69.     Defendant TEVA Pharmaceuticals USA, Inc. ("TEVA Pharmaceuticals") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

70.     Defendant TEVA Biopharmaceuticals and Defendant TEVA Pharmaceuticals shall be collectively referred to as the "Generic TEVA Defendants."

71.     It is believed that at all relevant times, one or a combination of the Generic TEVA Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

72.     The Generic TEVA Defendants were in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications for mild to moderate pain.

## GENERIC MYLAN DEFENDANTS

73.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") was at all relevant times a corporation organized under the laws of West Virginia, with its principal place of business located at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

74.     Defendant Mylan, Inc. ("Mylan") was at all relevant times a corporation organized under the laws of Pennsylvania, with its principal place of business located at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317, and is the parent corporation of Mylan Pharmaceuticals.

75.     Defendant Mylan Pharmaceuticals and Defendant Mylan shall be collectively referred to as the "Generic Mylan Defendants."

76.    It is believed that at all relevant times, one or a combination of the Generic Mylan Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription.

77.    It is believed that at all relevant times, one or a combination of the Generic Mylan Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

78.    The Generic Mylan Defendants were in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications for mild to moderate pain.

**GENERIC COVIDIEN DEFENDANTS**

79.    Defendant Covidien PLC was at all relevant times a corporation organized under the laws of Ireland, with its United States headquarters located at 15 Hampshire Street, Mansfield, Massachusetts 02048.

80.    Defendant Covidien Inc. ("Covidien") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 15 Hampshire Street, Mansfield, Massachusetts.  It has appointed The Corporation Trust Company as its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

81.    Upon information and belief, Defendant Mallinckrodt Inc. ("Mallinckrodt") was at all relevant times a corporation organized under the laws of Missouri or Delaware or New York, with its principal place of business located at 675 McDonnell Boulevard., Hazelwood, Missouri 63042.

82.    Defendants Covidien and Mallinckrodt are wholly-owned subsidiaries of Defendant Covidien PLC.

83.    Defendant Covidien PLC, Defendant Covidien and Defendant Mallinckrodt shall be collectively referred to as the "Generic Covidien Defendants."

- 15 -

84.     It is believed that at all relevant times, one or a combination of the Generic Covidien Defendants were the holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

85.     The Generic Covidien Defendants were in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications for mild to moderate pain.

## GENERIC WATSON DEFENDANTS

86.     Defendant Watson Pharmaceuticals, Inc. ("Watson" or "Generic Watson Defendant") was at all relevant times a corporation organized under the laws of Nevada, with its principal place of business located at 311 Bonnie Circle, Corona, California 92880-2882.

87.     It is believed that at all relevant times, Defendant Watson was the holder of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

88.     Defendant Watson was in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications for mild to moderate pain.

## GENERIC DEFENDANTS

89.     For reference sake only, the Generic Qualitest Defendants, the Generic Covidien Defendants, the Generic TEVA Defendants, the Generic Mylan Defendants, the Generic Watson Defendants and any other Defendant and/or entity involved in the testing, manufacture, sale,

- 16 -

distribution and/or marketing of generic Propoxyphene Products shall be referred to herein individually by name or jointly as the "Generic Defendants."

## PLAINTIFFS

90.    Plaintiffs are individuals who ingested Propoxyphene Products manufactured, marketed, distributed, and sold by Defendants, and suffered severe cardiovascular injuries as a result of said ingestion.

## FACTUAL BACKGROUND

### I.    THE DANGERS AND DUBIOUS EFFECTIVENESS OF PROPOXYPHENE PRODUCTS

#### A.    Propoxyphene is a dangerous, ineffective drug.

91.    Propoxyphene is a centrally-acting opiate analgesic that is structurally related to methadone.

92.    Propoxyphene is a pain reliever used to treat mild to moderate pain.

93.    Propoxyphene is marketed in two chemical forms (propoxyphene hydrochloride and propoxyphene napsylate), and is sold both as a single chemical entity and also in combination with either acetaminophen or aspirin.

94.    Branded products with the name "Darvocet" contain both propoxyphene and acetaminophen.

95.    Branded products with the name "Darvon" do not contain acetaminophen.

96.     In 1971, Eli Lilly conducted seven identically designed efficacy trials for propoxyphene, six of which demonstrated that propoxyphene alone was not significantly superior to placebo.  The trials showed, in contrast, that acetaminophen was significantly superior to placebo.

97.    Propoxyphene also has been plagued by concerns of its potential toxicity for decades.

98.    for instance, in as early as 1978, the Health Research Group filed a Citizen Petition to the FDA requesting the recall of Darvon, claiming it was a dangerous drug of questionable effectiveness.

- 17 -

99.    Non-clinical studies conducted in response to the 1978 Citizen Petition supported the hypothesis of certain clinical findings that deaths due to overdoses of propoxyphene could be due to cardiotoxicity from propoxyphene.

100.    Upon information and belief, Defendants knew of the risks and questionable effectiveness of Propoxyphene Products for decades and failed to convey those concerns to the public and/or properly investigate the concerns.

101.    According to the FDA, in 2009, approximately ten million people in the United States received prescriptions for Propoxyphene Products.

102.    However, propoxyphene, when taken as prescribed and intended, causes and contributes to a greatly increased risk of serious and dangerous side effects including, without limitation, heart arrhythmias, myocardial infarctions, other adverse cardiovascular events and/or sudden death.

103.    These unique and dangerous risks are not present with other practical and medically-feasible alternate pain management medications that do not contain propoxyphene.

104.    The FDA's adverse event data has confirmed that staggering, serious adverse events have been associated with propoxyphene-containing drugs, including but not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions and/or sudden death.

**B.    Great Britain and Europe Withdrew Propoxyphene Products.**

105.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because of concerns about the cardiac effects associated with the use of propoxyphene.

106.    In the announcement of the phased withdrawal of propoxyphene-containing products in Great Britain, health officials stated that "it has not been possible to identify any patient group in whom the risk benefit (ratio) may be positive."

107.    British officials further stated that propoxyphene's efficacy "is poorly established and the risk of toxicity in overdose, both accidental and deliberate, is unacceptable" even in "normal therapeutic doses."

- 18 -

108.    In other words, the British officials found, as Plaintiff herein alleges, that propoxyphene is a dangerous drug even in standard therapeutic doses.

109.    In addition, a 2009 study titled "Effect of Withdrawal of Co-Proxamol [propoxyphene-acetaminophen] on Prescribing and Deaths from Drug Poisoning in England and Wales: Time Series Analysis" concluded that the phased withdrawal of propoxyphene-containing products in Great Britain resulted in a substantial decline in suicides and accidental deaths involving such products during the phased withdrawal.

110.    In June 2009, the European Medicines Agency ("EMEA") recommended that the marketing authorizations for propoxyphene-containing medications be withdrawn across the European Union because of safety concerns.

111.    When deciding to ban propoxyphene-containing medications, the EMEA stated that "the available evidence suggests that the combination of propoxyphene and acetaminophen (as in Tylenol) is no more effective that acetaminophen on its own."

112.    The EMEA further stated that "the benefits of all medicines containing propoxyphene, either on its own or in combination, do not outweigh their risks."

C.    **The FDA called for the recall of Propoxyphene Products after determining that their risks outweighed their benefits.**

113.    A 2008 report titled "Drugs Identified in Deceased Persons by Florida Medical Examiners" reported that propoxyphene caused eighty deaths in Florida during 2008.

114.    A 2009 report titled "Drugs Identified in Deceased Persons by Florida Medical Examiners," produced by the Florida Department of Law Enforcement, demonstrated that propoxyphene caused 460 deaths in Florida alone from 2003 through 2007. This death toll equates to 4.2 causally-related deaths per 100,000 propoxyphene prescriptions, significantly higher than comparable ratios for alternative drugs examined in the report, such as tramadol, which caused only 2.2 deaths per 100,000 prescriptions. A drug was only indicated as the cause of death when, after examining all the evidence and the autopsy and toxicology results, the medical examiner determined the drug played a causal role in the death.

115.    In 2009, data from the Drug Abuse Warning Network (DAWN) presented to an FDA Advisory Committee demonstrated that in seven of the eight states examined, the number of drug-related deaths per 100,000 prescriptions was higher for propoxyphene than for tramadol or hydrocodone from 2004 through 2007.  In the eighth state, propoxyphene resulted in more deaths per 100,000 prescriptions than hydrocodone and only slightly less than tramadol.

116.    Despite overwhelming evidence of the risks of all propoxyphene-containing medications, their withdrawal from European markets, and evidence that Propoxyphene Products were no more effective than Tylenol, Defendants continued to actively market, produce and distribute Propoxyphene Products in the United States, causing injuries that included but were not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions, and/or sudden death.

117.    In light of these concerns, public interest groups petitioned for an investigation into whether propoxyphene-containing drugs were linked to serious and potentially fatal heart arrhythmias.

118.    In 2009, in light of these concerns and renewed efforts to recall Propoxyphene Products, the FDA Advisory Committee voted against the continued marketing of propoxyphene-containing products.

119.    Although the FDA did not follow the Advisory Committee's recall recommendation at that time, it did order Xanodyne to conduct clinical trials to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a Medication Guide ("MedGuide") as part of a Risk Evaluation and Minimization Strategy ("REMS") to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

120.    The FDA also ordered Xanodyne to include a "Black Box" warning on its label, effective July 9, 2009, concerning the risk of fatal overdose, the relevant portion of which states as follows:

> There have been numerous cases of accidental and intentional overdose with propoxyphene products either alone or in combination with other CNS depressants, including alcohol.  Fatalities within the first hour of overdosage are not uncommon.  Many of the propoxyphene-related deaths have occurred in patients with previous histories of emotional disturbances or suicidal

- 20 -

ideation/attempts and/or concomitant administration of sedatives, tranquilizers, muscle relaxants, antidepressants, or other CNS-depressant drugs.  Do not prescribe propoxyphene for patients who are suicidal or have a history of suicidal ideation.

121.    The FDA also required Xanodyne to add a Clinical Pharmacology section to its label to include the following warning about dangers associated with propoxyphene:

Propoxyphene is a centrally acting opiate analgesic.  In vitro studies demonstrated propoxyphene and the metabolite norpropoxyphene inhibit sodium channels (local anesthetic effect) with norpropoxyphene being approximately 2-fold more potent than propoxyphene and propoxyphene approximately 10-fold more potent than lidocaine.  Propoxyphene and norpropoxyphene inhibit the voltage-gated potassium current carried by cardiac rapidly activating delayed rectifier (hERG channels) with approximately equal potency.  It is unclear if the effects on ion channels occur within therapeutic dose range.

122.    The FDA also required Xanodyne to add a Special Populations section to its label to include the following warning about the special dangers propoxyphene poses to geriatric patients:

After oral administration of propoxyphene in elderly patients (70-78 years), much longer half-lives of propoxyphene and norpropoxyphene have been reported (propoxyphene 13 to 35 h, norpropoxyphene 22 to 41 h).  In addition, the AUC was an average of 3-fold higher and the Cmax was an average of 2.5-fold higher in the elderly when compared to a younger (20-28 years) population.  Longer dosage intervals may be considered in the elderly because the metabolism of propoxyphene may be reduced in this patient population.  After multiple oral doses of propoxyphene in elderly patients (70-78 years), the Cmax of the metabolite (norpropoxyphene) was increased 5-fold.

123.    Similarly, the FDA also required Xanodyne to add the following warning about the special dangers propoxyphene poses to elderly patients to the Precautions section of its label:

Clinical studies of DARVOCET-N did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects.  However, postmarketing reports suggest that patients over the age of 65 may be more susceptible to CNS-related side effects.  Therefore, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosage range, reflecting the greater frequency of decreased

- 21 -

hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy. Decreased total daily dosage should be considered (See DOSAGE and ADMINISTRATION).

124. The FDA also required Xanodyne to add the following warnings about propoxyphene's potential for abuse and dependence in a new Drug Abuse and Dependence section of its label:

**Controlled Substance**
DARVOCET-N is a Schedule IV narcotic under the U.S. Controlled Substances Act. DARVOCET-N can produce drug dependence of the morphine type, and therefore, has the potential for being abused. Psychic dependence, physical dependence and tolerance may develop upon repeated administration. DARVOCET-N should be prescribed and administered with the same degree of caution appropriate to the use of other narcotic-containing medications.

**Abuse**
Since DARVOCET-N is a mu-opioid agonist, it may be subject to misuse, abuse, and addition. Addiction to opioids prescribed for pain management has not been estimated. However, requests for opioids from opioid-addicted patients occur. As such, physicians should take appropriate care in prescribing DARVOCET-N.

**Dependence**
Opioid analgesics may cause psychological and physical dependence. Physical dependence results in withdrawal symptoms in patients who abruptly discontinue the drug after long term administration. Also, symptoms of withdrawal may be precipitated through the administration of drugs with mu-opioid antagonist activity, e.g., naloxone or mixed agonist/antagonist analgesics (pentazocine, butorphanol, nalbuphine, dezocine). (See also OVERDOSAGE section). Physical dependence usually does not occur to a clinically significant degree, until after several weeks of continued opioid usage. Tolerance, in which increasingly larger doses are required to produce the same degree of analgesia, is usually manifested by a shortened duration of an analgesic effect and subsequently, by decreases in the intensity of analgesia.

In chronic pain patients, and in opioid-tolerance cancer patients, the administration of DARVOCET-N should be guided by the degree of tolerance manifested and the doses needed to adequately relieve pain.

The severity of the DARVOCET-N abstinence syndrome may depend on the degree of physical dependence. Withdrawal is characterized by rhinitis, myalgia, abdominal cramping, and occasional diarrhea. Most observable symptoms disappear in 5 to 14 days without treatment; however, there may be a phase of secondary or chronic abstinence which may last for 2 to 6 months characterized by insomnia, irritability, and muscular aches. The patient may be detoxified by gradual reduction of the dose. Gastrointestinal disturbances or dehydration should be treated with supportive care.

125. Finally, the FDA also required Xanodyne to add the following warnings about tolerance and dependence in the Precautions section of its label:

**Tolerance and Physical Dependence**
Tolerance is the need for increasing doses of opioids to maintain a defined effect such as analgesia (in the absence of disease progression or other external factors). Physical dependence is manifested by withdrawal symptoms after abrupt discontinuation of a drug or upon administration of an antagonist. Physical dependence and tolerance are not unusual during chronic opioid therapy.

The opioid abstinence or withdrawal syndrome is characterized by some or all of the following: restlessness, lacrimation, rhinorrhea, yawning, perspiration, chills, myalgia, and mydriasis. Other symptoms also may develop, including: irritability, anxiety, backache, joint pain, weakness, abdominal cramps, insomnia, nausea, anorexia, vomiting, diarrhea, or increased blood pressure, respiratory rate, or heart rate. In general, opioids should not be abruptly discontinued (see DOSAGE AND ADMINISTRATION: Cessation of Therapy).

If DARVOCET-N is abruptly discontinued in a physically dependent patient, an abstinence syndrome may occur (See DRUG ABUSE AND DEPENDENCE). If signs and symptoms of withdrawal occur, patients should be treated by reinstitution of opioid therapy followed by gradual tapered dose reduction of DARVOCET-N combined with symptomatic support (see DOSAGE AND ADMINISTRATION: Cessation of Therapy).

126. Upon information and belief, Xanodyne did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.

127. Upon information and belief, Xanodyne also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon.

128. Upon information and belief, Xanodyne also did not publish the information in the Physicians' Desk Reference ("PDR"), the primary source of drug warning information for physicians.

- 23 -

129.    Upon information and belief, Xanodyne also did not communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

130.    The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

131.    Xanodyne did, however, follow part of the FDA mandate by starting to conduct a multiple-ascending dose (MAD) study in July 2009, which confirmed that even when taken at recommended doses, propoxyphene can cause significant changes to the electrical activity of the heart that can be seen on an electrocardiogram (ECG), such as prolonged PR intervals, widened QRS complexes, and prolonged QT intervals.

132.    An ECG is a recording of the electrical activity generated by the heart as it undergoes depolarization and repolarization, which is the process that causes the muscles in the heart to contract rhythmically and pump blood throughout the body.

133.    The different waves that comprise the ECG, including the PR intervals, QRS complexes, and QT intervals, represent the sequence of depolarization and repolarization of the atria and ventricles. Abnormalities in the ECG indicate abnormalities in the electrical activity of the heart, specifically the depolarization and repolarization process.

134.    Changes in the electrical activity of the heart can increase the risk for serious abnormal heart rhythms that have been linked to serious adverse effects, including sudden death.

135.    Propoxyphene's principal metabolite, norpropoxyphene, is a Sodium channel and hERG channel blocker. Blockage of either of these channels can lead to changes in the electrical activity of the heart and other cardiac injuries.

136.    The FDA concluded that the safety risks of propoxyphene, including the negative effects of propoxyphene on the electrical activity of the heart, outweigh its benefit for pain relief.

137.    On November 19, 2010, the FDA announced that Xanodyne had agreed to stop marketing its Propoxyphene Products in the United States.

- 24 -

138.    Also on November 19, 2010, the FDA requested that the generic manufacturers also remove their Propoxyphene Products.

139.    Also on November 19, 2010, the FDA advised health care professionals to stop prescribing and dispensing Propoxyphene Products, and to ask their patients to stop taking those drugs.

140.    In its news release on November 19, 2010, the FDA said that the data showed "that even when taken at recommended doses, propoxyphene causes significant changes to the electrical activity of the heart" and that the changes in electrical activity of the heart "can increase the risk for serious abnormal heart rhythms that have been linked to serious adverse events, including sudden death."

## II.    DEFENDANTS' NEGLIGENT AND WRONGFUL MARKETING, DISTRIBUTING AND SALE OF DEFECTIVELY DESIGNED PROPOXYPHENE PRODUCTS

141.    At all relevant time, Eli Lilly knew or should have known that Propoxyphene Products were defectively designed.

142.    As discussed above, in 1978, the Health Research Group filed a Citizen Petition with the FDA seeking the recall of Propoxyphene Products.

143.    Upon information and belief, the FDA rejected the 1978 recall in large part because of Eli Lilly's vocal and ultimately successful campaign, in which it made numerous false statements regarding the safety and efficacy of Propoxyphene Products, even though it knew or should have known that such statements were false.

144.    Upon information and belief, Eli Lilly also made commitments to the FDA about the manner in which it would market its Propoxyphene Products to address safety concerns, but failed to live up to these commitments.

145.    For example, a key factor in the FDA's decision to reject changing the regulatory status of Propoxyphene Products was Eli Lilly's commitment to an educational program to sensitize prescribers and patients to the hazards of propoxyphene products.

/ / /

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

146.   Upon information and belief, Eli Lilly not only failed to emphasize the user warnings in the majority of its physician visits, but also converted that "educational program" into a marketing initiative.

147.   At all relevant times, Xanodyne focused its sales on pain management products, including Darvocet and Darvon, because the area of pain management offers attractive commercial opportunities in significant markets in the United States.

148.   At all relevant times, Xanodyne affirmatively decided not to take part in full discovery research of its products because it was and is more beneficial for it to advance products more quickly through abbreviated developmental pathways in order to decrease the time and cost of bringing a new drug to market.

149.   At all relevant times, Xanodyne extensively marketed Darvocet and Darvon as safe and effective treatments for pain to induce their widespread use, and has received significant profits from the sale of those drugs.

150.   Similar to Eli Lilly's efforts to defeat the 1978 Propoxyphene Products recall request, as discussed above, Xanodyne also acted to defeat petitions to the FDA to recall Propoxyphene Products.

151.   Upon information and belief, in April, 2006, Xanodyne made false and misleading statements that it knew or should have known were false and misleading concerning the safety and effectiveness of Propoxyphene Products to the FDA in opposition to a 2006 Citizen Petition requesting the recall of Propoxyphene Products.

152.   Upon information and belief, Xanodyne also failed to disclose information that was inconsistent with allegations made in the Citizen Petition.

153.   Additionally, upon information and belief, Xanodyne made a presentation at the FDA's Joint Meeting of the Aesthetic and Life Support Drugs Advisory Committee and Drug Risk Management Committee on January 30, 2009 concerning the same 2006 Citizen Petition to recall Propoxyphene Products, in which it made the following false representations, among others, about Propoxyphene Products, even though it knew such statements to be false:

a.   that "Darvon and its combinations were effective analgesics";

- 26 -

b.    that Propoxyphene Products are "superior to placebo";

c.    that "Propoxyphene products have a long history in the US of safe and effective use as labeled"; and

d.    that "Petitioner [i.e., Public Citizen in its 2006 FDA Citizen Petition to recall Darvocet] presents no credible scientific evidence that propoxyphene drugs present an imminent hazard to public health or that they are unsafe and ineffective when used according to approved labeling."

154.    Upon information and belief, it is believed that the Generic Defendants likewise represented that their Propoxyphene Products were safe and effective for pain management in order to induce their widespread use, and have received significant profits from their sales of those drugs.

155.    Defendants knew or should have known of the dangers associated with Propoxyphene Products, including but not limited to the risks of serious abnormal heart rhythms that may cause serious adverse events, including death.

156.    Additionally, or in the alternative, Defendants should have started to investigate the link between Propoxyphene Products and cardiac effects significantly before the FDA ordered such an investigation.

157.    Had Defendants investigated propoxyphene safety on a timely basis, the associated risks would have been confirmed in time to prevent Plaintiffs from being prescribed or filling prescriptions for Propoxyphene Products, from ingesting or continuing to ingest Propoxyphene Products, and from suffering injuries as a result of those ingestions.

158.    Independent of this, before Plaintiffs were injured by ingesting Propoxyphene Products, there was a wealth of scientific and medical evidence available to Defendants – but not to Plaintiffs or their prescribing physicians – to correlate the use of those drugs with the increased risk of developing serious adverse cardiovascular effects, potentially resulting in death, which made those drugs unreasonably dangerous to consumers.

159.    Despite what Defendants knew or should have known through the sources cited above, they continued to manufacture and market and sell Propoxyphene Products.

160.    Upon information and belief, despite what Defendants knew or should have known through the sources cited above, they failed to provide adequate information to the general public or

- 27 -

the health care community – including Plaintiffs and their prescribing physicians – about the correlation between the use of Propoxyphene Products and the increased risk of developing serious adverse cardiovascular effects, potentially resulting in death, which made those drugs unreasonably dangerous to consumers due to the following:

a. Defendants failed to convey the warnings in a method reasonably calculated to notify the public and the health care community of its risks.

b. Defendants failed to convey the warning in a location or manner reasonably calculated to notify the public and the health care community of its risks.

c. Defendants failed to convey the warning by use of facts or information that were known about the risks of Propoxyphene Products.

d. Defendants failed to convey warnings in a manner that was clear, accurate and properly portrayed the intensity of the risks posed by Propoxyphene Products.

e. Defendants failed to provide "Dear Health Care Professional" letters to the health care community, as authorized by the FDA at 21 CFR 201.100(d)(1), at all and/or in a manner reasonably calculated to convey the risks associated with Propoxyphene Products.

f. Defendants failed to provide "Dear Health Care Professional" letters after the inclusion of warning label changes approved and/or required by the FDA, including but not necessarily limited to the 2009 label change requiring a "Black Box" warning, as discussed above.

g. Defendants failed to take reasonable steps to otherwise notify the public and the health care community of the inclusion of warning label changes approved and/or required by the FDA, including but not necessarily limited to the 2009 label change requiring a "Black Box" warning, as discussed above.

h. The Innovator and Brand Defendants failed to recommend to the FDA through the Changes Being Effected ("CBE") process that branded Propoxyphene Products include a warning identical or similar to the 2009 "Black Box" warning since Defendants knew or should have known of the risks conveyed in the "Black Box" warning for years prior to its inclusion in the warning label.

i. Xanodyne failed to properly notify the public and the health care community about the health risks conveyed in the 2009 "Black Box" warning even though the FDA specifically instructed them to do so.

j. Upon information and belief, Xanodyne continued to promote brand-name Propoxyphene Products as safe and effective even though it knew this was not

- 28 -

correct, before and even after, the FDA ordered Xanodyne to include the "Black Box" warning in 2009.

k.  Upon information and belief, the Generic Defendants failed to update their labels with certain label changes that the FDA approved and/or ordered for use by the Innovator and Brand Defendants, although Plaintiff must conduct discovery to determine the extent of this failure since the Generic Defendants' warning labels are not included in the Physician's Desk Reference.

l.  Defendants could have and should have requested stronger warnings for Propoxyphene Products, which the FDA could have then ordered to be included in the label without the need to undertake negotiations with the branded manufacturer.

161.    As stated above, upon information and belief, Defendants failed to adequately convey or warn the public and the health care community as to the risks associated with Propoxyphene Products, though discovery is necessary as to these issues since this information is, in large part, in control of Defendants.

162.    Upon information and belief, Defendants continued to promote and affirmatively claim that Propoxyphene Products are safe and effective, although they knew or should have known this was not the case.

163.    At least in part, the extent, dates and methods by which Defendants continued to promote the safety and effectiveness of Propoxyphene Products is not fully known, as this information is in the control of Defendants, and discovery is necessary to obtain this information.

164.    Had Defendants stopped selling Propoxyphene Products when they knew or should have known about the increased and unreasonably dangerous risks associated with their use, Plaintiffs would not have been prescribed or would not have filled prescriptions for Propoxyphene Products, would not have ingested or would have stopped ingesting them, and would not have suffered injuries resulting from those ingestions.

165.    Had the general public or the health care community – including Plaintiffs and their prescribing physicians – been adequately advised of the risks associated with the use of Propoxyphene Products, Plaintiffs would not have been prescribed or would not have filled prescriptions for Propoxyphene Products, would not have ingested or would have stopped ingesting them, and would not have suffered injuries resulting from those ingestions.

- 29 -

III.    **INNOVATOR AND BRAND DEFENDANTS' OWNERSHIP AND TRANSFERS OF THE DARVOCET AND DARVON NDAs**

A.    **Eli Lilly owned and then transferred the Darvocet and Darvon NDAs.**

166.    Prior to 2002, Eli Lilly owned all rights to Darvocet and Darvon, including the NDAs to sell those products. It had held these rights since FDA approval of Darvon (in 1957) and Darvocet (in 1973).

167.    On February 18, 2002, Eli Lilly sold the marketing rights to Darvocet and Darvon to NeoSan, pursuant to an Assignment, Transfer, and Assumption Agreement between the two.

168.    Eli Lilly generated substantial revenue and other benefits from this sale.

169.    Upon information and belief, this sale was made possible, at least in part, because of Eli Lilly's false and misleading statements regarding the safety and effectiveness of Propoxyphene Products.

170.    Upon information and belief, the foregoing misleading statements were made to the FDA, to the public and to the health care community.

171.    Plaintiff does not yet know the extent and specifics of such statements, as such information is in the control of Defendants, and Plaintiff must engage in discovery to learn of same.

172.    In connection with this transaction, NeoSan acquired the following from Eli Lilly:

a.    all rights, title and interest in Eli Lilly's propoxyphene or propoxyphene-based pharmaceutical products (including such products wherein propoxyphene is at least one of the active ingredients) in all forms marketed or marketable in the United States under certain propoxyphene-related product NDAs owned by Eli Lilly;

b.    all propoxyphene-related product NDAs owned by Eli Lilly;

c.    intellectual property related to the transferred propoxyphene-related pharmaceutical products, including (1) Eli Lilly's copyrights, including package inserts, (2) any unique appearance, look, shape, size, or color of the products, and (3) Eli Lilly's trademarks, including those for the names Darvocet-N, Darvon-N, and Darvon.

d.    marketing and promotional materials related to the acquired products;

e.    all books and records related to the purchased products; and

- 30 -

f.    with regard to the acquired products, a license to use all Eli Lilly's experience and other know-how.

173.    However, Eli Lilly specifically retained a combination patent related to dextropropoxyphene, under patent number 4,594,358, and patent application number 60/188,135, filed March 9, 2000.

174.    NeoSan, in turn, granted Eli Lilly the following consideration in connection with the transfer of assets:

a.    $211,400,000, which Eli Lilly amortized over three years;

b.    royalties based on sales of NeoSan's future developed improvements to the Darvon product line or other products containing the active ingredient propoxyphene and any other pharmaceutical products sold under the name Darvon, Darvocet or other Eli Lilly trademarks, excluding the products specifically acquired from Eli Lilly;

c.    all licenses necessary for Eli Lilly to fulfill its obligations under a manufacturing agreement between the parties (described further infra) or necessary for Eli Lilly to sell the acquired products outside of the United States;

d.    the right to audit NeoSan as related to its "performance" and royalty payment obligations; and

e.    for products using the trademarks transferred in connection with the agreement, NeoSan was obligated to provide to Eli Lilly free of charge two then-current production samples of each such product (with then-current packaging) not manufactured by Eli Lilly, and (ii) permit Eli Lilly to inspect the manufacturing process for each such product, so long as the products were manufactured by parties other than Eli Lilly.

175.    Eli Lilly and the aaiPharma Entities further agreed to the following joint obligations:

a.    to cooperate in any inspection, investigation, or other inquiry from a government agency related to the acquired products, including the right to be present during any such inspection and to make the others party's employees available during such investigation;

b.    to form an implementation team to oversee the activities contemplated by the agreement;

c.    to prepare all necessary government filings;

- 31 -

d.      to agree to and execute a manufacturing agreement;

e.      to enter into a "Quality Agreement," which Plaintiff has not been able to discover through public sources;

f.      to permit audits to monitor compliance with the agreements;

g.      to enter into an agreement whereby aaiPharma guaranteed NeoSan's performance;

h.      to keep confidential all confidential information;

i.      to indemnify each other for losses caused by the indemnifying party's breaches of the agreement; and

j.      to bind all successors and assigns.

176.    The Assignment, Transfer, and Assumption Agreement specifically indicates that nothing therein would forbid Eli Lilly from fulfilling the requirements of a 1994 propoxyphene supply agreement that it had with Mylan and/or Mylan Pharmaceuticals.

177.    In connection with the Assignment, Transfer, and Assumption Agreement, NeoSan and Eli Lilly also entered into a Manufacturing Agreement on February 18, 2002, which was set to expire on December 31, 2004, subject to a six month extension at NeoSan's election.

178.    Under the Manufacturing Agreement, NeoSan agreed to purchase a set percentage of its Darvocet and Darvon from Eli Lilly, who would manufacture the products, which equaled 60% in the first year of the contract, 50% in the second contract year, and 40% in the third contract year.

179.    The Manufacturing Agreement also obligated Eli Lilly to transfer its existing inventory of Darvocet and Darvon products to NeoSan, and provided that the aaiPharma Entities would "not re-label or over-label any such Product inventory without the prior written consent of Lilly, which consent will not be unreasonably withheld."

180.    The publicly available Manufacturing Agreement Plaintiff has been able to discover did not include multiple exhibits and related documents to that agreement, including but not limited to a Quality Agreement setting forth certain quality and regulatory responsibilities relating to the manufacture and release for sale of the Product by Eli Lilly to NeoSan, a schedule setting forth the specifications for manufacturing and packaging the product, a schedule setting forth the amount of

- 32 -

1   inventory transferred from Eli Lilly to the aaiPharma Entities and the prices paid for that product, and

2   a Manufacturing Responsibility Document setting forth additional written instructions regarding the

3   manufacture and sale of the products.

4        181.   In addition to NeoSan's agreement with Eli Lilly, aaiPharma LLC entered into a

5   Manufacturing and Supply Agreement with DSM Pharmaceuticals, Inc. ("DSM") on January 26,

6   2004, which specified that DSM would exclusively manufacture and supply Darvocet-N 100 for

7   aaiPharma LLC for five years from the first commercial production of the product.

8        182.   The agreement also stated that DSM would be responsible for distributing any product

9   that had already been manufactured by aaiPharma LLC or any third party.  Upon information and

10  belief, these "third parties" included Eli Lilly and the products in question included at least the

11  Darvocet-N 100 acquired by the aaiPharma Entities from Eli Lilly.

12
13              **B.     The aaiPharma Entities Were Investigated for Securities Fraud and Filed
                        for Bankruptcy.**
14

15       183.   After NeoSan acquired the marketing rights to Darvocet and Darvon, the aaiPharma

16  Entities reported high sales for those products in their public filings with the Securities and Exchange

17  Commission ("SEC").

18       184.   Certain analysts questioned the public numbers, noting that industry data on written

19  prescriptions did not reflect increased demand for either Darvocet or Darvon and suggesting that the

20  aaiPharma Entities had been engaging in "channel stuffing" for both products, i.e. counting shipped-

21  but-unsold drugs as revenue, even though some of them likely would be returned.

22       185.   In 2003, the aaiPharma Entities received a letter from the SEC generally addressing

23  the same issue.

24       186.   These issues came to a head in 2004, when the aaiPharma Entities announced an

25  internal investigation and disclosed that they had received five subpoenas from a grand jury in

26  Charlotte, North Carolina seeking information about the sales of Darvocet and Darvon.

27  ///

28  ///

- 33 -

187.    Ultimately, the aaiPharma Entities disclosed that they had overstated their revenue by counting shipped-but-not sold product (specifically including Darvocet and Darvon) as revenue, and in the wake of this revelation, the company filed for Chapter 11 bankruptcy on May 9, 2005.

188.    As a result of these events, the aaiPharma Entities' former CEO – David M. Hurley – pled guilty to fraud and financial misrepresentation, and settled civil charges with the SEC.

### C.    Xanodyne acquired the NDAs for Darvocet and Darvon and assumed the aaiPharma Entities' obligations to Eli Lilly

189.    On July 25, 2005, the aaiPharma Entities (which were then in the process of bankruptcy proceedings) sold their drug business (including the propoxyphene products) to Xanodyne.

190.    Specific assets sold included the following:

a.    NDAs related to propoxyphene products, including NDA 10-996 (Darvon Compound, Darvon Compound-65 and Darvon with ASA), NDA 10-997 (Darvon 65mg capsules), NDA 16-862 (Darvon N (100 mg tablet)), NDA 17-122 (Darvocet N 50 and Darvocet N 100), NDA 17-507 (Darvocet N Suspension), and NDA 76-429 (Darvocet A500).

b.    drug manufacturing and investigative files related to propoxyphene products;

c.    all of the aaiPharma Entities' existing inventory of propoxyphene products and propoxyphene bulk active ingredient;

d.    certain intellectual property related to propoxyphene products; and

e.    all of the aaiPharma Entities' rights under certain contracts, specifically including the aaiPharma Entities' rights under the 2002 Assignment, Transfer, and Assumption Agreement between NeoSan and Eli Lilly.

191.    Xanodyne accordingly assumed NeoSan's obligation to pay Eli Lilly royalties for product reformulations, i.e. the royalty obligation created by the 2002 Assignment, Transfer, and Assumption Agreement.

192.    Xanodyne also assumed all other obligations of NeoSan under the 2002 Assignment, Transfer, and Assumption Agreement.

- 34 -

193.     The bankruptcy Court authorized assignment of NeoSan's obligations under the 2002 Assignment, Transfer, and Assumption agreement to Xanodyne in an order dated July 18, 2005. Bnkrpcy. Ct. Del. 05-11341-CSS, Dckt. # 296.

194.     The purchase and sale agreement between the aaiPharma Entities and Xanodyne explicitly noted that the aaiPharma Entities were in default on payment obligations for raw propoxyphene purchased from Eli Lilly.

195.     In conjunction with the purchase and sale agreement, Xanodyne entered into a "Master Services Agreement" with AAI DS.

196.     Under that agreement, Xanodyne agreed that AAI DS would manufacture 100% of Xanodyne's Darvocet-N 50, Darvon, Darvon-N, and Darvon Compound 65.

197.     This agreement continued until 2009, when the aaiPharma Entities sold their contract manufacturing assets to AAI Services, a newly created company. AAI Services appears to have manufactured propoxyphene products for Xanodyne until those products were removed from the market.

198.     Darvocet A500, one of the Propoxyphene Products sold to Xanodyne by the aaiPharma Entities, was purchased by the aaiPharma Entities from Athlon Pharmaceuticals Inc. ("Athlon") in July 2003. Under the terms of the agreement, the aaiPharma Entities owe Athlon royalties in an amount equal to 10% of the net sales of Darvocet A500 and any other combination propoxyphene napsylate and acetaminophen products that they may sell in the future through 2023.

199.     Darvocet A500 was manufactured and supplied by Mikart, Inc. and was to be supplied by Mikart, Inc. until 2013, but in June 2004, the aaiPharma Entities notified Athlon that Athlon had breached a related services agreement, and initiated litigation. Athlon brought counterclaims seeking payment of unpaid monthly payments under the contract and additional litigation with respect to the royalty provisions in the asset purchase agreement. Despite Plaintiff's best efforts, it remains unclear whether these royalty payments are still owed to Athlon by Xanodyne as the aaiPharma Entities' successor-in-interest.

200.     On February 21, 2007 Xanodyne and DSM entered into an agreement for the manufacture of Darvocet. Upon information and belief, DSM continued to produce Darvocet-N 100

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

for Xanodyne pursuant to its prior agreement with the aaiPharma Entities, and entered into a separate agreement with Xanodyne to continue manufacturing the same. Therefore, DSM had separate contractual agreements with both the aaiPharma Entities and Xanodyne to manufacture Darvocet.

**D.    Both the aaiPharma Entities and Xanodyne sold Darvocet and Darvon labeled by Eli Lilly.**

201.    Because of the aaiPharma Entities' bankruptcy, the Delaware bankruptcy court had to approve the asset sale.

202.    In connection with that sale, Eli Lilly filed documents indicating the aaiPharma Entities was responsible for paying Medicare/Medicaid reimbursements for all Darvon or Darvocet products sold after the effective date of the 2002 Assignment, Transfer and Assumption Agreement.

203.    As described above, the aaiPharma Entities acquired Eli Lilly's inventory of Darvon and Darvocet products when the 2002 Assignment, Transfer and Assumption Agreement was executed. Eli Lilly's filings in the bankruptcy court indicate that this was "product manufactured and labeled by Lilly."

204.    Individual state Medicaid agencies would invoice Eli Lilly for Medicare or Medicaid reimbursements in connection with sale of the acquired inventory, i.e., Eli Lilly would be charged when NeoSan sold Darvocet or Darvon drawn from Eli Lilly's pre-agreement inventory. Eli Lilly would in turn invoice NeoSan/the aaiPharma Entities for these charges.

205.    As of July 6, 2005, Eli Lilly contended the aaiPharma Entities owed Eli Lilly $1,093,931.78 in such charges. Eli Lilly indicated it expected further amounts would accrue between January 1, 2005 and the effective date of Xanodyne's assumption of the 2002 Agreement, and that it was likely that additional amounts would accrue even after Xanodyne assumed the contract, although Plaintiff requires discovery to determine the extent and amount of these payments.

206.    This indicates that the aaiPharma Entities likely sold Eli Lilly-labeled product even after buying the NDA, and that Xanodyne may have sold the same, although Plaintiff will require discovery to determine the extent and amount of such sales.

- 36 -

207.    Statements made by Xanodyne in public filings confirm this.  In a Form S-1 filed with the Securities and Exchange Commission on June 8, 2008, Xanodyne noted that:

> The products that we acquired from AAIPharma in July 2005 had been previously acquired by AAIPharma from various other third parties.  Before selling these products to us, AAIPharma continued to use the third parties' National Drug Code, or NDC, numbers for the products.  Among other purposes, state Medicare and Medicaid programs use NDC numbers to track product utilization.  Because AAIPharma used the third parties' NDC numbers, these third parties paid the Medicaid and Medicare rebates directly and billed AAIPharma in arrears.  At the time of acquisition and for a period of time following the acquisition, this created an unpredictable rebate history for these products on which to base our Medicaid and Medicare rebate accruals.

208.    Upon information and belief, these "third parties" included Eli Lilly and the products in question included the Propoxyphene Products acquired by the aaiPharma Entities from Eli Lilly.

209.    Xanodyne went on to indicate that they were able to pay the referred-to Medicare rebates directly "after transitioning the NDC numbers for the products to Xanodyne NDC numbers."

210.    Xanodyne's Form S-1 also noted that Xanodyne believed the trademarks on Darvocet and Darvon were "an important factor in marketing those products," and that it relied on "brand reputation and awareness among physicians and patients to generate ongoing market demand for and sale of" Darvocet and Darvon without promotional efforts from Xanodyne.

### E.    Xanodyne was Obligated to Pay Royalties to Eli Lilly for Its Sales of Darvocet.

211.    Xanodyne's 2008 Form In S-1 Registration Statement contained the following assertion:

> As a result of our acquisition of all of AAIPharma's rights to Darvon and Darvocet, including the related trademarks and NDAs that AAIPharma had originally acquired from Eli Lilly in February 2002, we have agreed to pay Eli Lilly a royalty based on net sales in the United States above specified sales thresholds of all forms of Darvon and Darvocet covered by the acquired NDAs and, with specified exceptions, any new pharmaceutical product containing the active pharmaceutical ingredient propoxyphene or the name "Darvon" or "Darvocet." We do not currently expect to pay this royalty prior to FDA approval and the initiation of commercial sale of XP20B, which we

- 37 -

expect to market as a line extension of our Darvocet brand.  We do not anticipate this to occur earlier than 2011.

212.   That same form contained the following statement:

We have agreed to pay AAIPharma a royalty through December 2011 based on quarterly net sales of Zipsor, XP20B and any orally administered follow on products.  If we decide to develop any pain products containing the active pharmaceutical ingredient propoxyphene or diclofenac, or opioid products in combination with acetaminophen or an NSAID, or if we elect to continue to develop any pain products offered to us by AAIPharma, we are obligated to pay AAIPharma a royalty based on net sales of such pain products for ten years following commercial launch.

213.   XP20B was a time-release combination propoxyphene and acetaminophen modified release oral tablet being developed by Xanodyne.

**F.      Xanodyne Relied on Third Parties to Manufacture and Perform Other Services Related to Its Product Line of Propoxyphene Products.**

214.   Xanodyne has stated in its S-1/A filing of January 11, 2008 that it does not own or operate, and has no plans to establish, any manufacturing facilities for its products, which would include Darvocet and other branded propoxyphene products.

215.   Xanodyne further stated in this filing that it relies, and continues to rely, upon third parties for the supply of the active pharmaceutical ingredients in its products, which would include Darvocet and other branded propoxyphene products.

216.   Xanodyne further stated in this filing that it has entered into manufacturing agreements with various entities, including but not limited to, the aaiPharma Entities.

217.   Xanodyne further stated in this filing that it relies on third parties, such as the aaiPharma Entities, to conduct clinical trials of propoxyphene-containing medications.

218.   As discovery is on-going, Plaintiff is still in the process of discovering the extent of the various relationships by and among Xanodyne and other Defendants in this case, except to the extent set forth elsewhere in this Complaint.

///

///

- 38 -

### G.    The Innovator and Brand Defendants Were Inter-Related.

219.    Even after selling the intellectual property rights associated with propoxyphene-containing drugs such as Darvocet and Darvon, the Innovator and Brand Defendants retained significant rights and control with respect to the manufacturing, labeling, and distribution of the drugs and continued to reap royalties based on net sales of the drugs in the United States, and as a result, they had an ongoing interest in maintaining sales of Propoxyphene Products such as Darvocet and Darvon.

220.    In particular, the Assignment, Transfer, and Assumption Agreement between Eli Lilly and NeoSan referenced above, required Eli Lilly to share its experience and other know-how related to Propoxyphene Products such as Darvocet and Darvon with NeoSan.

221.    As a result of the foregoing, the Innovator and Brand Defendants are liable to Plaintiff, jointly and severally, due to the foregoing contractual and other relationships by, between and among the Innovator and Brand Name Defendants, at all relevant times, under the legal doctrine(s) of agency, vicarious liability, and/or respondeat superior.

## IV.    NDC NUMBERS AND PLAINTIFFS' INGESTION OF PROPOXYPHENE PRODUCTS

222.    Upon information and belief, as alleged above, Plaintiffs ingested propoxyphene containing prescription drugs manufactured by Defendants.

223.    Ingestion of a prescription drug may be demonstrated by various means.  One such method is through the use of a National Drug Code ("NDC") identifier.

224.    The NDC number may be, but is not always, helpful in identifying the particular medication taken by a particular patient.

225.    For instance, 21 CFR 201.2 states that "[t]he National Drug Code (NDC) number is requested but not required to appear on all drug labels and in all drug labeling, including the label of any prescription drug container furnished to a consumer."

/ / /

/ / /

- 39 -

226.    At other times, the pharmacy or other entity dispensing the medication may no longer possess the documents that would provide an otherwise valid NDC number, or some pharmacies do not include NDC numbers in their records.

227.    In other instances, it can take six months or longer to obtain records, even from established retail pharmacies.  Other, unique problems can arise in obtaining such records for a plaintiff who obtained his or her prescription by mail.

228.    Additionally, in a preamble to the NDC directory, the FDA states, among other things, that "The NDC Directory contains ONLY information submitted to FDA in SPL electronic listing files by labelers.  (A labeler may be either a manufacturer, including a repackager or relabeler, or, for drugs subject to private labeling arrangements, the entity under whose own label or trade name the product will be distributed.)."

229.    In sum, the NDC number is not always available, and there are other methods to establish proof of ingestion of a particular Propoxyphene Product.

### FIRST CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Against All Defendants)

230.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

231.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

232.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

233.    At all relevant times, all Propoxyphene Products were associated with a greatly increased risk of developing severe adverse cardiovascular effects that could result in death, and that risk outweighed their benefit for pain relief.

- 40 -

234.    At all relevant times, practical and medically-feasible alternate pain management medications that did not contain propoxyphene or involve an increased risk of serious adverse cardiovascular effects that could result in death were available.

235.    At all relevant times, the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

236.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

237.    For these reasons, at all relevant times, all of Defendants' Propoxyphene Products were in an unreasonably dangerous and defective condition.

238.    For these reasons, all of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were in an unreasonably dangerous and defective condition at the time of purchase.

239.    All of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested was expected to and did reach Plaintiffs without substantial change in the unreasonably dangerous and in a defective condition in which they were when they left the hands of Defendants.

240.    Plaintiffs took their Propoxyphene Products in the intended and prescribed manner, and as a direct and proximate result, suffered the injuries described above.

241.    As a direct and proximate result of the defective and inappropriate design and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from

1    the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will

2    continue into the future.

3         242.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and

4    deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby

5    entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter

6    them from similar conduct in the future.

7         WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and

8    punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the

9    Court deems proper.

### SECOND CAUSE OF ACTION
10   **STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
11   **(Against All Defendants)**

12        243.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

13   Complaint.

14        244.   At all relevant times, the Innovator and Brand Defendants were engaged in the

15   business of researching, designing, manufacturing, testing, studying, labeling, packaging,

16   distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name

17   Propoxyphene Products.

18        245.   At all relevant times, the Generic Defendants were engaged in the business of

19   researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling,

20   supplying, marketing and/or promoting generic Propoxyphene Products.

21        246.   At all relevant times:

22        a.    propoxyphene had not been adequately tested;

23        b.    Propoxyphene Products were associated with a greatly increased risk of serious
              adverse cardiovascular events that could result in death, which outweighed
24            their benefit for pain relief;

25        c.    the risks, and the nature, scope, severity and duration of any serious side
              effects, were greater with Propoxyphene Products than with other practical,
26            medically feasible and available pain management medications;

27        d.    Propoxyphene Products were unreasonably dangerous to the health of patients
28            suffering from pain; and

- 42 -

     e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

247.    At all relevant times, the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

248.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

249.    At all relevant times, Defendants failed to adequately warn the general public or the medical community – including Plaintiffs and their treating physicians – about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

250.    More specifically, Defendants failed to adequately warn the general public or the medical community – including Plaintiffs and their treating physicians – that:

    a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

    b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

    c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

    d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

- 43 -

e.    In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.    In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.    In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

251.    Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.

252.    Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

253.    The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

254.    It would have been technologically feasible, and would not have been cost-prohibitive, for Defendants to include adequate warnings and instructions in their marketing and labeling materials, and in their communications to the general public and the health care community.

255.    Defendants instead used their resources to downplay the risks associated with propoxyphene and Propoxyphene Products in their instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.

/ / /

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

256.   At all relevant times, all of Defendants' Propoxyphene Products were in an unreasonably dangerous and defective condition, because they were distributed without the warnings outlined above.

257.   For these reasons, all of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were in an unreasonably dangerous and defective condition at the time of purchase.

258.   All of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were expected to and did reach Plaintiffs without substantial change in the unreasonably dangerous and defective condition in which they were when they left the hands of Defendants.

259.   Plaintiffs took their Propoxyphene Products in the intended and prescribed manner, and as a direct and proximate result, suffered the injuries described above.

260.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY IN TORT
### (Against All Defendants)

261.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

262.   Defendants used and controlled toxic propoxyphene for use in humans.

263.   Propoxyphene is highly toxic, inherently dangerous, and ultra-hazardous to humans.

- 45 -

264. Defendants allowed and directed that toxic propoxyphene be used and directed in humans.

265. As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT DESIGN**
**(Against All Defendants)**

266. Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

267. At all relevant times, the Innovator and Brand Defendants were engaged in the business of designing Darvocet/Darvon, brand-name Propoxyphene Products.

268. At all relevant times, the Generic Defendants were engaged in the business of designing generic Propoxyphene Products.

269. At all relevant times, Defendants had a duty to exercise reasonable care to carefully and properly design their Propoxyphene Products to be reasonably safe prescription pain management medications.

270. Defendants breached that duty because all of the Propoxyphene Products that they designed were in an unreasonably dangerous and defective condition, for the reasons described above.

- 46 -

271.    Because of Defendants' failure to properly design their Propoxyphene Products, those products were placed on the market and sold to Plaintiffs while they were in an unreasonably dangerous and defective condition.

272.    Plaintiffs purchased and ingested Defendants' Propoxyphene Products, which were in an unreasonably dangerous and defective condition at the time of purchase, in a reasonably foreseeable manner and substantially as intended by Defendants.

273.    As a direct and proximate result, Plaintiffs suffered the injuries described above.

274.    It was foreseeable that persons like Plaintiffs who ingested Defendants' Propoxyphene Products would, as a direct and proximate result, suffer those injuries.

275.    In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

276.    Through these actions and inactions, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

277.    As a direct and proximate result of the negligent design and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

/ / /

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# FIFTH CAUSE OF ACTION
## NEGLIGENCE
### (Against All Defendants)

278.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

279.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, testing, studying, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

280.    At all relevant times, the Generic Defendants were engaged in the business of researching, testing, studying, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

281.    At all relevant times, Defendants had a duty to:

    a.    exercise reasonable care to conduct adequate studies, tests, surveillance and analyses to assess the risks and adverse effects associated with their Propoxyphene Products; and

    b.    stop distributing, selling and/or supplying them if they discovered that the drugs were unreasonably dangerous and defective.

282.    Defendants breached those duties, because:

    a.    they failed to timely conduct adequate studies, tests, surveillance and analysis, which would have confirmed that their Propoxyphene Products were unreasonably dangerous and defective, for the reasons described above, and that other practical, medically-feasible and safer alternatives were available; and

    b.    they failed to timely stop distributing, selling and/or supplying their Propoxyphene Products once they discovered or should have discovered that those drugs were unreasonably dangerous and defective, and that other practical and medically-feasible alternatives that were safer were available.

283.    If Defendants had not breached those duties, their unreasonably dangerous and defective Propoxyphene Products would not have been on the market for Plaintiffs to purchase and ingest, and Plaintiffs would not have suffered the injuries described above.

- 48 -

284.    Because of these breaches, however, Defendants' unreasonably dangerous and defective Propoxyphene Products were on the market, and Plaintiffs purchased and ingested them in a reasonably foreseeable manner and substantially as intended by Defendants.

285.    As a direct and proximate result, Plaintiffs suffered the injuries described above.

286.    It was foreseeable that persons like Plaintiffs who ingested Defendants' Propoxyphene Products would, as a direct and proximate result, suffer those injuries.

287.    In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

288.    Through these actions and inactions, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

289.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO WARN
### (Against All Defendants)

290.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

- 49 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

291.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

292.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

293.    The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

    a.    to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

    b.    to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

294.    Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products, Defendants knew or should have known that:

    a.    propoxyphene had not been adequately tested;

    b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

    c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

    d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

    e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management

- 50 -

medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

295.    At all relevant times, Defendants knew or should have known that the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

296.    More specifically, Defendants knew or should have known that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware of the information outlined above, absent disclosures from Defendants, because:

    a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

    b.    Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

297.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

298.    At all relevant times, Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians – about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

299.    More specifically, Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians, about the following facts that it knew or should have known:

    a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

- 51 -

b.  In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.  In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.  In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.  In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.  In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.  In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

300.  Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

301.  Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

302.  The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

303.    It would have been technologically feasible, and would not have been cost-prohibitive, for Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

304.    Defendants instead used their resources to downplay the risks associated with propoxyphene and Propoxyphene Products in their instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.

305.    Plaintiffs and their prescribing physicians justifiably relied on the lack of information about the risks associated with Propoxyphene Products and/or about other available, practical and medically-feasible pain management medications, and acted upon it, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

306.    Had Defendants provided adequate disclosures:

    a.    Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

307.    In light of what Defendants knew or should have known, they should have anticipated that their failure to disclose the dangers of propoxyphene and Propoxyphene Products, and of the availability of practical and medically-feasible alternate pain management medications that posed less risk, would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing

1    and ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious
2    adverse cardiovascular effects that could result in death.

3        308.   Plaintiffs prescription for and purchase and ingestion of Defendants' Propoxyphene
4    Products, and the injuries described above that followed, were the direct and proximate result of
5    Defendants' failure to disclose.

6        309.   By failing to provide adequate disclosures, Defendants knowingly risked the lives of
7    unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and
8    outrageous, and warrants an award of punitive damages.

9        310.   As a direct and proximate result of the defective and inappropriate warnings and the
10   unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to
11   comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as
12   herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and
13   emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered
14   lost wages and earnings, and were otherwise physically, emotionally, and economically injured.
15   Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the
16   Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will
17   continue into the future.

18       WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and
19   punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the
20   Court deems proper.

### SEVENTH CAUSE OF ACTION
### FRAUDULENT NONDISCLOSURE
### (Against All Defendants)

23       311.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this
24   Complaint.

25       312.   At all relevant times, the Innovator and Brand Defendants were engaged in the
26   business of researching, designing, manufacturing, testing, studying, labeling, packaging,
27   distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name
28   Propoxyphene Products.

- 54 -

313.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

314.    The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

    a.    to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

    b.    to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

315.    Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products, Defendants knew that:

    a.    propoxyphene had not been adequately tested;

    b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

    c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

    d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

    e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

316.    At all relevant times, Defendants knew that the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain

- 55 -

management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

317.    More specifically, Defendants knew that the general public and the health care community -- including Plaintiffs and their prescribing physicians -- would not have been aware of the information outlined above, absent disclosures from Defendants, because:

    a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

    b.    Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

318.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

319.    At all relevant times, Defendants failed to adequately disclose to the general public or the medical community -- including Plaintiffs and their treating physicians -- about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

320.    More specifically, Defendants failed to adequately disclose to the general public or the medical community -- including Plaintiffs and their treating physicians, about the following facts that it knew:

    a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

    b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

    c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.    In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.    In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.    In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

321.    Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

322.    Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

323.    The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

324.    It would have been technologically feasible, and would not have been cost-prohibitive, for the Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

325.   Defendants instead used their resources to conceal and downplay the risks associated with Propoxyphene Products in their promotional materials, instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.Defendants failed to disclose the material information outlined above because they wanted the general public and the health care community – including Plaintiffs and their prescribing physicians – to believe that Propoxyphene Products were safe and effective, and wanted to induce medical providers – including Plaintiffs prescribing physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to purchase and ingest their Propoxyphene Products.

326.   Plaintiffs and their prescribing physicians justifiably relied on the lack of information about the risks associated with Propoxyphene Products and/or about other available, practical and medically-feasible pain management medications, and acted upon it, by Plaintiffs physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

327.   Had Defendants provided adequate disclosures:

    a.    Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

328.  In light of what Defendants knew, they had to have known or anticipated that their failure to disclose the dangers of propoxyphene and Propoxyphene Products, and of the availability of practical and medically-feasible alternate pain management medications that posed less risk, would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious

2  adverse cardiovascular effects that could result in death.

3      329.  Plaintiffs prescription for and purchase and ingestion of Defendants' Propoxyphene

4  Products, and the injuries described above that followed, were the direct and proximate result of

5  Defendants' knowing failure to disclose.

6      330.  By failing to make the disclosures outlined above, Defendants knowingly risked the

7  lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was

8  extreme and outrageous, and warrants an award of punitive damages.

9      331.  Upon information and belief, Plaintiffs allege that Defendants actively and

10 fraudulently concealed information in Defendants' exclusive possession regarding the hazards

11 associated with the Propoxyphene Products with the purpose of preventing consumers, such as

12 Plaintiffs, from discovery these hazards.

13     332.  As a direct and proximate result of the defective manufacturing and the unreasonably

14 dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to

15 comply with federal standards and requirements, the Plaintiffs suffered severe and permanent

16 injuries.  Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in

17 nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages

18 and earnings, and was otherwise physically, emotionally, and economically injured.  Plaintiffs

19 suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as

20 alleged herein.  The injuries and damages alleged herein are permanent and will continue into the

21 future.

22     333.  Defendants acted willfully or with gross negligence indicating a wanton disregard for

23 the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages.  The

24 aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate

25 disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs

26 to punitive damages in an amount appropriate to punish the Defendants and deter them from similar

27 conduct in the future.

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

334.  The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

335.  Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

336.  At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

337.  At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

338.  The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

    a.    to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiff and their prescribing physicians; and

    b.    to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

339.    Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products, Defendants knew or should have known that:

a.    propoxyphene had not been adequately tested;

b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

340.    More specifically, Defendants knew or should have known that:

a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

- 61 -

e.  In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.  In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.  In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

341.  Despite what the Innovator and Brand Defendants knew or should have known, upon information and belief, they represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional materials and labeling that:

a.  propoxyphene had been adequately tested;

b.  Propoxyphene Products were safe and effective for pain management; and

c.  Propoxyphene Products were more effective for pain management than other pain management medications.

342.  Similarly, despite what the Generic Defendants knew or should have known, upon information and belief, they represented to the general public and the health care community in their instructional materials and labeling that:

a.  propoxyphene had been adequately tested;

b.  Propoxyphene Products were safe and effective for pain management; and

c.  Propoxyphene Products were more effective for pain management than other pain management medications.

343.  These representations made by Defendants were false at the time that they were made, and Defendants knew or should have known that they were false.

344.  Defendants knew or should have known that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that

- 62 -

their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

    a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

    b.    Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

345.    At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that Defendants' misrepresentations were false.

346.    Because of what Defendants knew or should have known, as described above, they failed to exercise reasonable care or competence in making these misrepresentations.

347.    Plaintiffs and their prescribing physicians justifiably relied and acted upon Defendants' misrepresentations, by Plaintiffs physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

348.    Had Defendants not made these misrepresentations:

    a.    Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

349.    In light of what Defendants knew or should have known, they should have anticipated that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

/ / /

/ / /

- 63 -

350.    Plaintiffs prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of Defendants' misrepresentations.

351.    By making the misrepresentations described above, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

352.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### NINTH CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION AND CONCEALMENT
### (Against All Defendants)

353.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

354.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

/ / /

/ / /

- 64 -

355.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

356.    The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

      a.   to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

      b.   to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

357.    Before Plaintiffs was injured by ingesting Defendants' Propoxyphene Products, Defendants knew that:

      a.   propoxyphene had not been adequately tested;

      b.   Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

      c.   the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

      d.   Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

      e.   Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

358.    More specifically, Defendants knew that:

- 65 -

a.  In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.  In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.  In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.  In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.  In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.  In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.  In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

359.  Despite what the Innovator and Brand Defendants knew, upon information and belief, they falsely represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

a.  propoxyphene had been adequately tested;

b.  Propoxyphene Products were safe and effective for pain management; and

- 66 -

     c.    Propoxyphene Products were more effective for pain management than other pain management medications.

360.    Similarly, despite what the Generic Defendants knew, upon information and belief, they falsely represented to the general public and the health care community in their instructional materials and labeling that:

     a.    propoxyphene had been adequately tested;

     b.    Propoxyphene Products were safe and effective for pain management; and

     c.    Propoxyphene Products were more effective for pain management than other pain management medications.

361.    These representations were all intentionally false and misleading at the time that they were made, and Defendants knew that they were false and misleading, and willfully, wantonly and recklessly disregarded that they were false.

362.    Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

     a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

     b.    Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

363.    At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that Defendants' misrepresentations were false.

364.    Defendants made these material misrepresentations because they wanted the general public and the health care community to rely on them, and wanted to induce medical providers – including Plaintiffs prescribing physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to purchase and ingest their Propoxyphene Products.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

365.    Plaintiffs and their prescribing physicians justifiably relied and acted upon Defendants' misrepresentations, by Plaintiffs physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

366.    Had Defendants not made these misrepresentations:

    a.    Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products, and

    c.    Plaintiffs would not have suffered the injuries described above.

367.    In light of what Defendants knew, they had to have known that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

368.    Plaintiffs prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of Defendants' knowing misrepresentations.

369.    By making the misrepresentations described above, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

370.    Upon information and belief, Plaintiffs allege that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with the Propoxyphene Products with the purpose of preventing consumers, such as Plaintiffs, from discovery these hazards.

371.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to

- 68 -

1  comply with federal standards and requirements, the Plaintiffs suffered severe and permanent

2  injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in

3  nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages

4  and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs

5  suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as

6  alleged herein. The injuries and damages alleged herein are permanent and will continue into the

7  future.

8      372.    Defendants acted willfully or with gross negligence indicating a wanton disregard for

9  the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The

10  aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate

11  disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs

12  to punitive damages in an amount appropriate to punish the Defendants and deter them from similar

13  conduct in the future.

14     373.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and

15  deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby

16  entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter

17  them from similar conduct in the future.

18     WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and

19  punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the

20  Court deems proper.

### TENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### (Against All Defendants)

21

22

23     374.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this

24  Complaint.

25     375.    At all relevant times, the Innovator and Brand Defendants were engaged in the

26  business of researching, designing, manufacturing, testing, studying, labeling, packaging,

27  distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name

28  Propoxyphene Products.

- 69 -

376.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

377.    Under the doctrine of negligence per se, otherwise known as statutory negligence, the duty of Defendants to exercise reasonable care included the obligation to conform their products and activities related to those products to safety standards imposed by applicable statutes or regulations.

378.    At all relevant times, Defendants violated federal standards for the sale of prescription drugs set forth in the Federal Food, Drug and Cosmetic Act, at 21 C.F.R. § 310.303, because their Propoxyphene Products were not safe and effective for their intended use.

379.    Additionally, there were violations of federal standards for the sale of prescription drugs set forth in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., by the Innovator and Brand Defendants at all relevant times, and by the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before, as follows:

a.    Their Propoxyphene Products were adulterated pursuant to 21 U.S.C. § 351 because, among other things, their quality fell below the standard set forth in the official compendium for their Propoxyphene Products and such deviations were not plainly stated in their labels.

b.    Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because, among other things, their labeling was false or misleading.

c.    Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because words, statements or other information required by or under authority of that section were not prominently placed thereon with such conspicuousness and in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

d.    Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because the labeling did not bear adequate directions for use, and/or the labeling did not bear adequate warnings against use where their use may have been dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as were necessary for the protection of users.

e.    Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because they were dangerous to health when used in the dosage or manner, or

- 70 -

with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

    f.    Their Propoxyphene Products' labeling was not informative and accurate as required by 21 C.F.R. § 201.56.

    g.    Their Propoxyphene Products were misbranded pursuant to 21 C.F.R. § 201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false or misleading.

    h.    Their Propoxyphene Products were mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling failed to describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur.

    i.    Their Propoxyphene Products were mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling was not revised to include a warning as soon as there was reasonable evidence of an association of a serious hazard with the drugs.

    j.    Defendants failed to list the adverse reactions that occurred with their Propoxyphene Products and other drugs in the same pharmacologically active and chemically related class, as required by 21 C.F.R. § 201.57.

    k.    Defendants violated 21 C.F.R. § 310.303 by failing to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there were or might have been grounds for suspending or withdrawing approval of the application for their Propoxyphene Products to the FDA.

380.    Such violations constitute a breach of duty of reasonable care toward Plaintiffs that would subject Defendants to civil liability for personal injuries proximately caused by the violations.

381.    As a lawful consumer of Defendants' Propoxyphene Products, Plaintiffs was within the class of persons the statutes and regulations described above was designed to protect, and their injuries were the type of harm they were intended to prevent.

382.    As a direct and proximate cause of the violations of these statutes and regulations by Defendants, which therefore constitute negligent per se acts and/or omissions, Plaintiffs suffered the injuries set forth in this Complaint.

///

///

- 71 -

383. By violating these statutes and regulations, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

384. As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

385. Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

386. At all relevant times, the Innovator and Brand Defendants were engaged in the business of selling goods, which were Darvocet/Darvon.

387. At all relevant times, the Generic Defendants were engaged in the business of selling goods, which were generic Propoxyphene Products.

388. Upon information and belief, at all relevant times, Defendants expressly warranted that:

a. propoxyphene, such as that contained in their Propoxyphene Products, had been adequately tested;

b. propoxyphene, such as that contained in their Propoxyphene Products, was safe and effective for pain management; and

- 72 -

c.    Propoxyphene Products, such as their Propoxyphene Products, were more effective for pain management than other pain management medications.

389.   Upon information and belief, Defendants made these express warranties for the benefit of Plaintiffs.

390.   These express warranties were relied upon, and were part of the basis of the bargain for, Plaintiffs and their prescribing physicians.

391.   Defendants' Propoxyphene Products did not conform to these express warranties, because:

a.    Propoxyphene, such as that contained in Defendants' Propoxyphene Products, had not been adequately tested;

b.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c.    the risks, and the nature, scope, severity and duration of any serious side effects were greater with Propoxyphene Products, such as Defendants' Propoxyphene Products,  than with other practical, medically-feasible and available pain management medications;

d.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were unreasonably dangerous to the health of patients suffering from pain; and

e.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were no more effective for pain management than other practical, medically-feasible and available alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

392.   Had Defendants not made these express warranties:

a.    Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

b.    Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

c.    Plaintiffs would not have suffered the injuries described above.

- 73 -

393.   Upon information and belief, Defendants did, however, make these express warranties, and as a result, Plaintiffs' physicians prescribed Propoxyphene Products, and Plaintiffs purchased and ingested Defendants' Propoxyphene Products, and suffered the injuries described above.

394.   Plaintiffs' injuries that are described above were the direct and proximate result of Defendants' breach of their express warranties.

395.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY
### (Against All Defendants)

396.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

397.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of selling goods, which were Darvocet/Darvon and owed a duty to consumers regarding all Propoxyphene Products.

398.   At all relevant times, the Generic Defendants were engaged in the business of selling goods, which were generic Propoxyphene Products.

- 74 -

399.    Defendants sold their Propoxyphene Products to Plaintiffs.

400.    The ordinary purpose for which Propoxyphene Products are used is for safe and effective management of pain.

401.    The Propoxyphene Products that Defendants sold to Plaintiffs were not fit for their ordinary purpose of providing safe and effective management of pain because:

a.    Propoxyphene, such as that contained in Defendants' Propoxyphene Products, had not been adequately tested;

b.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c.    the risks, and the nature, scope, severity and duration of any serious side effects were greater with Propoxyphene Products, such as Defendants' Propoxyphene Products,  than with other practical, medically-feasible and available pain management medications;

d.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were unreasonably dangerous to the health of patients suffering from pain; and

e.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were no more effective for pain management than other practical, medically-feasible and available alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

402.    Plaintiffs' injuries that are described above were the direct and proximate result of the failure of Defendants' Propoxyphene Products to be fit for their ordinary purpose of providing safe and effective management of pain.

403.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the

- 75 -

Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
### DECEIT BY CONCEALMENT – VIOLATION OF CALIFORNIA CIVIL CODE §§ 1709, 1710
### (Against All Defendants)

404. Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

405. The Defendants had actual knowledge based upon studies, published reports, and clinical experience, that products containing propoxyphene created an unreasonable risk of serious bodily injury or should have known such information.

406. The Defendants intentionally omitted, concealed and suppressed this information from the product labeling, promoting, and advertising of products containing propoxyphene and instead labeled, promoted, and advertised products containing propoxyphene as safe in order to avoid losses and sustain profits in its sale to consumers, as Defendants knew that Plaintiffs' healthcare providers would not have exposed Plaintiffs to products containing propoxyphene had Plaintiffs' healthcare providers known or otherwise been aware of the true facts concerning propoxyphene administration.

407. Plaintiffs and Plaintiffs' healthcare providers reasonably relied, to their detriment, upon the Defendants' fraudulent actions and omissions in their representations concerning the risks of propoxyphene in the labeling, advertising, and promoting of said product.

408. Plaintiffs and Plaintiffs' healthcare providers reasonably relied upon the Defendants' representations to them that propoxyphene was safe for human consumption and/or use and that the Defendants' labeling, advertising, and promotions fully described all known risks of propoxyphene.

409. The Defendants' actions, concealment and omissions as described herein demonstrate a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

- 76 -

410.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FOURTEENTH CAUSE OF ACTION
### VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200
### (Against All Defendants)

411.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

412.    Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17204, in Plaintiffs' individual capacities, and not on behalf of the general public.

413.    California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

414.    The acts and practices described above were and are likely to mislead the general public and therefore constitute unfair business practices within the meaning of California Business & Professions Code § 17200.  The acts of untrue and misleading advertising are, by definition, violations of California Business & Professions Code § 17200.  This conduct includes, but is not limited to:

    a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs'

- 77 -

physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

b.  Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

c.  Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

415.  These practices constitute unlawful, unfair and fraudulent business acts or practices, within the meaning of California Business & Professions Code § 17200, as well as unfair, deceptive, untrue and misleading advertising as prohibited by California Business & Professions Code § 17500.

416.  As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of ill-gotten gains from the sale of propoxyphene in California, sold in large part as a result of the acts and omissions described herein.

417.  Because of fraudulent misrepresentations made by Defendants as detailed above, and the inherently unfair practice of committing a fraud against the public by intentionally misrepresenting and concealing material information, the acts of Defendants described herein constitute unfair or fraudulent business practices.

418.  Plaintiffs, pursuant to California Business & Professions Code § 17203, seek an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

419.  As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the

- 78 -

Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
### VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17500
### (Against All Defendants)

420.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

421.    Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17500, in Plaintiffs' individual capacities and not on behalf of the general public.

422.    California Business & Professions Code § 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

423.    At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Business & Professions Code § 17500 by engaging in the following acts and practices with intent to induce members of the public, including healthcare professionals, to purchase and use products containing propoxyphene:

a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

b.    Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

c.    Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

- 79 -

424.    The foregoing practices constitute false and misleading advertising within the meaning of California Business & Professions Code § 17500.

425.    As a result of their conduct described above, Defendants have been and will be unjustly enriched.  Specifically, Defendants have been unjustly enriched by receipt of ill-gotten gains from the sale and prescription of products containing propoxyphene in California, sold in large part as a result of the acts and omissions described herein.

426.    Pursuant to California Business & Professions Code § 17535, Plaintiffs seek an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

427.    Plaintiffs seek restitution of the monies collected by Defendants, and each of them, and other injunctive relief to cease such false and misleading advertising in the future.

428.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTEENTH CAUSE OF ACTION
### VIOLATION OF CIVIL CODE § 1750 ET. SEQ.
### (Against All Defendants)

429.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

- 80 -

430.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, by the acts and misconduct alleged herein, violated the Consumers Legal Remedies Act, California Civil Code §§ 1750 et. seq. ("CLRA").

431.    Plaintiffs hereby seek injunctive relief as appropriate against Defendants, and each of them, for their violations of California Civil Code §§ 1750 et. seq. The CLRA applies to Defendants' actions and conduct described herein because it extends to transactions which are intended to result, or which have resulted, in the sale of goods to consumers.

432.    Plaintiffs are a "consumer" within the meaning of California Civil Code § 1761(d).

433.    Defendants have violated, and continue to violate, the CLRA in representing that goods have characteristics and benefits which they do not have in violation of California Civil Code § 1770(a)(5).

434.    At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Civil Code § 1770 by engaging in the following acts and practices with intent to induce members of the public, including healthcare providers, to purchase and use products containing propoxyphene, but is not limited to:

a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

b.    Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

c.    Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

435.    The foregoing practices constitute false and misleading advertising and representations within the meaning of California Civil Code § 1770.

1    436.    Pursuant to California Civil Code § 1780, Plaintiffs seek an order of this court for

2    injunctive relief calling for Defendants, and each of them, to cease such deceptive business practices

3    in the future.

4    437.    As a direct and proximate result of the defective and inappropriate warnings and the

5    unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

6    comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

7    herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

8    emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered

9    lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

10    Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the

11    Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will

12    continue into the future.

13    WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and

14    punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the

15    Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
### NEGLIGENCE
### (Against Innovator and Brand Defendants)

18    438.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this

19    Complaint.

20    439.    At all relevant times, the Innovator and Brand Defendants were engaged in the

21    business of researching, testing, studying, distributing, selling, supplying, marketing and/or

22    promoting Darvocet and Darvon, brand-name Propoxyphene Products.

23    440.    At all relevant times, the Innovator and Brand Defendants had a duty to:

25    a.    exercise reasonable care to conduct adequate studies, tests, surveillance and
      analyses to assess the risks and adverse effects associated with their
26         Propoxyphene Products; and

27    b.    stop distributing, selling and/or supplying them if they discovered that the
      drugs were unreasonably dangerous and defective.

- 82 -

441.    At all relevant times, the Innovator and Brand Defendants knew or should have known that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe, often rely on the statements made about the brand formulations of a drug, and thus that the physicians who prescribed either brand or generic Propoxyphene Products to their patients were relying on the statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

442.    At all relevant times, the Innovator and Brand Defendants knew or should have known that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely would have instead purchased a generic formulation of Darvocet and/or Darvon.

443.    Because of this knowledge, the duties of the Innovator and Brand Defendants that are outlined above applied at all relevant times not only to the purchasers of the brand products and their prescribing physicians, but also to the purchasers of generic formulations of those drugs and their prescribing physicians, including Plaintiffs and their prescribing physicians.

444.    This count applies to the Innovator and Brand Defendants in relation to Plaintiffs' ingestion of generic Propoxyphene Products.

445.    The Innovator and Brand Defendants breached the duties outlined above, because:

   a.    they failed to timely conduct adequate studies, tests, surveillance and analysis, which would have confirmed that their Propoxyphene Products were unreasonably dangerous and defective, for the reasons described above, and that other practical, medically-feasible and safer alternatives were available; and

   b.    they failed to timely stop distributing, selling and/or supplying their Propoxyphene Products once they discovered or should have discovered that those drugs were unreasonably dangerous and defective, and that other practical and medically-feasible alternatives that were safer were available.

446.    If the Innovator and Brand Defendants had not breached those duties, and had more timely withdrawn their Propoxyphene Products from the market for reasons of safety and efficacy, the FDA would have also required the withdrawal of all generic Propoxyphene Products.

- 83 -

447. If this had occurred, the Generic Defendants' unreasonably dangerous and defective Propoxyphene Products would not have been on the market for Plaintiffs to purchase and ingest, and Plaintiffs would not have suffered the injuries described above.

448. Because of these breaches, however, the Generic Defendants' unreasonably dangerous and defective Propoxyphene Products were on the market, and Plaintiffs purchased and ingested them in a reasonably foreseeable manner and substantially as intended by the Innovator and Brand Defendants.

449. As a direct and proximate result, Plaintiffs suffered the injuries described above.

450. It was foreseeable that if the Innovator and Brand Defendants did not timely withdraw their brand Propoxyphene Products from the market for reasons of safety and efficacy, that the FDA would allow the generic Propoxyphene Products to also remain on the market, and that persons like Plaintiffs would be prescribed Propoxyphene Products, and would purchase and ingest the Generic Defendants' Propoxyphene Products, and, as a direct and proximate result, suffer the injuries that Plaintiffs suffered.

451. Through the actions and inactions described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

452. As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

- 84 -

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
### FRAUDULENT NONDISCLOSURE
#### (Against Innovator and Brand Defendants)

453.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

454.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet and/or Darvon, brand-name Propoxyphene Products.

455.    At all relevant times, the Innovator and Brand Defendants had a duty to:

a.    assess, manage and communicate the risks, dangers and adverse effects associated with their Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

b.    distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

456.    At all relevant times, the Innovator and Brand Defendants knew that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe, often rely on the statements made about the brand formulations of a drug, and thus that the physicians who prescribed either brand or generic Propoxyphene Products to their patients were relying on the statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

457.    At all relevant times, the Innovator and Brand Defendants knew that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely would have instead purchased a generic formulation of Darvocet and/or Darvon.

- 85 -

458.    Because of this knowledge, the duties of the Innovator and Brand Defendants that are outlined above applied at all relevant times not only to the purchasers of the brand products and their prescribing physicians, but also to the purchasers of generic formulations of those drugs and their prescribing physicians, including Plaintiffs and their prescribing physicians.

459.    This count applies to the Innovator and Brand Defendants in relation to Plaintiffs' ingestion of generic Propoxyphene Products.

460.    Before Plaintiffs was injured by ingesting the Generic Defendants' Propoxyphene Products, the Innovator and Brand Defendants knew that:

  a.    propoxyphene had not been adequately tested;

  b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

  c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

  d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

  e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

461.    At all relevant times, the Innovator and Brand Defendants knew that the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

462.    More specifically, the Innovator and Brand Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not

- 86 -

have been aware of the information outlined above, absent disclosures from the Innovator and Brand Defendants, because:

      a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

      b.    the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

463.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

464.    At all relevant times, the Innovator and Brand Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians – about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

465.    More specifically, the Innovator and Brand Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians, about the following facts that it knew:

      a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

      b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

      c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

      d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-

- 87 -

containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.  In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.  In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.  In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

466.  Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.  The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

467.  Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.  The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

468.  It would have been technologically feasible, and would not have been cost-prohibitive, for the Innovator and Brand Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

469.  The Innovator and Brand Defendants instead used their resources to conceal and downplay the risks associated with Propoxyphene Products in their promotional materials, instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.

470.  The Innovator and Brand Defendants failed to disclose the material information outlined above because they wanted the general public and the health care community – including

- 88 -

Plaintiffs and their prescribing physicians – to believe that Propoxyphene Products were safe and effective, and wanted to induce medical providers – including Plaintiffs' prescribing physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to request or not resist those prescriptions.

471.    Plaintiffs and their prescribing physicians justifiably relied on the lack of information about the risks associated with Propoxyphene Products and/or about other available, practical and medically-feasible pain management medications, and acted upon it, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs requesting or not resisting those prescriptions.

472.    Had the Innovator and Brand Defendants provided adequate disclosures:

    a.    Plaintiffs' physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested the Generic Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

473.    In light of what the Innovator and Brand Defendants knew, they had to have known or anticipated that their failure to adequately disclose the dangers of propoxyphene and Propoxyphene Products, and the availability of practical and medically-feasible alternate pain management medications that posed less risk, would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting generic Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

474.    Plaintiffs' prescription for and purchase and ingestion of the Generic Defendants' Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' knowing failure to disclose.

475.    By failing to make the disclosures outlined above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive

2    damages.

3         476.    Upon information and belief, Plaintiffs allege that Defendants actively and

4    fraudulently concealed information in Defendants' exclusive possession regarding the hazards

5    associated with the Propoxyphene Products with the purpose of preventing consumers, such as

6    Plaintiffs, from discovery these hazards.

7         477.    As a direct and proximate result of the defective manufacturing and the unreasonably

8    dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to

9    comply with federal standards and requirements, the Plaintiffs suffered severe and permanent

10    injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in

11    nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages

12    and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs

13    suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as

14    alleged herein. The injuries and damages alleged herein are permanent and will continue into the

15    future.

16         478.    Defendants acted willfully or with gross negligence indicating a wanton disregard for

17    the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The

18    aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate

19    disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs

20    to punitive damages in an amount appropriate to punish the Defendants and deter them from similar

21    conduct in the future.

22         479.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and

23    deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby

24    entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter

25    them from similar conduct in the future.

26         WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and

27    punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the

28    Court deems proper.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### NINETEENTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (Against Innovator and Brand Defendants)

480.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

481.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet and Darvon, brand-name Propoxyphene Products.

482.    At all relevant times, the Innovator and Brand Defendants had a duty to:

    a.    assess, manage and communicate the risks, dangers and adverse effects associated with their Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

    b.    distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

483.    At all relevant times, the Innovator and Brand Defendants knew or should have known that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe, often rely on the statements made about the brand formulations of a drug, and thus that the physicians who prescribed either brand or generic Propoxyphene Products to their patients were relying on the statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

484.    At all relevant times, the Innovator and Brand Defendants knew or should have known that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely would have instead purchased a generic formulation of Darvocet and/or Darvon.

485.    Because of this knowledge, the duties of the Innovator and Brand Defendants that are outlined above applied at all relevant times not only to the purchasers of the brand products and their

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

prescribing physicians, but also to the purchasers of generic formulations of those drugs and their prescribing physicians, including Plaintiffs and their prescribing physicians.

486.    This count applies to the Innovator and Brand Defendants in relation to Plaintiffs' ingestion of generic Propoxyphene Products.

487.    Before Plaintiffs were injured by ingesting the Generic Defendants' Propoxyphene Products, the Innovator and Brand Defendants knew or should have known that:

    a.    propoxyphene had not been adequately tested;

    b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

    c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

    d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

    e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

488.    More specifically, the Innovator and Brand Defendants knew or should have known that:

    a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

    b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

    c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

    d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-

- 92 -

containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.   In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.   In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.   In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

489.   Despite what the Innovator and Brand Defendants knew or should have known, upon information and belief, the Innovator and Brand Defendants represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

a.   propoxyphene had been adequately tested;

b.   Propoxyphene Products were safe and effective for pain management; and

c.   Propoxyphene Products were more effective for pain management than other pain management medications.

490.   Upon information and belief, these representations made by the Innovator and Brand Defendants were false at the time that they were made, and the Innovator and Brand Defendants knew or should have known that they were false.

491.   Because of what the Innovator and Brand Defendants knew or should have known, as described above, they failed to exercise reasonable care or competence in making these misrepresentations.

492.   The Innovator and Brand Defendants knew or should have known that the general public and the health care community – including Plaintiffs and their prescribing physicians – would

- 93 -

not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

    a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

    b.    the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

493.    At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that the Innovator and Brand Defendants' misrepresentations were false.

494.    Because of what the Innovator and Brand Defendants knew or should have known, as described above, they failed to exercise reasonable care or competence in making these misrepresentations.

495.    Plaintiffs and their prescribing physicians justifiably relied and acted upon the Innovator and Brand Defendants' misrepresentations, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Propoxyphene Products.

496.    Had the Innovator and Brand Defendants not made these misrepresentations:

    a.    Plaintiffs' physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested the Generic Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

497.    In light of what the Innovator and Brand Defendants knew or should have known, they should have anticipated that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting generic Propoxyphene Products,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

498.   Plaintiffs' prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' misrepresentations.

499.   By making the misrepresentations described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

500.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION AND CONCEALMENT
### (Against Innovator and Brand Defendants)

501.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

502.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging,

- 95 -

distributing, selling, supplying, marketing and/or promoting Darvocet and Darvon, brand-name Propoxyphene Products.

503.    At all relevant times, the Innovator and Brand Defendants had a duty to:

a.    assess, manage and communicate the risks, dangers and adverse effects associated with their Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

b.    distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

504.    At all relevant times, the Innovator and Brand Defendants knew or should have known that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe, often rely on the statements made about the brand formulations of a drug, and thus that the physicians who prescribed either brand or generic Propoxyphene Products to their patients were relying on the statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

505.    At all relevant times, the Innovator and Brand Defendants knew or should have known that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely would have instead purchased a generic formulation of Darvocet and/or Darvon.

506.    Because of this knowledge, the duties of the Innovator and Brand Defendants that are outlined above applied at all relevant times not only to the purchasers of the brand products and their prescribing physicians, but also to the purchasers of generic formulations of those drugs and their prescribing physicians, including Plaintiffs and their prescribing physicians.

507.    This count applies to the Innovator and Brand Defendants in relation to Plaintiffs' ingestion of generic Propoxyphene Products.

508.    Before Plaintiffs were injured by ingesting the Generic Defendants' Propoxyphene Products, the Innovator and Brand Defendants knew that:

a.    propoxyphene had not been adequately tested;

- 96 -

b. Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c. the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

d. Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

e. Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

509. More specifically, the Innovator and Brand Defendants knew that:

a. In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b. In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c. In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d. In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e. In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f. In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

- 97 -

g.  In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

510.  Despite what the Innovator and Brand Defendants knew, upon information and belief, the Innovator and Brand Defendants falsely represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

a.  propoxyphene had been adequately tested;

b.  Propoxyphene Products were safe and effective for pain management; and

c.  Propoxyphene Products were more effective for pain management than other pain management medications.

511.  Upon information and belief, these representations were all intentionally false and misleading at the time they were made, and the Innovator and Brand Defendants knew that they were false and misleading, and willfully, wantonly and recklessly disregarded that they were false.

512.  The Innovator and Brand Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

a.  the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

b.  the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

513.  At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that the Innovator and Brand Defendants' misrepresentations were false.

- 98 -

514.    The Innovator and Brand Defendants made these material misrepresentations because they wanted the general public and the health care community to rely on them, and wanted to induce medical providers – including Plaintiffs' treating physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to request or not resist those prescription.

515.    Plaintiffs and their prescribing physicians justifiably relied and acted upon the Innovator and Brand Defendants' misrepresentations, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs requesting or not resisting that prescription.

516.    Had the Innovator and Brand Defendants not made these misrepresentations:

    a.    Plaintiffs' physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

    b.    Plaintiffs would not have purchased or ingested the Generic Defendants' Propoxyphene Products; and

    c.    Plaintiffs would not have suffered the injuries described above.

517.    In light of what the Innovator and Brand Defendants knew, they had to have known that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting generic Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

518.    Plaintiffs' prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' knowing misrepresentations.

519.    By making the misrepresentations described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

520.    Upon information and belief, Plaintiffs allege that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with the Propoxyphene Products with the purpose of preventing consumers, such as Plaintiffs, from discovery these hazards.

521.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

522.    Defendants acted willfully or with gross negligence indicating a wanton disregard for the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

523.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

///

///

- 100 -

## PUNITIVE DAMAGE

524. At all times material hereto, the Defendants knew or should have known that the administration of propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

525. At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of propoxyphene and products containing propoxyphene.

526. Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiffs herein, concerning the safety of propoxyphene.

527. At all times material hereto, the Defendants knew and recklessly disregarded the fact that propoxyphene and products containing propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

528. Notwithstanding the foregoing, the Defendants continued to aggressively market products containing propoxyphene to consumers, including Plaintiffs herein, without disclosing the fact that administration of propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

529. The Defendants knew of the defective and unreasonably dangerous nature of products containing propoxyphene as set forth herein, but continued to design, develop, manufacture, market, distribute, and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable risks including, adverse cardiovascular events that could result in death.

530. Defendants intentionally concealed and/or recklessly failed to disclose to the public, including Plaintiffs herein, the potentially life threatening side effects of the administration of propoxyphene in order to ensure continued and increased sales.

531. The Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs of necessary information to enable Plaintiffs and their healthcare providers to weigh the true risks of using propoxyphene against the benefits.

- 101 -

532.    As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries, and other neurological and movement disorders.

533.    Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise economically injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.

534.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;
2. For specific damages, according to proof;
3. For punitive/exemplary damages;
4. For Plaintiffs' costs incurred herein;
5. For the costs of suit; and
6. For pre-judgment interest;
7. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED:   November 9, 2012                    SIZEMORE LAW FIRM

By_____
   J. PAUL SIZEMORE
   Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury on all claims.

Respectfully submitted,

DATED:   November 9, 2012                    SIZEMORE LAW FIRM


By_____
      J. PAUL SIZEMORE
      Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# EXHIBIT B



DEFENDANT'S
EXHIBIT
B

1  ELISE R. SANGUINETTI (CA SBN: 191389)
   AMANDA J. GREENBURG (CA SBN: 255767)
2  KHORRAMI, LLP
   360 22nd Street, Suite 640
3  Oakland, California 94612
   Telephone: (510) 867-2000
4  Facsimile: (866) 546-7377
5  Email: ESanguinetti@khorrami.com

6  TREVOR B. ROCKSTAD (CA SBN: 277274)
   DAVIS & CRUMP PC
7  1712 15th Street, Suite 300
   Gulfport, MS 39501
8  Telephone: (228) 863-6000
   Facsimile: (228) 864-0907
9  Email: Trevor.Rockstad@daviscrump.com
10
11 TARA TABATABAIE (OK Bar No. 21838)
   THE SILL LAW GROUP PLLC
12 14005 N. Eastern Avenue
   Edmond, OK 73103
13 Tel: (405) 509-6300
   Fax: (405) 509-6268
14 Email: tara@sill-law.com
15
   STEPHEN J. RANDALL (CA SBN:
16 PEARSON RANDALL & SCHUMACHER, PA
   100 S. Fifth Street
17 Suite 1025
   Minneapolis, MN 55402
18 612-767-7500
   Fax: 612-767-7501
19 Email: srandall@prslegal.com
20 Attorneys for JCCP Petitioners

21              JUDICIAL COUNCIL OF CALIFORNIA

22              CHAIR OF THE JUDICIAL COUNCIL

23
   RACHEL RENTZ, et al.,              )  LOS ANGELES SUPERIOR COURT
24                                    )  CASE NO.: BC 483765
                 Plaintiffs,          )
25      vs.                           )  **PETITION FOR COORDINATION**
                                      )
26 MCKESSON CORPORATION, et al.,      )  *[Filed concurrently with Declaration of*
                                      )  *Elise Sanguinetti; Memorandum of*
27               Defendants.          )  *Points and Authorities ISO Petition for*
                                      )  *Coordination]*
28 _____  )

                              1

                    PETITION FOR COORDINATION

1    TO THE HONORABLE TANI G. CANTIL-SAKAUYE, CHAIRPERSON OF THE

2   CALIFORNIA JUDICIAL COUNCIL, CHIEF JUSTICE OF CALIFORNIA:

3          Pursuant to the California Code of Civil Procedure Section 404, et seq., and

4   California Rules of Court 3.500, et seq., plaintiffs and petitioners *RACHEL RENTZ; GEORGIA*

5   *METCALFE; VIVIAN PONCE; JERRY HALL; CLAUDETTA MCCLAIN; ERIC CANTRELL*

6   through counsel, Khorrami, LLP, respectfully submit this request to the Chairperson of the

7   Judicial Council for assignment of a judge to determine whether the above-titled actions and

8   included joined actions are complex actions and, if so, whether coordination of the actions is

9   appropriate.

10         The petitioners and plaintiffs in the included actions all allege use of the prescription

11  medication containing the active ingredient propoxyphene sold under various generic and brand

12  names including Darvon and Darvocet and consequent injuries including, but not limited to,

13  heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions, and/or

14  sudden death.

15         This petition for coordination is based upon the criteria codified in *California Code of*

16  *Civil Procedure* § 404.1. That is, in the Darvocet cases sought to be coordinated herein:

17         One judge hearing all of the actions for all purposes in a selected site or sites will
           promote the ends of justice taking into account whether common questions of fact or law
18         are predominating and significant to the litigation; the convenience of parties, witnesses,
           and counsel; the relative development of the actions and the work product of counsel; the
19         efficient utilization of judicial facilities and manpower; the calendar of the courts; the
           disadvantages of the duplicative and inconsistent rulings, orders or judgments; and, the
20         likelihood of settlement of the actions without further litigation should coordination be
           denied. (*California Code of Civil Procedure* § 404.1).

21

22         All of the cases sought to be coordinated herein involve use of the pharmaceutical

23  medication containing the active ingredient propoxyphene and consequent injuries including, but

24  not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial

25  infarctions, and/or sudden death (hereinafter "Darvocet related injury cases"). Such cases are

26  more particularly described in the accompanying Declaration of Elise Sanguinetti, the

27  accompanying memorandum of points and authorities, exhibits attached thereto including

28

1  conformed copies of complaints filed in said actions, and other supporting documents submitted

2  herewith.

3       The actions sought to be coordinated fall within the definition of "complex litigation"

4  under Section 19 of the Standards of Judicial Administration and Rule 3.400 et seq., of the

5  California Rules of Court. (See the Declaration of Elise Sanguinetti filed herewith.) Petitioners

6  are currently seeking to coordinate theseven (7) actions listed below. However, Petitioners'

7  counsel is informed and believes that scores of additional propoxyphene related injury cases will

8  be filed within the next weeks.  Petitioners will seek to join these additional cases via "Add-On

9  Petitions."

10       1.    *Terry Freitas and Lori Freitas, husband and wife; Oleta Burney and Harold*

11  *Burney, wife and husband; Donald Green, individually and as husband and next of kin to Mary*

12  *Green, Deceased; Charles Hearn, a single man; John Jenkins, a single man, Linda Miller and*

13  *Anthony Miller, wife and husband; Barbara Reed, individually and as wife and next of kin to*

14  *Raymond Reed, deceased; Martha Poole, a single woman, vs. McKesson Corporation; Eli Lilly*

15  *& Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan*

16  *Pharmaceuticals Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.;*

17  *Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Vintage*

18  *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics*

19  *Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo*

20  *Pharmaceuticals Holdings, Inc.; and DOES 1 thru 50, inclusive;* filed in San Francisco County

21  Superior Court  on 10/31/2011, Case No. CGC-11-515537;

22       2.    *Mary Keene and George Keene, wife and husband; Judy Humphrey, a single*

23  *woman; Marty Armstrong, a single man; Diane Bane, a single woman; Linda Brown, a single*

24  *woman; Doris Dowdy, a single woman; Darlene Hibler, a single woman; Tiffany Hughes, a*

25  *single woman; Imogene Mealer, a single woman; Jessie Miller, a single woman; Deidra Minor,*

26  *a single woman; Lettie Perkins, a single woman;  William Sherrill and Becky Sherrill, husband*

27  *and wife; Brenda Shields, a single woman; Thomas Strzyz and Trixy Strzyz, husband and wife;*

28  *Linzo Taylor and Nadine Taylor, husband and wife; Sharon Waller, a single woman; Vanissa*

3

1 | *White, a single woman; Mary Bearden, a single woman; Michael Brooks, a single man; Jerry*

2 | *Gibson and Katherine Gibson, husband and wife; Jackie Jackson, a single woman; Mosetta*

3 | *Wortham, a single woman; Virgie Hopper, individually and as daughter and next of kin to Lola*

4 | *Hopper, deceased; Avensky Clayborn, individually and as son and next of kin to Belinda*

5 | *Clayborn, deceased; Bobbie Osborn, individually and as daughter and next of kin to Joann*

6 | *Spears, deceased; vs. McKesson Corporation; Eli Lilly & Company;  AAI Pharma, Inc; AAI*

7 | *Pharma LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma*

8 | *Services, Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.; Vintage*

9 | *Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn*

10 | *Manufacturing, Inc.; Vintage Pharmaceuticals, LLC;  Generics International (US), Inc.;*

11 | *Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo*

12 | *Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.; Cornerstone Pharmaceuticals,*

13 | *Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva*

14 | *Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.;*

15 | *Mylan, Inc.; Covidien PLC; Covidien Inc.; Mallinckrodt.; Watson Pharmaceuticals, Inc.;*

16 | *and DOES 1 through 50, inclusive,* filed in San Francisco County Superior on 11/18/2011, Case

17 | No. CGC-11-516031;

18 |       3.      *Tenessia Posey, Megan Stinson, Barbara J. Olson, Mary A. Alsop, Clifford*

19 | *August, Charlie Bell, Wrildia A. Blackburn, Dorothy Bonds, Terrence Brown, Delores*

20 | *Christopher, Dorothy A. Cowan, Christine W. Graham, Mary L. Gremillion, Martha R. Grooms,*

21 | *Margaret R. Harmon, Kay F. Jones, Anthony B. Kenner, Suzanne Manuel,  John H. Moore, Paul*

22 | *M. Nelson, Carilee Pemberton, Kenneth J.  Tambaugh, Sheila G. Sulljvan, Casa Thomas vs.*

23 | *McKesson Corporation; Eli Lilly & Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI*

24 | *Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.;*

25 | *Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals,*

26 | *Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage*

27 | *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics*

28 | *Bidco II, LLC; Generics International (US Parent), Inc: Endo Pharmaceuticals, Inc.; Endo*

4

1    *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals. Inc.; Cornerstone Biopharma,*

2    *Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva*

3    *Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien*

4    *Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive,* filed

5    in San Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515995;

6         4.    *Wendell Rice and Patricia Rice, husband and wife; Roy Bell and Laurel Bell,*

7    *husband and wife; Linda Mahorney and David Mahorney, wife and husband; Jay Mason and*

8    *Sharon Mason, husband and wife; William Barker and Ann Barker, husband and wife; Teddy*

9    *Teasley And Joyce Teasley, husband and wife; Ilmaid Khalil and Roxanne Khalil, husband and*

10    *wife; Beverly Rodriguez, a single woman; Mary Dries and Andrew Dries, wife and husband;*

11    *Joseph Roy, a single man: Wanda Thomas and Bernard Thomas, wife and husband; Harry*

12    *Stepp, a single man; Mitchell Ashley and Geraldine Ashley, husband and wife; Ethel Newberry,*

13    *a single woman; Mary Price-Thomas, a single woman; and Fannie Smith, a single woman, vs.*

14    *McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma LLC; AAI*

15    *Development Services, Inc; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne*

16    *Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst*

17    *Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage*

18    *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco 1, LLC: Generics*

19    *Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals. Inc.; Endo*

20    *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma,*

21    *Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva*

22    *Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien*

23    *Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,*

24    filed in San Francisco County Superior Court on 11/15/2011, Case No. CGC-11-515897;

25         5.    *Harry D. Witthauer, a married man; Marina Damas, a married individual; Joyce*

26    *Auston, a married woman; Minnie Beasley, a married woman; Teresa Hash, a single individual;*

27    *Gary Hatfield, a married man; Billy Hoskins, a married man; Kenneth Delavergnie, Jr., a*

28    *married man; Edith Langlois, a single woman; Donna Quesinberry, a single woman; Kay*

PETITION FOR COORDINATION

1    *Romero, a single woman; Donna Romero, a single woman; Diane Saucier, a married woman;*

2    *Joyce Brown, a married woman; Gary Tackett, a married man; Ronald T. Miller, a married*

3    *man; Kim Ragan, a married woman; Helen Timmons, a single woman; Beverly Webb, a single*

4    *woman; Charles T. Hibbard, a married man; Frances Ziegler, a single man; Jeffie Mills, a*

5    *single individual; Jennifer Walker nka Jennifer Dunn and Janet Dunn, individually and as*

6    *daughters and next of kin to Drexel Dunn, deceased; Edward Murray, individually and as*

7    *husband and next of kin to Margaret Murray, deceased; Willam O'Banion and Leesa O'Banion,*

8    *individually and as son and daughter-in-law, respectively and as next of kin to Jackinell*

9    *O'Banion, deceased; Avis Ortego, individually and as son and next of kin to Margaret Ortego,*

10   *deceased; Patricia Jackson, individually and as mother and next of kin to Priscilla Pile,*

11   *deceased; Sarah Hinson, individually and as daughter and next of kin to Dorothy Smith,*

12   *deceased; and Thurman Stacy, individually and as husband and next of kin to Shelby Stacy,*

13   *deceased, vs. McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma*

14   *LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services,*

15   *Inc.; Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage*

16   *Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn*

17   *Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.;*

18   *Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo*

19   *Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals,*

20   *Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva*

21   *Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Ivax Pharmaceuticals, Inc.; Mylan*

22   *Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien, Inc.; Mallinckrodt Inc.; Watson*

23   *Pharmaceuticals, Inc.; and DOES I through 100, inclusive,* filed in San Francisco County

24   Superior Court on 11/18/2011, Case No. CGC-11-515994.

25          6. ·     *Lawrence B. Fields Robinson, by and through his Guardian ad Litem,*

26   *Diane Laws; Joseph Lee Laverine Fields, by and through his Guardian ad Litem, Diane Laws,*

27   *vs. Eli Lilly and Company; Watson Pharmaceuticals, Inc. and DOES 1-100 inclusive,* filed in

28   Los Angeles County Superior Court on 12/16/2011, Case No. KC 062737.

6

7.     *Rachel Rentz; Georgia Metcalfe; Vivian Ponce; Jerry Hall; Claudetta Mcclain; Eric Cantrell Vs. McKesson Corporation; Eli Lilly And Company; Xanodyne Pharmaceuticals, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.;Cornerstone Biopharma Holdings, Inc.; And Does 1 thru 50, inclusive,* filed in Los Angeles County Superior Court on 5/3/2012, Case No. BC483765.

Proof of filing of a Notice of Submission of Petition for Coordination and a copy of this Petition in each included action will be submitted to the Chair of the Judicial Council pursuant to Rule 3.522 of the California Rules of Court.  Proof of filing of any further documents to be submitted pursuant to Rule 3.523 of the California Rules of Court will be submitted to the Chair of the Judicial Council within the time frames provided by Rules 3.522 and 3.523.

This Petition is based upon the accompanying Memorandum of Points and Authorities, and the Declaration of Elise Sanguinetti filed herewith and the exhibits attached thereto.

A hearing on this petition for coordination is requested.

DATED: Oct. 23, 2012

Respectfully submitted,

By _Alise R Sanguinetti_
ELISE R. SANGUINETTI (CA SBN: 191389)
AMANDA J. GREENBURG (CA SBN: 255767)
KHORRAMI, LLP
360 22nd Street, Suite 640
Oakland, California 94612
Telephone: (510) 867-2000
Facsimile: (866) 546-7377
Email: ESanguinetti@khorrami.com

*Attorneys for Plaintiffs/Petitioners*

PETITION FOR COORDINATION

# EXHIBIT C



**DEFENDANT'S EXHIBIT**
_C_

1  ELISE R. SANGUINETTI (CA SBN: 191389)
   AMANDA J. GREENBURG (CA SBN: 255767)
2  KHORRAMI, LLP
   360 22nd Street, Suite 640
3  Oakland, California 94612
   Telephone: (510) 867-2000
4  Facsimile: (866) 546-7377
   Email: ESanguinetti@khorrami.com
5
6  TREVOR B. ROCKSTAD (CA SBN: 277274)
   DAVIS & CRUMP PC
7  1712 15th Street, Suite 300
   Gulfport, MS 39501
8  Telephone: (228) 863-6000
   Facsimile: (228) 864-0907
9  Email: Trevor.Rockstad@daviscrump.com
10
   TARA TABATABAIE (OK Bar No. 21838)
11 THE SILL LAW GROUP PLLC
   14005 N. Eastern Avenue
12 Edmond, OK 73103
   Telephone: (405) 509-6300
13 Facsimile: (405) 509-6268
   Email: tara@sill-law.com
14
15 STEPHEN J. RANDALL (CA SBN: 165025)
   PEARSON RANDALL & SCHUMACHER, PA
16 100 S. Fifth Street, Suite 1025
   Minneapolis, MN 55402
17 Telephone: (612) 767-7500
   Facsimile: (612) 767-7501
18 Email: srandall@prslegal.com
19
   Attorneys for JCCP Petitioners
20                JUDICIAL COUNCIL OF CALIFORNIA
21         CHAIR OF THE JUDICIAL COUNCIL
22
23 RACHEL RENTZ, et al.,                )  LOS ANGELES COUNTY SUPERIOR
                                        )  COURT CASE NO.: BC 483765
24              Plaintiffs,             )  MEMORANDUM OF POINTS AND
                                        )  AUTHORITIES IN SUPPORT OF
25         vs.                          )  PETITION FOR COORDINATION
                                        )
26 MCKESSON CORPORATION, et al.,        )
                                        )  [Filed concurrently with Petition for
27              Defendants.             )  Coordination; Declaration of Elise
                                        )  Sanguinetti]
28 _____    )
                                        1
───────────────────────────────────────────────────────────
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR COORDINATION

## I.     INTRODUCTION

Petitioner is aware of a total of seven (7) cases that have been filed in California Superior Courts on behalf of persons that have developed, among other injuries, cardiac injuries and/or sudden death (hereinafter "Darvocet related injuries") from ingesting Darvocet and other prescription medication containing the active ingredient propoxyphene (hereinafter the "Darvocet Product"). All of the actions at issue name the same group of defendants: the distributor, MCKESSON CORPORATION; the brand name manufacturer, ELI LILLY AND COMPANY; the generic manufacturers[1] of the Darvocet Product .; and DOES 1 through 50, inclusive. Petitioners' counsel plans to file additional similar cases in California Superior Courts within the next several weeks. Further, counsel is informed that, aside from the additional cases that we will file shortly, scores of similar cases will be filed soon involving consumption of the Darvocet Product and consequent diagnosis of Darvocet related injuries.

Plaintiffs/petitioners seek coordination of the following seven (7) actions that are known to be filed in the State of California and involve the same defective Darvocet Product, the same or substantially similar causes of action, the same or substantially similar issues of law, the same or substantially similar issue of material fact:

1.     *Terry Freitas and Lori Freitas, husband and wife; Oleta Burney and Harold Burney, wife and husband; Donald Green, individually and as husband and next of kin to Mary Green, Deceased; Charles Hearn, a single man; John Jenkins, a single man, Linda Miller and Anthony Miller, wife and husband; Barbara Reed, individually and as wife and next of kin to Raymond Reed, deceased; Martha Poole, a single woman, vs. Mckesson Corporation; Eli Lilly & Company; AAI*

---

[1] AAI PHARMA, INC; AAI PHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN PHARMACEUTICALS INC.; AAI PHARMA SERVICES, INC.; XANODYNE PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC; GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS HOLDINGS INC.; CORNERSTONE PHARMACEUTICALS, INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; IVAX PHARMACEUTICALS, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN, INC.; MALLINCKRODT INC.; WATSON PHARMACEUTICALS,INC.

2

1    *Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.;*

2    *Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.;*

3    *Propst Distribution, Inc.; Brenn Distribution, Inc.; Vintage Pharmaceuticals, LLC; Generics*

4    *International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US*

5    *Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.; and DOES 1 thru*

6    *50, inclusive;* filed in San Francisco County Superior Court on 10/31/2011, Case No. CGC-11-

7    515537;

8        2.    *Mary Keene and George Keene, wife and husband; Judy Humphrey, a single woman;*

9    *Marty Armstrong, a single man; Diane Bane, a single woman; Linda Brown, a single woman; Doris*

10    *Dowdy, a single woman; Darlene Hibler, a single woman; Tiffany Hughes, a single woman; Imogene*

11    *Mealer, a single woman; Jessie Miller, a single woman; Deidra Minor, a single woman; Lettie*

12    *Perkins, a single woman; Martha Poole, a single woman; William Sherrill and Becky Sherrill,*

13    *husband and wife; Brenda Shields, a single woman; Thomas Strzyz and Trixy Strzyz, husband and*

14    *wife; Linzo Taylor and Nadine Taylor, husband and wife; Sharon Waller, a single woman; Vanissa*

15    *White, a single woman; Mary Bearden, a single woman; Michael Brooks, a single man; Jerry Gibson*

16    *and Katherine Gibson, husband and wife; Jackie Jackson, a single woman; Mosetta Wortham, a*

17    *single woman; Virgie Hopper, individually and as daughter and next of kin to Lola Hopper,*

18    *deceased; Avensky Clayborn, individually and as son and next of kin to Belinda Clayborn, deceased;*

19    *Bobbie Osborn, individually and as daughter and next of kin to Joann Spears, deceased; vs.*

20    *McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma LLC; AAI*

21    *Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne*

22    *Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst*

23    *Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals,*

24    *LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics*

25    *International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.;*

26    *Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma*

27    *Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Mylan*

28    *Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien Inc.; Mallinckrodt Inc.; Watson*

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR COORDINATION

1  *Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive*, filed in San Francisco County Superior on

2  11/18/2011, Case No. CGC-11-516031;

3       3.     *Tenessia Posey, Megan Stinson, Barbara J. Olson, Mary A. Alsop, Clifford August,*

4  *Charlie Bell, Wrildia A. Blackburn, Dorothy Bonds, Terrence Brown, Delores Christopher, Dorothy*

5  *A. Cowan, Christine W. Graham, Mary L. Gremillion, Martha R. Grooms, Margaret R. Harmon, Kay*

6  *F. Jones, Anthony B. Kenner, Suzanne Manuel,  John H. Moore, Paul M. Nelson, Carilee Pemberton,*

7  *Kenneth J. Tambaugh, Sheila G. Sullivan, Casa Thomas vs. McKesson Corporation; Eli Lilly &*

8  *Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan*

9  *Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne Pharmaceuticals, Inc.; Qualitest*

10  *Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution,*

11  *Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.;*

12  *Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc: Endo*

13  *Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals. Inc.;*

14  *Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals,*

15  *Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC;*

16  *Covidien Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive*,

17  filed in San Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515995;

18       4.     *Wendell Rice and Patricia Rice, husband and wife; Roy Bell and Laurel Bell, husband*

19  *and wife; Linda Mahorney and David Mahorney, wife and husband; Jay Mason and Sharon Mason,*

20  *husband and wife; William Barker and Ann Barker, husband and wife; Teddy Teasley And Joyce*

21  *Teasley, husband and wife; Ilmaid Khalil and Roxanne Khalil, husband and wife; Beverly Rodriguez,*

22  *a single woman; Mary Dries and Andrew Dries, wife and husband; Joseph Roy, a single man:*

23  *Wanda Thomas and Bernard Thomas, wife and husband; Harry Stepp, a single man; Mitchell  Ashley*

24  *and Geraldine Ashley, husband and wife; Ethel Newberry, a single woman; Mary Price-Thomas, a*

25  *single woman; and Fannie Smith, a single woman, vs. McKesson Corporation; Eli Lilly & Company;*

26  *AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc; Neosan Pharmaceuticals Inc.;*

27  *AAI Pharma Services, Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.;*

28  *Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn*

4

1   *Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics*

2   *Bidco I, LLC: Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo*

3   *Pharmaceuticals. Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.;*

4   *Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals,*

5   *Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC;*

6   *Covidien Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,*

7   filed in San Francisco County Superior Court on 11/15/2011, Case No. CGC-11-515897;

8        5.    *Harry D. Witthauer, a married man; Marina Damas, a married individual; Joyce*

9   *Auston, a married woman; Minnie Beasley, a married woman; Teresa Hash, a single individual;*

10  *Gary Hatfield, a married man; Billy Hoskins, a married man; Kenneth Delavergnie, Jr., a married*

11  *man; Edith Langlois, a single woman; Donna Quesinberry, a single woman; Kay Romero, a single*

12  *woman; Donna Romero, a single woman; Diane Saucier, a married woman; Joyce Brown, a*

13  *married woman; Gary Tackett, a married man; Ronald T. Miller, a married man; Kim Ragan, a*

14  *married woman; Helen Timmons, a single woman; Beverly Webb, a single woman; Charles T.*

15  *Hibbard, a married man; Frances Ziegler, a single man; Jeffie Mills, a single individual; Jennifer*

16  *Walker nka Jennifer Dunn and Janet Dunn, individually and as daughters and next of kin to Drexel*

17  *Dunn, deceased; Edward Murray, individually and as husband and next of kin to Margaret Murray,*

18  *deceased; Willam O'Banion and Leesa O'Banion, individually and as son and daughter-in-law,*

19  *respectively and as next of kin to Jackinell O'Banion, deceased; Avis Ortego, individually and as son*

20  *and next of kin to Margaret Ortego, deceased; Patricia Jackson, individually and as mother and next*

21  *of kin to Priscilla Pile, deceased; Sarah Hinson, individually and as daughter and next of kin to*

22  *Dorothy Smith, deceased; and Thurman Stacy, individually and as husband and next of kin to Shelby*

23  *Stacy, deceased, vs. McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma*

24  *LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.;*

25  *Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.;*

26  *Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage*

27  *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II,*

28  *LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals*

5

1  *Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.; Cornerstone*

2  *Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Ivax*

3  *Pharmaceuticals, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien, Inc.;*

4  *Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,* filed in San

5  Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515994.

6      6.    *Lawrence B. Fields Robinson, by and through his Guardian ad Litem, Diane Laws;*

7  *Joseph Lee Laverine Fields, by and through his Guardian ad Litem, Diane Laws, vs. Eli Lilly and*

8  *Company; Watson Pharmaceuticals, Inc. and DOES 1-100 inclusive,* filed in Los Angeles County

9  Superior Court on 12/16/2011, Case No. KC 062737.

10      7.    *Rachel Rentz; Georgia Metcalfe; Vivian Ponce; Jerry Hall; Claudetta Mcclain; Eric*

11  *Cantrell Vs. McKesson Corporation; Eli Lilly And Company; Xanodyne Pharmaceuticals, Inc.; Teva*

12  *Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage*

13  *Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing,*

14  *Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC;*

15  *Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo*

16  *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma,*

17  *Inc.;Cornerstone Biopharma Holdings, Inc.; And Does 1 thru 50, inclusive,* filed in Los Angeles

18  County Superior Court on 5/3/2012, Case No. BC483765.

19      In all seven matters, Plaintiffs allege, among other injuries, cardiac injuries and/or sudden

20  death along with loss of consortium claims caused by use of Darvocet/Propoxyphene.  Accordingly,

21  while each plaintiff's medical background and special damages may be unique, each case shares the

22  same general liability facts and issues against the defendants, the same scientific facts and issues

23  concerning the Darvocet Product and consequent injuries, and the same or similar treatment protocols

24  for the Darvocet related injuries.  Petitioners' counsel anticipates that the actions will, therefore,

25  involve duplicative requests for the same defendant witness depositions and the same documents

26  related to development, manufacturing, testing, marketing, and sale of the Darvocet Product.  Absent

27  coordination of these actions by a single judge, there is a significant likelihood of duplicative

28  discovery, waste of judicial resources and possible inconsistent judicial rulings on legal issues.

1    Plaintiffs and petitioners submit that Los Angeles County is the most appropriate choice as a

2    coordination venue for the Darvocet Product cases.  Los Angeles County has a complex litigation

3    panel at the Central Civil West Division and said panel has extensive experience in handling

4    coordinated actions similar to the cases at issue in this Petition.  These actions constitute complex

5    litigation under Section 19 of the Standards of Judicial Administration and Rule 3.400., et seq., of the

6    California Rules of Court, thus, coordination and assignment to a complex panel is appropriate.  The

7    cases were not originally filed as complex cases.  However, pursuant to California Rule of Court (c)

8    (5), the cases are complex as they are claim involving mass tort.   (See Declaration of Elise

9    Sanguinetti ¶ 6.)

10    Plaintiffs and petitioners respectfully request that the Judicial Council appoint a coordination

11    motion judge.  Petitioners further submit that the interests of justice and judicial economy support the

12    coordination of the seven (7) Darvocet Product cases as well as other such cases that may be filed

13    before this Petition is decided.  Finally, petitioners urge the Judicial Council to designate Los Angeles

14    County Central Civil West Division as the coordination venue.

15                                                    II.

16                                            ARGUMENT

17    A.    THE DARVOCET CASES AGAINST DEFENDANTS ARE APPROPRIATE

18          CASES FOR COORDINATION PURSUANT TO CODE OF CIVIL

19          PROCEDURE SECTION 404.1

20    Pursuant to *California Code of Civil Procedure* § 404, the petitioners currently seek

21    coordination of seven (7) actions involving more than 100 personal injury claimants that used

22    Darvocet and thereafter suffered injury and/or death and additional 20 plaintiffs that have suffered

23    resulting loss of consortium as a result.   These seven (7) actions are pending in San Francisco

24    County Superior Court and Los Angeles County Superior Court against the same group of

25    defendants.   Use of committees and standardized discovery in a coordinated setting will expedite

26    resolution of these cases, avoid inconsistent results, and assist in alleviating onerous burdens on the

27    courts as well as the parties.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR COORDINATION

1      The factors set forth in *California Code of Civil Procedure* § 404.1 must be weighed in

2   determining whether coordination under *California Code of Civil Procedure* § 404, in selecting the

3   site or sites for the coordinated proceedings and the coordination trial judge under Section 404.3, and

4   in selecting the reviewing court under Section 404.3. The following factors, catalogued in section

5   404.1 and discussed in more detail below, all demonstrate that coordination of these included actions

6   is appropriate: One judge hearing all of the actions for all purposes in a selected site or sites will

7   promote the ends of justice; Common questions of fact or law are predominating and significant to

8   the litigation; Coordination may serve the convenience of parties, witnesses, and counsel the relative

9   development of the actions and the work product of counsel; Coordination may facilitate the efficient

10  utilization of judicial facilities and manpower; Coordination may enhance the orderly calendar of the

11  courts; Without coordination, the parties may suffer from disadvantages caused by duplicative and

12  inconsistent rulings, orders or judgments; and, without coordination, settlement of the actions without

13  further litigation is unlikely.

14          1.      **COMMON QUESTIONS OF FACT OR LAW ARE PREDOMINATING**

15                  **AND SIGNIFICANT**

16      These included actions are more similar than dissimilar. The actions share substantially the

17  same defendants, the same acts and omissions, the same product and the same general medical

18  consequences caused by the product. Each action alleges the same general claims, including theories

19  of liability, causation and damages as allegedly caused by the Darvocet Product (See Exhibit 1 to

20  Declaration of Elise Sanguinetti).

21      The facts relied on to show that each included action meets the coordination standards

22  specific in CCP Section 404.1 are those as alleged in the complaints – specifically, those facts alleged

23  in the general factual allegation sections of the complaints. The general allegations in each of these

24  complaints state that the plaintiffs suffered, among other injuries, cardiac injury and/or sudden death

25  following exposure to the product and that the defendants failed to warn patients and physicians

26  regarding all known and knowable risks associated with the product.

27      The actions involve common questions of law that predominate and are significant to the

28  litigation. These common questions of law and fact include, but are not limited to:

8

1.    Whether there are design and/or manufacturing defects in the defendants' Darvocet Product;

2.    Whether the defendants failed to adequately warn physicians and consumers regarding all known and knowable risks associated with the Darvocet Product;

3.    Whether the defendants' conduct in designing, manufacturing, and marketing the Darvocet Product fell below the applicable duties of care owed by the defendants to the plaintiffs;

4.    Whether the defendants intentionally, deliberately, knowingly, carelessly, recklessly, or negligently misrepresented, omitted, concealed or suppressed material and important information regarding the true and known risks of the product from the plaintiffs and their physicians;

5.    Whether the defendants' misconduct constitutes negligence;

6.    Whether the defendants' conduct constitutes negligence;

7.    Whether the plaintiffs are entitled to compensatory damages and/or restitution, and if so, the method by which such relief should be determined; and

8.    Whether the defendants are liable for punitive or exemplary damages, a matter to be determined when appropriate, and if so, the amount necessary and appropriate to punish them for their conduct, to deter others, and to fulfill the other policies and purposes of punitive and exemplary damages.

Thus, the similarities of the parties and the issues of liability and scientific causation justify coordination of these actions.

> **2.    THE RELATIVE DEVELOPMENT OF THE ACTIONS AND THE WORK PRODUCT OF COUNSEL WEIGH IN FAVOR OF COORDINATION PROCEEDINGS**

*California Code of Civil Procedure* § 404.1 suggests that the Judicial Council and the coordination motion judge weigh the "relative development of the actions and the work product of counsel" in determining whether coordination is appropriate. However, in all cases sought to be coordinated, the complaints have only recently been filed. In all of the cases, no responsive pleadings have yet been filed. Therefore, this factor does not preclude coordination of these actions at this time, as coordination will not penalize any particular individual case.

Additionally, in light of the similarity of the actions, there will be duplicate discovery obligations upon the common defendants unless coordination is ordered. Coordination before initiation of discovery in any of the cases will eliminate waste of resources and will facilitate economy. Thus, this factor weighs in favor of prompt coordination.

### 3. COORDINATION WOULD FOSTER EFFICIENT UTILIZATION OF JUDICIAL RESOURCES

At present, these actions are pending in San Francisco County and Los Angeles County. More actions will likely be filed in other counties across this State. No one can seriously dispute that coordination would foster judicial consistencies and result in efficient use of the court's resources as well as the parties' resources. Conversely, unless coordinated, these cases would likely be assigned to different judges in different counties, thereby undermining judicial economy.

### 4. DUPLICATIVE AND INCONSISTENT RULINGS AND ORDERS WILL LIKELY OCCUR IF MULTIPLE COURTS ARE ADDRESSING THE SAME ISSUES

Failure to coordinate these actions will result in the disadvantages of duplicate and inconsistent rulings, orders, or judgments. The inevitability of realizing the inconsistency and duplication factor of California Code of Civil Procedure Section 404.1, weighs heavily in favor of coordination. Indeed, issues likely to be raised in this action include issues pertaining to liability, allocation of fault and contribution, as well as the same wrongful conduct of defendants. Such difficult issues may ultimately be addressed by the California Court of Appeal. Coordination is required in order to avoid duplicative efforts and inconsistent rulings.

### 5. IF COORDINATION IS DENIED, IT IS NOT LIKELY THAT THESE CASES WILL SETTLE WITHOUT FURTHER LITIGATION

The final factor to be considered under California Code of Civil Procedure 404.1 is "the likelihood of settlement of the actions without further litigation should coordination be denied." It is highly unlikely that denial of coordination would foster settlement. The included actions are in litigation on multiple claims and significant issues. With multi-millions of dollars at stake, these cases are sure to be seriously litigated. Generally, coordination assists in the settlement process

10

1   because the parties, at the Court's urging, are forced to create organized plans for mediation or

2   settlement.  If experience is a guide, coordination will not only lead to greater efficiencies in the

3   litigation process, it will also lead to coordinated settlement discussions.

4   **B.  A STAY OF ALL DARVON CASES PENDING IN CALIFORNIA STATE**

5   **COURTS IS NECESSARY AND WARRANTED TO EFFECT THE PURPOSES OF**

6   **COORDINATION**

7   The ends of justice will be well-served by ordering a stay of the pending Darvon actions.  A

8   brief stay pending determination of coordination will ensure the uniformity, consistency and

9   predictability of pre-trial discovery and other proceedings.

10   Currently, there is outstanding case activity which requires a stay in various cases.  All the

11   cases have upcoming court requirements such as motion work and Case Management Conferences.

12   Petitioning Plaintiff will be requesting an order staying the California Darvon cases pending

13   resolution of the Petition for Coordination.  This limited stay will prevent the wasteful expenditure of

14   resources to individual case motions while coordination is considered.  Additionally, a stay will

15   prevent inconsistent rulings and a waste of judicial resources pending a decisions by the assigned

16   judge on the Petition for Coordination.

17   **III.**

18   **CONCLUSION**

19   As set forth above, all factors to be considered demonstrate that coordination of these

20   included actions is appropriate as it is in the interest of judicial economy and the parties.

21   DATED:  _Oct. 23, 2012_

22   Respectfully submitted,

23   By _Elise R. Sanguinetti_

24   ELISE R. SANGUINETTI (CA SBN: 191389)
     AMANDA J. GREENBURG (CA SBN: 255767)

25   KHORRAMI, LLP

26   360 22nd Street, Suite 640
     Oakland, California 94612

27   Telephone: (510) 867-2000
     Facsimile: (866) 546-7377

28   Email:  ESanguinetti@khorrami.com

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR COORDINATION

EXHIBIT D

1    ELISE R. SANGUINETTI (SBN 191389)
     AMANDA J. GREENBURG (SBN 255767)
2    KHORRAMI, LLP
     360 22nd Street, Suite 640
3    Oakland, California 94612
     Telephone: (866) 546-7266
4    Facsimile: (866) 546-7377

5

6    RICHARD SALKOW (SBN 204572)
     SALKOW LAW, APC
7    1540 7th Street, Suite 206
     Santa Monica, California 90401-3432
8    Telephone: (310) 451-8484
     Facsimile: (310) 451-8486

9

10    Attorneys for Plaintiffs

11

12           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13             IN AND FOR THE COUNTY OF SAN FRANCISCO

14    TERRY FREITAS, et al.,            )   CASE NO.: CGC-11-515537
                                    )
15           Plaintiffs,          )   **MEMORANDUM OF POINTS AND**
                                    )   **AUTHORITIES IN SUPPORT OF**
16    vs.                               )   **PLAINTIFFS' MOTION TO STAY**
                                    )   **PROCEEDINGS PENDING**
17    MCKESSON CORPORATION, et al.,    )   **RESOLUTION OF PLAINTFFS'**
                                    )   **PETITION FOR COORDINATION**
18           Defendants.        )
                                    )
19                                       )   DATE: December 6, 2012
                                      )   TIME: ~~9:00am~~ 9:30am.
20                                       )   DEPT: 302

21

22        Plaintiffs submit this Memorandum of Points and Authorities in Support of their Motion to

23    Stay Proceedings Pending Resolution of Plaintiffs' Petition For Coordination. Plaintiffs have

24    brought the exact same motion in all Darvon cases filed in San Francisco.

25                     I.    **STATEMENT OF FACTS**

26        This lawsuit concerns personal injuries related to Plaintiffs' ingestion of prescription

27    medication containing the active ingredient Propoxyphene for treatment of mild to moderate pain.

28

                                    - 1 -

The Propoxyphene medication was marketed and sold as generic and/or brand-name drugs under various names including Darvon and Darvocet. In addition to the Plaintiffs bringing this lawsuit, there are additional cases before this Court and cases filed in Los Angeles Superior Court making similar allegations regarding personal injuries related to prescription medications containing the active ingredient Propoxyphene.

In the Propoxyphene cases before the Court, Defendants have brought numerous motions. The following Motions are currently pending before this Court:

1. *Terry Freitas and Lori Freitas, etc., et al., vs. McKesson Corporation, et al.* CGC-11-515537:

   a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Vintage Pharmaceuticals, LLC et al., and joined by multiple Defendants.

   b. Demurrer on Ground of Improper Joinder brought by Vintage Pharmaceuticals, LLC and joined by multiple Defendants.

   c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

2. *Mary Keene and George Keene, et al., vs. McKesson Corporation, et al.* CGC-11-510631:

   a. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

   b. Motion to Dismiss for Forum Non Conveniens brought by Teva Pharmaceuticals USA, Inc..

   c. Motion to Sever Based on Improper Joinder brought by Teva Pharmaceuticals USA, Inc..

3. *Tenessia Posey, et al., vs. McKesson Corporation, et al.* CGC-11-515995:

   a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne Pharmaceuticals, Inc. and joined by multiple Defendants.

   b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals, Inc. and joined by multiple Defendants.

   c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

- 2 -

4.  *Wendell Rice and Patricia Rice, et al., vs. McKesson Corporation et al.* CGC-11-515897:

    a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne Pharmaceuticals, Inc. and joined by multiple Defendants.

    b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals, Inc. and joined by multiple Defendants.

    c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

5.  *Harry D. Witthauer, et al., vs. McKesson Corporation et al.* CGC-11-515994:

    a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne Pharmaceuticals, Inc. and joined by multiple Defendants.

    b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals, Inc. and joined by multiple defendants.

    c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

In addition to these five cases filed in San Francisco Superior Court, there are two additional cases filed in Los Angeles Superior Court that concern injuries related to Propoxyphene ingestion. The additional cases are *Lawrence B. Fields Robinson, etc. et al., vs. Eli Lilly and Company, et al.*, KC062737 and *Rachel Rentz et al., vs. McKesson Corporation et al.,* BC483765. Further, it is expected that additional cases related to Propoxyphene ingestion will be filed in California Courts in the near future.

These motions were scheduled to be heard on November 6, 2012 and November 8, 2012. This Court allowed the motion date to be pushed back until December 18, 2012 to allow the Judicial Council time to review the coordination. As of today's date, a decision has not been made by the Judicial Council. Also, Plaintiffs' will be filing an Application for Stay Order before the Judicial Council.

On October 23, 2012, the Plaintiffs in the above referenced cases filed a Petition for Coordination to consolidate these cases pursuant to *California Code of Civil Procedure § 404, et seq.* and California Rules of Court 3.500, *et seq.* In order to avoid the possibility of conflicting rulings,

- 3 -

avoid prejudice to the parties and promote judicial efficiency, Plaintiffs now ask this Court to stay

ruling on and hearing the motions in these various Propoxyphene cases pending a decision on

coordination from the Judicial Council.

## II. ARGUMENT

**A.     A Stay Should Be Granted Pending a Decision on the Plaintiffs' Motion for Coordination.**

This Court has the authority to grant Plaintiffs' request to stay the current proceedings

pending a decision on coordination of the California Propoxyphene cases, as "[t]rial courts generally

have the inherent power to stay proceedings in the interests of justice and to promote judicial

efficiency." *Freiberg v. City of Mission Viejo*, 33 Cal. App. 4th 1484, 1489 (1995).

California Code of Civil Procedure § 187 gives this Court discretion to "adopt any suitable

process or mode of proceeding . . . which may appear most comfortable to the spirit of this code."

*Cal. Civ. Proc. Code* §187. This Court's authority to stay proceedings is part of its "inherent power"

to "insure the orderly administration of justice". *Bailey* v. *Fosca Oil Co. Ltd.,*(1963) 216 Cal. App. 2d

813,817-818 (approving of trial court's stay pursuant to Cal. Civ. Code § 187). Moreover, the

California Rules of Court Rule 3.515(a) allows courts to stay proceedings in any action being

considered for coordination. Specifically, Rule 3.515 provides:

> (a) Any party may file a motion for an order under Code of Civil
> Procedure section 404.5 staying the proceedings in any action being
> considered for, or affecting an action being considered for, coordination,
> or the court may stay the proceedings on its own motion.

As noted earlier, this action involves plaintiffs who suffered heart related injuries as the result

of using various name brand and generic Propoxyphene containing medications.  It involves factual

allegations and claims for relief that are similar to numerous other cases that have been filed in

California.  Coordination of all the California Propoxyphene cases makes sense.  All the cases

involve the same defective medication, allege the same or substantially similar causes of action,

involve the same or substantially similar issues of law, and involve the same or substantially similar

issues of material fact. As of October 23, 2012, Plaintiffs have filed a Petition for Coordination of the

- 4 -

1 | cases in this action. An analysis of all factors to be considered regarding consolidation set out in

2 | California Code of Civil Procedure § 400 *et seq.* weighs in favor of consolidation. (See Declaration

3 | of Elise Sanguinetti indicating that the petition has been filed and can be produced to this Court upon

4 | request.) Thus, it is very likely that these cases will indeed proceed to coordination.

5 | In multiple cases, Defendants have filed multiple Demurrers on the ground of Improper

6 | Joinder, multiple Motions to Dismiss for Forum Non Conveniens and multiple Motions to Quash

7 | Service. All of these motions concern issues that should be brought before the coordination judge

8 | and uniformly decided at one time so as to avoid inconsistent rulings and promote the interests of

9 | justice. If the Judicial Council orders coordination, the transferee court will address the same issues

10 | as this Court if the case is not stayed.

11 | If this Court proceeds with the pending Motions, the Court will have to continue to expend

12 | time and resources on issues that may ultimately be addressed in another forum after coordination.

### III.    CONCLUSION

14 | For the foregoing reasons, the Plaintiffs' Motion To Stay Proceedings Pending Resolution of

15 | Plaintiffs' Pending Petition for Coordination should be GRANTED.

16 | DATED:  November 9, 2012                          KHORRAMI, LLP

By: _____
ELISE R. SANGUINETTI

- 5 -

# EXHIBIT E



DEFENDANT'S
EXHIBIT
_E_

1  ELISE R. SANGUINETTI (CA SBN: 191389)
   AMANDA J. GREENBURG (CA SBN: 255767)
2  KHORRAMI, LLP
   360 22nd Street, Suite 640
3  Oakland, California 94612
   Telephone: (510) 867-2000
4  Facsimile: (866) 546-7377
   Email: ESanguinetti@khorrami.com
5
6  TREVOR B. ROCKSTAD (CA SBN: 277274)
   DAVIS & CRUMP PC
7  1712 15th Street, Suite 300
   Gulfport, MS  39501
8  Telephone: (228) 863-6000
   Facsimile: (228) 864-0907
9  Email: Trevor.Rockstad@daviscrump.com
10
11 TARA TABATABAIE (OK Bar No. 21838)
   THE SILL LAW GROUP PLLC
12 14005 N. Eastern Avenue
   Edmond, OK 73103
13 Tel: (405) 509-6300
   Fax: (405) 509-6268
14 Email: tara@sill-law.com
15 STEPHEN J. RANDALL (CA SBN:
   PEARSON RANDALL & SCHUMACHER, PA
16 100 S. Fifth Street
   Suite 1025
17 Minneapolis, MN 55402
   612-767-7500
18 Fax: 612-767-7501
19 Email: srandall@prslegal.com
20 Attorneys for JCCP Petitioners
21              JUDICIAL COUNCIL OF CALIFORNIA

22           CHAIR OF THE JUDICIAL COUNCIL

23 RACHEL RENTZ, et al.,                    )    LOS ANGELES COUNTY SUPERIOR
                                            )    COURT CASE NO.: BC 483765
24              Plaintiffs,                  )
                                            )    DECLARATION OF ELISE
25      vs.                                  )    SANGUINETTI IN SUPPORT OF
                                            )    PETITION FOR COORDINATION
26 MCKESSON CORPORATION, et al.,           )    _[Filed concurrently with Petition for_
                                            )    _Coordination; Points and Authorities in_
27              Defendants.                  )    _Support of Petition for Coordination]_
                                            )
28 _____  )

                                    1

DECLARATION OF ELISE SANGUINETTI IN SUPPORT OF PETITION FOR COORDINATION

I, Elise Sanguinetti, declare and state as follows:

1.    I am an attorney at law duly licensed to practice law in all courts of the State of California and am a managing attorney at Khorrami LLP. I have personal knowledge of the matters set forth herein, and if called upon to testify, would be competent to do so under oath.

2.    This petition is brought for the purpose of seeking coordination of seven (7) complaints, which involve claims of numerous injured plaintiffs, alleging use of the prescription medication containing the active ingredient Propoxyphene sold under various generic and brand names including Darvon and Darvocet (hereinafter the "Product") and plaintiffs' consequent injuries including, but not limited to, cardiac injuries and/or sudden death. Each complaint asserts causes of action arising from common claims and allegations against the defendants and each involves identical issues of law.

3.    The names of the parties to all known pending product cases in California state courts and the names and address of each party's attorney of record, along with the complete title of each included action are listed in Exhibit 1 attached hereto. The petitioners seek to coordinate all actions included in Exhibit 1.

4.    All of the cases allege generally similar theories of liability, including strict liability, negligence, breach of implied and express warranties, and violations of Business and Professions Code 17200 and 17500 arising from defendants' manufacture and distribution of the Product.

5.    At present, no other action is known to be pending in a court of this state that shares common questions of fact or law with the included actions.

6.    The subject cases are complex pursuant to California Rule of Court 3.400(b) and (c). Not only are these cases a mass tort, they will include the following: (1) Numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; (2) Management of a large number of witnesses or a substantial amount of documentary evidence; and (3) Coordination with related actions pending in one or more courts in other counties, states or countries, or in federal court. The subject cases arise out of injuries sustained by plaintiffs due to their exposure to the Product, therefore, the cases will include complex scientific and medical issues which consistently

2

1   trigger numerous pre-trial motions.  The subject cases assert claims against large pharmaceutical

2   companies and will, therefore, necessarily involve several corporate witnesses, scientific researchers,

3   advertising and marketing consultants as well as multiple treating physicians for each plaintiff.  In

4   addition, cases involving manufacture, marketing and sale of a prescription drug often result in the

5   production of large amounts of documentary evidence. The cases were not originally filed as complex

6   cases.  However, pursuant to California Rule of Court (c) (5), the cases are complex as they are claim

7   involving mass tort.

8          7.    The actions sought to be coordinated meet the standards described in California Code

9   of Civil Procedure section 404.1.  The actions involve common questions of law and fact that

10  predominate and are significant to the litigation.  These common questions of law and fact include,

11  but are not limited to:

12          a)    whether there are design and/or manufacturing defects in the defendants'

13                Product;

14          b)    Whether the defendants failed to adequately warn physicians and consumers

15                regarding all known and knowable risks associated with the Product and/or

16                whether warnings were vitiated by defendants' advertising and marketing

17                campaigns;

18          c)    Whether the defendants' conduct in designing, manufacturing, and marketing

19                of the Product fell below the applicable duties of care owed by the defendants

20                to the plaintiffs;

21          d)    Whether the defendants intentionally, deliberately, knowingly, carelessly,

22                recklessly, or negligently misrepresented, omitted, concealed or suppressed

23                material and important information regarding the true and known risks of the

24                Product from the plaintiffs and their physicians;

25          e)    Whether the defendants' misconduct constitutes breaches of any warranties

26                recognized by law;

27          f)    Whether the defendants' conduct constitutes negligence;

28

3

DECLARATION OF ELISE SANGUINETTI IN SUPPORT OF PETITION FOR COORDINATION

g)    Whether the plaintiffs are entitled to compensatory damages and/or restitution, and if so, the method by which such relief should be determined; and

h)    Whether the defendants are liable for punitive or exemplary damages, a matter to be determined when appropriate and if so, the amount necessary and appropriate to punish them for their conduct, to deter, and to fulfill the other policies and purposes of punitive damages.

8.    Coordination of these related actions will serve the convenience of the parties, witnesses and counsel because discovery in these overlapping actions is likely to be duplicative if they proceed separately. Coordination of these actions will prevent repetitive and redundant depositions regarding the same issues by witnesses. In addition, without coordination, duplicative motions concerning the adequacy of the pleadings, the admissibility of scientific evidence and other matters are sure to arise.

9.    All cases (except the Rentz case) were filed in October and November of 2011. Shortly after filing, Defendant Eli Lilly & Company removed all five cases to federal court where they were quickly transferred and made part of In re: Darvocet, Darvon and Propoxyphene Products Liability Litigation, MDL No. 2226, before the Honorable Danny C. Reeves in the United States District Court for the Eastern District of Kentucky. Once in the MDL, counsel for plaintiffs and petitioners fought to have their respective cases remanded back to California State Court. As such, the coordination of these actions will not severely disrupt the progress of any individual action. Below is a timeline of this activity:

| Case Name/No. | Date Filed in California Superior Court | Removal by Defendants to USDC NDCA | Remand Motions Filed by Pltfs | Remand Granted by MDL Judge remanding case back to CA Sup. Court |
|---|---|---|---|---|
| *Freitas, et al.,* CGC-11-515537 | 10/31/2011 | 12/6/2011 | 1/4/2012 in NDCA; re-filed on 2/27/2012 in MDL | 7/2/2012 |
| *Keene, et al.,* CGC-11-516031 | 11/18/2011 | 1/24/2012 | 7/4/2012 | 7/31/2012 |
| *Rice, et al.,* CGC-11-515897 | 11/15/2011 | 1/24/2012 | 7/13/2012 | 8/7/2012 |

4

| | | | | |
|---|---|---|---|---|
| *Posey, et al.,* CGC-11-515995 | 11/18/2011 | 1/24/2012 | 7/14/2012 | 8/7/2012 |
| *Witthauer, et al.,* CGC-11-515994 | 11/18/2011 | 1/24/2012 | 7/14/2012 | 8/7/2012 |
| *LBFR et al.,* KC062737 | 12/16/2011 | 1/30/2012 | 5/18/2012 | 7/16/2012 |
| *Rentz et al.* BC 483765 | 5/3/20012 | N/A | N/A | N/A |

10.     Absent coordination, redundant duplicative discovery and motion practice in these overlapping actions would waste litigant and judicial resources.   Duplicative discovery will result in unnecessary copying costs, expert costs, depositions costs and filing fees.  In addition, the need to take the same depositions in each of these actions will likely increase travel costs for all the litigants' counsel.

11.     Failure to coordinate these actions creates a risk of inconsistent or duplicative judgments and orders.  Without coordination, two or more separate courts will decide essentially the same issues and may render different rulings on liability and other issues.  Coordination of these actions in a single court would avoid this possibility.

12.     Absent coordination, settlement of the individual actions is unlikely.  Generally, the primary motivating factors for settling cases are the elimination of further litigation, the avoidance of the risk of an adverse judgment at trial and the avoidance of additional litigation costs.  If the cases are not coordinated, the incentive to settle any of these cases is drastically reduced.  Settlement of one of these cases may not end the litigation in the other two cases, leaving defendants with a continued risk of adverse judgment and substantial litigation costs.  Only if the defendants are able to settle these claims in a coordinated action is there any realistic possibility of settlement.

8.     Attached as Exhibit 2 is a true and correct copy of the complaint, *Terry Freitas and Lori Freitas, husband and wife, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.,* Case No. CGC-11-515537, filed on 10/31/2011 (San Francisco County Superior Court);

9.     Attached as Exhibit 3 is a true and correct copy of the complaint, *Mary Keene and George Keene, wife and husband, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.,* Case No. CGC-11-516031, filed on 11/18/2011 (San Francisco County Superior Court);

DECLARATION OF ELISE SANGUINETTI IN SUPPORT OF PETITION FOR COORDINATION

1    10.    Attached as Exhibit 4 is a true and correct copy of the complaint, *Wendell Rice and*

2    *Patricia Rice, husband and wife, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case

3    No. CGC-11-515897, filed on 11/15/2011 (San Francisco County Superior Court);

4    11.    Attached as Exhibit 5 is a true and correct copy of the complaint, *Tenessia Posey, et*

5    *al., vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. CGC-11-515995, filed on

6    11/18/2011 (San Francisco County Superior Court);

7    12.    Attached as Exhibit 6 is a true and correct copy of the complaint, *Harry D. Witthauer,*

8    *a married man, et al. vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. CGC-11-

9    515994, filed on 11/18/2011 (San Francisco County Superior Court).

10    13.    Attached as Exhibit 7 is a true and correct copy of the complaint, *Lawrence B. Fields*

11    *Robinson, etc., et al., vs. Eli Lilly and Company, et al.*, Case No. KC 062737 filed 12/16/2011 (Los

12    Angeles County Superior Court).

13    14.    Attached as Exhibit 8 is a true and correct copy of the complaint, *Rachel Rentz, et*

14    *al.,vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. BC 483765 filed 5/3/2012 (Los

15    Angeles County Superior Court).

16    I declare under penalty of perjury under the laws of the State of California that the foregoing

17    is true and correct.

18    Executed this 23 day of October, 2012, at _____Oakland_____, California.

19

20    *[signature]*

21    ELISE SANGUINETTI

22

23

24

25

26

27

28

6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Michael Wilner.

The case number on all documents filed with the Court should read as follows:

## CV12- 9977 GW (MRWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>DEUNA BROWN, et al | **DEFENDANTS**<br>MCKESSON CORPORATION, et al. |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>THE SIZEMORE LAW FIRM<br>2101 Rosecrans Ave., Ste. 3290, El Segundo, CA 90245<br>Tel.: 310.322.8800  Fax: 310.322.8811 | Attorneys (If Known)<br><br>O'HAGAN SPENCER, LLP<br>1600 Rosecrans Ave., Bldg 7 - Ste 320, Manhattan Beach, CA 90266<br>Tel.: (310) 727-3330  Fax: (310) 727-3331<br>Attorneys for: MYLAN INC. and MYLAN PHARMACEUTICALS INC. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding
☑ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No     ☑ MONEY DEMANDED IN COMPLAINT: $ Over $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1332; 28 U.S.C. 1441; Products Liability (Diversity); Federal pre-emption of claims for damages due to ingestion of prescription medication with Propoxyphene

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☑ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number: _____ CV12 9977

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes

If yes, list case number(s): 12-cv-04399-PSG(Ex); 12-cv-00818-JGW(PLAx); 11-cv-06147-PSG(Ex)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or

☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Alabama, Delaware, Indiana, Kentucky, Maryland, Massachusetts, North Carolina, Pennsylvania, Missouri, West Virginia, New Jersey, Nevada, Ireland |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

\* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved                                                                                                        .

X. SIGNATURE OF ATTORNEY (OR PRO PER): /s/ Julian G. Senior          Date November 20, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |